FILED

2020 Nov-30  PM 03:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | | |
|---|---|---|
| **JAMIE MILLS,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **6:17-cv-00789-LSC** |
| | ) | |
| | ) | |
| **JEFFERSON S. DUNN,** | ) | |
| **Commissioner, Alabama** | ) | |
| **Department of Corrections,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OF OPINION

This is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by Petitioner Jamie Mills ("Mills"), a death row inmate at Holman Correctional Facility in Atmore, Alabama. Mills challenges the validity of his 2007 conviction on three counts of capital murder and sentence of death in the Circuit Court of Marion County, Alabama. Upon thorough consideration of the entire record and the briefs submitted by the parties, the Court finds that Mills' petition for habeas relief is due to be denied.

## I.    FACTS OF THE CRIME

The Alabama Court of Criminal Appeals ("ACCA") quoted the trial court's

lengthy description of the details of the killings and the surrounding circumstances

as follows:

> During the late afternoon of June 24, 2004, the defendant, 30 year old
> Jamie Ray Mills, and his common-law wife, JoAnn Mills, went to the
> home of Floyd and Vera Hill on County Road 54 in Guin, Marion
> County, Alabama, for the purpose of robbing them. . . . Mrs. Hill, 72
> years old, was diabetic and in poor health and was cared for by her
> husband of 55 years, Floyd Hill, a spry gentleman 15 years her senior.
> At 87 years old, Mr. Hill cared for the needs of his ailing wife, to
> include administering her prescription drugs which he kept in a locked
> tackle box on the kitchen table. To ensure that her prescription drugs
> were administered properly and timely, he set his alarm clock to alarm
> every four hours. Although the Hills lived alone, their adult
> grandchildren who resided in the area frequently checked on their
> grandparents. Although both Hills were retired, they frequently held
> yard sales, no doubt more so to keep themselves occupied and working
> than to augment their Social Security income. Mr. Hill was known by
> the employees of the local Amoco service station (where defendant
> Mills was last employed prior to the murders) to carry large sums of
> cash in his pocket, always paying for his gas in cash.
>
> Though Mills denied knowing either of the Hills, there was evidence
> from which the jury could have concluded that Mills, out of work at
> the time, certainly did know the Hills and preconceived a plot to rid
> them of their cash . . . and, then brutally executed them with a
> machete, tire tool and ball-peen hammer. A detailed factual account of
> this horrendous, gutless and cowardly act follows.
>
> Shortly after dark on June 24, 2004, following repeated failed attempts
> by Angela Jones to check on her grandparents by phone, Jones went to
> the residence of her grandparents, Floyd and Vera Hill. It appeared as
> if the Hills were home; however, the door was locked and knocks on
> the door resulted in no response. Angela summoned the Guin Police
> Department for a welfare check. Officer Larry Webb arrived at the

2

residence in approximately three or four minutes. Upon Webb's arrival, he was informed by Angela Jones that her family had spoken to the Hills shortly after 2:00 p.m., at which time they were fine. Officer Webb and Mrs. Jones then knocked on the doors and windows with no response from the Hills. Webb called the Hills' home from his cell phone. It was detected that the phone was ringing on his cell phone, but there was no noticeable ring coming from inside the Hills' home. Officer Webb then shined his flashlight into the house from the front porch, and Angela noticed that Vera Hill's bed was empty and made, and her walker was in the living room. Mr. Hill's alarm was sounding for Mrs. Hill's medication, but no one stirred in the home. Mrs. Jones became fearful that something was terribly wrong. Webb then moved to the pre-fabricated building on the property (enclosed with x-type lattice and polyethylene type plastic) where the Hills had yard sale items stored. Because the door was padlocked, Webb pulled a small bench to the door and climbed up on the bench to look over the door.

Officer Webb saw Floyd Hill lying on his back at the rear of the building in a pool of blood with a bloody towel thrown over his face. Mr. Hill's walking cane was across his lower legs. Webb then saw Vera Hill lying on her right side just inside the door. She was in a pool of blood and her head and face were bloody. Vera Hill moved her left arm.

At approximately 8:42 p.m., Webb notified 911 to send an ambulance, and then called for additional backup (Guin Police Chief Bryan McCraw and District Attorney Jack Bostick). Webb cut the plastic wall and tore away the lattice to gain entrance into the building where he checked Vera Hill's condition. She was still breathing. Webb moved to Floyd Hill and found him to be cold to the touch with no pulse. Webb then noticed several long bloody gashes on Mrs. Hill's head. When asked what happened, Vera Hill repeatedly stated, 'Let me out of here.' Once medical assistance had arrived, Vera Hill was transported by ambulance to the Winfield hospital. Floyd Hill was pronounced dead at the scene.

The scene was secured and a joint investigation was initiated by the Guin Police Department, the Marion County District Attorney's

Office, and the Alabama Department of Forensic Science. The crime scene was processed, photos were taken, blood samples were collected, and Vera Hill's clothing and fingernail clippings were obtained.

During the processing of the victims' home and belongings, it was discovered that Floyd Hill's wallet, Vera Hill's purse, and a green padlocked tackle box containing Vera Hill's medication had been taken from the residence along with a police scanner, and the Hills' phone, which had been cut from the phone line.

. . . Upon completion of the autopsy of Floyd Hill, the cause of death was determined to be blunt and sharp force injury to the head and neck.

Vera Hill later died on September 12, 2004 at the home of her daughter, Brenda Barger, while under the care of Hospice, two and a half months after having been transferred from the Winfield hospital to UAB Hospital in Birmingham, Alabama, where she was treated for brain injuries, a depressed skull fracture on the back of the head, fractures around her left eye, fractures to the nasal cavity, broken/fractured neck, and crushed hands . . . . Upon completion of the autopsy of Vera Hill, the cause of death in her case was determined to be complications of blunt head trauma.

At approximately 11:15 p.m. on June 24, 2004, Marion County District Attorney Investigators Tommy Moore and Ken Mays interviewed the Hills' next door neighbor, Jennifer Yaden, at which time they were informed that Yaden had noticed a white late model four-door sedan going by her house several times earlier that day. She also observed this same vehicle parked in the Hills' drive. At approximately 12:05 a.m. on June 25, 2004, Investigators Moore and Mays returned to the crime scene and discussed with Guin Police Chief Bryan McCraw and Officer Larry Webb the information they had obtained from Yaden. Both McCraw and Webb advised the investigators of a local man named Jamie Mills who drove a white car matching that described by Yaden. At this point, a patrol unit was sent to the residence of Jamie and wife, JoAnn Mills, but it appeared as if no one was home.

Investigator Moore asked Chief McCraw to send a car to the Mills'
residence on a regular basis to see if the Mills were home for
questioning.

At 9:45 a.m. on June 25, 2004, Guin Police Department Officers G.B.
Blaylock and Stanley Webb arrived at the Mills' residence to find
Jamie and JoAnn Mills attempting to leave their residence in a small
white 1990 two-door Nissan Infiniti M30. The officers pulled
crossways of the drive, blocking the Mills' attempted exit. Officer
Blaylock then asked Jamie Mills to back the car up in the drive so that
Blaylock could talk to him. After doing so, Jamie Mills was then
transported to the Guin City Hall for questioning about his
whereabouts on June 24, 2004. At this time, Jamie Mills denied any
knowledge of the Hills and stated that he and JoAnn were in Brilliant
on June 24, 2004 looking at houses prior to going to his father's
home . . . where he and JoAnn spent the night.

Marion County District Attorney Investigator Ted Smith and District
Attorney Jack Bostick arrived at the Mills' residence to question
JoAnn Mills, who was on probation at the time, regarding her
whereabouts at the time the Hills' attack occurred. While being
questioned by Investigator Ted Smith, JoAnn Mills gave consent for
the search of the Mills' home, white two-door sedan, and the trunk of
the vehicle. In plain view in the car trunk was a green tackle box with a
cut padlock matching the description of the tackle box in which Vera
Hill's medication was kept. Also in plain view was a large blue duffel
bag that appeared to be splattered with blood. At this time, JoAnn
Mills was read her *Miranda* rights, but she waived her rights and gave
a statement. Guin Police Chief Brian McCraw and Officer Webb were
then called to the residence and a search warrant was obtained. The
search was conducted by officers from the Marion County Drug Task
Force, the A.B.I. and the Guin Police Department. During this time,
Jamie Mills was transported back to his residence where he was later
placed under arrest for capital murder and transported to the Marion
County Jail.

The search of the items contained in the vehicle's trunk revealed that
the green tackle box contained numerous pill bottles with

prescriptions belonging to Vera Hill. The duffel bag contained an assortment of items including one large concrete block, one pair of size 12 tennis shoes with blood stains on them, one blood-stained pair of work pants with Jamie Mills' name on the inside tab, one black t-shirt with blood stains, one pair of size 5 ½ tennis shoes with blood stains, one telephone with cut cord attached, one man's wallet containing the driver's license of James Floyd Hill, one ladies' purse with papers identifying it as Vera Hill's, one machete with blood and hair on it, one ball-peen hammer with blood on it wrapped in paper, and one lug nut tire tool. The items from inside the trunk were itemized and photographed before the car, toolbox, duffel bag and contents were handed over to forensic science for examination.

DNA analysis was later performed on the machete, hammer, tire tool, black t-shirt and black pants. Test results revealed that the primary source of blood found on the machete matched that of Floyd Hill and the secondary source matched that of Vera Hill. The blood found on the ball-peen hammer matched that of Vera Hill. The blood found on the tire tool was a mixture, with Vera Hill being the major contributor and Floyd Hill being the minor contributor. The blood on the black t-shirt matched that of Vera Hill. The blood on the pants (containing the tab with Jamie Mill's name) matched that of Floyd Hill.

On August 22, 2007 during the trial of defendant Jamie Mills, JoAnn Mills testified that on June 23, 2004, she and her husband, Jamie Mills, had stayed up all night smoking methamphetamine at their residence. On Thursday, June 24, 2004, they stayed at their residence until around 5:00 p.m. before going to Webster's Market grocery (7270 U.S. Highway 43 in Guin, Alabama) to buy cigarettes. After the cigarettes had been purchased, she and Jamie left Webster's and stopped in Fred's store parking lot to talk to JoAnn's cousin, Brandy West. After leaving Fred's parking lot, Jamie told JoAnn that he was going to talk to a man about some money and for her to just follow his lead. Upon reaching the Hills' residence around 5:15 p.m., the Hills allowed the Mills into their home where Jamie attempted to make several phone calls from the Hills' phone as JoAnn sat and talked with the Hills. According to JoAnn, Mr. Hill obviously knew Jamie and referred to him by name. After Jamie had used the phone and both

couples had talked for awhile, Vera Hill wanted to show JoAnn Mills some of their yard sale items that were stored in their shed. Due to the rainy weather, Floyd Hill unlocked the padlocked building and opened the door while Vera Hill, Jamie Mills and JoAnn waited on the porch. Floyd Hill then returned and gave the women the umbrella so they could go on to the building. Floyd Hill went back into the house to get a light fixture and then returned to the building. After the Hills had shown the Mills their sale items, Jamie Mills continued to talk to Floyd Hill in the shed while the two women proceeded to walk back to the porch.

JoAnn Mills then testified that she heard a loud noise and saw a silhouette through the building's plastic siding of what appeared to be Jamie Mills with something raised over his shoulder 'with both hands, as if he was swinging something.' JoAnn Mills then followed Vera Hill back into the shed to see what had happened. Upon entering the shed, JoAnn saw Floyd Hill lying on the ground and saw Jamie Mills hit Vera Hill in the back of her head with a hammer. When Mrs. Hill attempted to get up he struck her again with the hammer.

JoAnn further stated that she stood with her eyes closed in the corner of the building as she listened to the sound of Jamie Mills repeatedly striking Floyd and Vera Hill. She could hear the sound of Jamie's feet scuffling on the ground as he went back and forth between the two victims. After the sounds of Jamie striking the Hills stopped, JoAnn Mills was then handed a hammer, a tire tool, and a machete by Jamie Mills and witnessed Jamie Mills place a white towel over Floyd Hill's head to silence the gurgling sounds coming from Mr. Hill. Jamie and JoAnn Mills then exited the shed. Jamie padlocked the door shut and the two went back into the Hills' home. Inside the Hills' home, Jamie and JoAnn went through the house and took a padlocked tackle box, Vera's purse, the phone, and the police scanner before leaving the residence and returning to their residence on County Road 83.

Upon reaching the Mills' residence, Jamie brought all the items from the Hills' residence into the kitchen. JoAnn took a shower. Jamie and JoAnn then went through the items taken from the Hills' residence (wallet, purse, medication contained in the green tackle box) and

placed them along with the hammer, tire tool and machete in a bag. The Mills recovered about $140 cash from the Hills. Jamie then took a shower and called Benji Howe, a known drug abuser in the area. Benji Howe came over to the Mills' home and purchased some pain pills. After Benji left the Mills' residence, Jamie and JoAnn placed the bag containing the items from the Hills' residence in the shed on their property before going to Jamie's father's residence in Hamilton, Alabama, to play dominos and spend the night.

The next morning, June 25, 2004, Jamie and JoAnn Mills returned to their residence to find that dogs had torn into the bag containing the bloody items from the Hills' residence. JoAnn retrieved a large blue duffel bag and the Mills placed into the bag the machete, hammer, tire tool, telephone, wallet, purse, the clothes the Mills had worn at the time of the attacks, and one heavy cement block. The Mills then placed the duffel bag in the trunk of their car along with the green tackle box. As the two were leaving the residence to obviously dispose of the duffel bag and tackle box, they were stopped by Guin Police Officers G.B. Blaylock and Stanley Webb.

(C.R. 123–29.)

*Mills v. State*, 62 So. 3d 553, 557–61 (Ala. Crim. App. 2008).

## II.    PROCEDURAL HISTORY

On December 14, 2004, Mills was indicted by a grand jury in Marion County, Alabama, on three counts of capital murder for the killings of Floyd Hill and Vera Hill. Count I charged him with the robbery-murder of Floyd, *see* § 13A-5-40(a)(2), Ala. Code 1975; Count II charged him with the robbery-murder of Vera, *see* § 13A-5-40(a)(2), Ala. Code 1975; and Count III charged him with murder

made capital because he killed Floyd and Vera by one act or pursuant to one scheme or course of conduct, *see* § 13A–5–40(a)(10), Ala. Code 1975. (C1 32-33.)

Mills pled not guilty and proceeded to trial. The State's theory of the case was that Mills and his wife, JoAnn, were high on methamphetamine and looking for a way to get money to purchase more drugs when they decided to rob Floyd and Vera Smith, an elderly couple known to have large amounts of cash at their home. (R1. 658, 690, 693, 795, 913-14.) The State's evidence consisted primarily of the testimony of JoAnn that she and Mills had both been up for over 24 hours using methamphetamine and that it was Mills who attacked the victims in her presence (R1. 913-14, 917); evidence that the victims' belongings and murder weapons were found in the trunk of the Millses' car (R1. 548-49, 553-55); and the testimony of Kenneth Snell, the State's medical examiner, that Vera Hill's death due to bronchopneumonia was caused by the assault. (R1. 511.)

Mills chose to testify at trial. (C. 16-18, 59-62 ¶¶117-23). He testified that he was at home with JoAnn at the time of the offense and had nothing to do with the murders (R1. 785-812); that there was no lock on the trunk to their car so anyone could have planted the evidence there (R1. 792); that Benji Howe, a friend of Mills' and JoAnn's who was another initial suspect in the murders, had access to the Millses' home and car; and that Howe had stopped by their house on the evening

of the offense. (R1. 791-92, 798-801.) The State sought to discredit Mills'
testimony with testimony from Howe and his alibi witnesses, Thomas Green and
Melissa Bishop.

After closing arguments, the court asked for argument on whether to instruct
the jury on lesser-included offenses. (Vol. 10, Tab #R-23, R. 923.) The parties
raised the possibility of instructions on felony murder based on (1) nullification of
specific intent by methamphetamine-induced intoxication, and (2) assault and
robbery in the case of Vera Hill, based on the possibility that her death (more than
two months after the offense) was caused by pre-existing disease rather than her
wounds. (*Id*. at 923-25.) The court instructed Mills to discuss the matter with his
lawyers. (*Id*. at 925.) Mills decided not to instruct the jury on any lesser-included
offenses, and the court instructed the jury on only capital murder. (Vol. 10, Tab
#R-24, R. 941-48)

On August 23, 2007, Mills was convicted by a jury of all three counts of
capital murder. (R1. 959-60.) The sentencing phase of the trial occurred the next
day. The jury heard from Mills' sister, Kim Mobley, and his father's girlfriend,
Sherri Sanchez, in mitigation. The jury recommended the death penalty by an 11 to
1 vote. The trial court sentenced Mills to death on September 14, 2007. The court
found the existence of four aggravating circumstances: 1) Mills committed the

capital offenses while he was under a sentence of imprisonment, *see* § 13A–5–49(1), Ala. Code 1975 (Mills had a 2003 felony conviction for receiving stolen property and was on probation); 2) Mills committed the capital offenses during the course of a robbery, *see* § 13A–5–49(4), Ala. Code 1975; 3) the capital offenses were especially heinous, atrocious, or cruel compared to other capital offenses, *see* § 13A–5–49(8), Ala. Code 1975; and 4) Mills intentionally caused the death of two or more people by one act or pursuant to one scheme or course of conduct, *see* § 13A–5–49(9), Ala. Code 1975. The court found that three statutory mitigating circumstances existed—1) Mills did not have a significant history of prior violent criminal activity, *see* § 13A–5–51(1), Ala. Code 1975; 2) Mills committed the capital offenses while he was under the influence of extreme mental or emotional disturbance, *see* § 13A–5–51(2); and 3) Mills' age at the time of the offenses, *see* § 13A–5–51(7), Ala. Code 1975. The trial court also made the following findings as to non-statutory mitigating circumstances:

> "The defendant experienced a failed marriage nine to ten years before the murders. This marriage yielded two sons who, at the time of trial, were 15 and 14 years old, lived with their mother, and were described by the defendant's sister as 'good kids.' Defense counsel suggested to the jury that by giving the defendant life without parole, perhaps he would have a positive influence on his two boys and could guide them away from life's pitfalls that he had experienced.
>
> "The pre-sentence report notes and court files confirm that Mills was charged in 2001 for nonsupport of his two children. At the time of the

murders, he was $10,318.67 in arrears on his child support payments. There is little, if any, basis for mitigation that the defendant would be any more supportive of his sons than he was been in the past. To argue that perhaps if he received life without the possibility of parole he could have any positive influence on his children is an extremely weak mitigator at best.

"The defendant grew up in Haleyville, Alabama, in what his sister described as a 'good home.' After dropping out of high school in the eleventh grade, he worked as a truck driver and mechanic at various local establishments. His last employment was as a mechanic at Hightower's Amoco in Guin, Alabama, until he quit his job complaining of tendonitis shortly before the murders. Ben Hightower, the owner of the service station, rented a house to the Mills and described Jamie as 'no trouble' and 'a hard worker.'

(C.R. 133.) The court found that the four aggravating circumstances outweighed the three statutory mitigating circumstances and other non-statutory mitigating circumstances in sentencing Mills to death. (R1. 1019, 1032; C1 136.)

On September 24, 2007, JoAnn Mills pleaded guilty to murder and was sentenced to life imprisonment without the possibility of parole.

John Wiley and William Mathis, who represented Mills at trial, also represented him on direct appeal to the ACCA. They raised four arguments on direct appeal: (1) the trial court should have granted Mills' motion to suppress evidence that law enforcement seized from the trunk of his vehicle pursuant to a warrantless search; (2) the trial court erroneously allowed Dr. Snell to testify about the causes of death of the victims because his testimony was based on another

doctor's notes and findings; (3) the trial court erred when it did not allow Mills to elicit testimony about JoAnn's mental illness; and (4) the State did not disclose the alleged fact that it had a plea agreement with JoAnn. The State also appealed, arguing that the case should be remanded for the trial court to correct its sentencing order regarding the existence or nonexistence of aggravating circumstances. On June 27, 2008, the ACCA remanded the case with instructions to amend the sentencing order. *Mills*, 62 So. 3d at 572. On return from remand, the ACCA affirmed Mills' convictions and sentence of death. *Id.* at 573-74.

Mills' counsel, joined by new counsel from the Equal Justice Initiative in Montgomery, Alabama, then petitioned the Alabama Supreme Court for certiorari review, raising the same four arguments that Mills presented to the ACCA and an additional 21 issues on which Mills requested plain error review. The Supreme Court of Alabama granted certiorari to consider the following questions: (1) whether the trial court committed plain error in not instructing the jury on a lesser-included offense; (2) whether the admission of testimony from Dr. Snell regarding the causes of death for Floyd and Vera Hill was plain error; (3) whether the admission into evidence of the items seized from the trunk of Mills' vehicle was plain error; and (4) whether the trial court committed plain error in its instructions to the jury about weighing the aggravating circumstances and the mitigating

circumstances. On September 4, 2010, the Alabama Supreme Court affirmed Mills' convictions and sentence of death. *Ex parte Mills*, 62 So. 3d 574, 601 (Ala. 2010).

Mills filed a petition for certiorari to the United States Supreme Court on April 22, 2011, which was denied on June 29, 2012. *Mills v. Alabama*, No. 10-10180 (2012).

On November 21, 2011, Mills timely filed a petition pursuant to Alabama Rule of Criminal Procedure 32 (hereinafter, the "Rule 32 petition") raising (1) claims of ineffective assistance of counsel, (2) claims that the State committed violations of *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and *Napue v. Illinois*, 360 U.S. 264 (1959), (3) claims of juror misconduct, (4) a claim that Mills is innocent, and (5) claims challenging the death penalty and Alabama's method of execution. (C. 15-22, ¶¶ 14-27.)

On July 19, 2013, in a two-page order, the circuit court summarily dismissed and denied all the claims in Mills' petition except the juror misconduct claims, on which it scheduled an evidentiary hearing. (C. 303-04.) After the hearing, the circuit court denied those claims as well. (C. 422, 429.)

On December 11, 2015, the ACCA affirmed the denial of Rule 32 relief in a nearly 100-page opinion. *Mills v. State*, No. CR-13-0724 (Ala. Crim. App. Dec. 11,

2015) (mem. op.). On May 20, 2016, the Alabama Supreme Court affirmed. *Ex parte Mills*, No. 1150588 (Ala. May 25, 2016).

This is Mills' first and only application for federal habeas corpus relief, and it is timely filed.

## III.   STANDARDS OF FEDERAL HABEAS REVIEW

This action is governed by 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1345 (11th Cir. 2011). Pursuant to § 2254(a), a federal district court is prohibited from entertaining a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court" unless the petition alleges "he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). In other words, this Court's review of habeas claims is limited to federal constitutional questions. Claims pertaining solely to "an alleged defect in a [state] collateral proceeding" or to a "state's interpretation of its own laws or rules" do not provide a basis for federal habeas corpus relief under § 2254. *Alston v. Dep't of Corr., Fla.*, 610 F.3d 1318, 1325-26 (11th Cir. 2010) (quotation marks and citations omitted).

### A.     Exhaustion of State Remedies and Procedural Default

Under § 2254(b) and (c), a federal court must limit its grant of habeas applications to cases where an applicant has exhausted all state remedies. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). This means that "'[s]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process,' including review by the state's last court of last resort, even if review in that court is discretionary." *Pruitt v. Jones*, 348 F.3d 1355, 1358-59 (11th Cir. 2003) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S. Ct. 1728, 1732-33 (1999)). Alabama's discretionary direct review procedures bring Alabama prisoner habeas petitions within the scope of the rule. *Id.* The purpose of this requirement is to ensure that state courts are afforded the first opportunity to correct federal questions affecting the validity of state court convictions. *See Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998); *see also Smith v. Newsome*, 876 F.2d 1461, 1463 (11th Cir. 1989) ("Federal courts are not forums in which to relitigate state trials.") (citation omitted)). Moreover, "to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues. 'It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was

made.'" *Snowden*, 135 F.3d at 735 (quoting *Anderson v. Harless*, 459 U.S. 4, 5-6, 103 S. Ct. 276, 277 (1982)).

"[A]n issue is exhausted if 'the reasonable reader would understand the claim's particular legal basis and specific factual foundation' to be the same as it was presented in state court." *Pope v. Sec'y for Dep't of Corr.*, 680 F.3d 1271, 1286 (11th Cir. 2012) (quoting *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1344–45 (11th Cir. 2004)) (brackets in original omitted). If a petitioner fails to raise his federal claim to the state court at the time and in the manner dictated by the state's procedural rules, the state court can decide the claim is not entitled to a review on the merits, i.e., "the petitioner will have procedurally defaulted on that claim." *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010). Moreover, a "state court's rejection of a petitioner's constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim." *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010) (quoting *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001)). "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S. Ct. 2590, 2594 (1991). Yet as the Eleventh Circuit has noted, a claim will only be procedurally defaulted in the following circumstance:

> [A] state court's rejection of a federal constitutional claim on procedural grounds may only preclude federal review if the state procedural ruling rests upon "adequate and independent" state grounds. *Marek v. Singletary*, 62 F.3d 1295, 1301 (11th Cir. 1995) (citation omitted).
>
> We have "established a three-part test to enable us to determine when a state court's procedural ruling constitutes an independent and adequate state rule of decision." *Judd*, 250 F.3d at 1313. "First, the last state court rendering a judgment in the case must clearly and expressly state that it is relying on state procedural rules to resolve the federal claim without reaching the merits of that claim." *Id.* Second, the state court's decision must rest entirely on state law grounds and not be intertwined with an interpretation of federal law. *See id.* Third, the state procedural rule must be adequate, i.e., firmly established and regularly followed and not applied "in an arbitrary or unprecedented fashion." *Id.*

*Ward*, 592 F.3d at 1156–57 (footnote omitted).

There are also instances where the doctrines of procedural default and exhaustion intertwine. For instance, if a petitioner's federal claim is unexhausted, a district court will traditionally dismiss it without prejudice or stay the cause of action to allow the petitioner to first avail himself of his state remedies. *See Rose v. Lundy*, 455 U.S. 509, 519-20, 102 S. Ct. 1198, 1204 (1982). But "if it is clear from state law that any future attempts at exhaustion [in state court] would be futile" under the state's own procedural rules, a court can simply find that the claim is "procedurally defaulted, even absent a state court determination to that effect." *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (citation omitted).

## B.      Overcoming Procedural Default

"[A]n adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 749–50, 111 S. Ct. 2546, 2564-65 (1991) (citations and internal quotation marks omitted).

The "cause and prejudice" exception is framed in the conjunctive, and a petitioner must prove both cause and prejudice. *Id.* at 750, 111 S. Ct. at 2565. To show cause, a petitioner must prove that "some objective factor external to the defense impeded counsel's efforts" to raise the claim previously. *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645 (1986). Examples of such objective factors include:

> . . . interference by officials that makes compliance with the State's procedural rule impracticable, and a showing that the factual or legal basis for a claim was not reasonably available to counsel. In addition, constitutionally ineffective assistance of counsel . . . is cause. Attorney error short of ineffective assistance of counsel, however, does not constitute cause and will not excuse a procedural default.

*McCleskey v. Zant*, 499 U.S. 467, 494, 111 S. Ct. 1454, 1470 (1991) (internal quotation marks, brackets, and citations omitted). As for prejudice, a habeas petitioner must show "not merely that the errors . . . created a *possibility* of

prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170, 102 S. Ct. 1584, 1596 (1982) (emphasis in original).

Finally, a petitioner may also escape a procedural default bar if he "can demonstrate a sufficient probability that [the court's] failure to review his federal claim will result in a fundamental miscarriage of justice." *Edwards v. Carpenter*, 529 U.S. 446, 451, 120 S. Ct. 1587, 1591 (2000). To make such a showing, a petitioner must establish that either: (1) "a constitutional violation has probably resulted in the conviction of one who is actually innocent," *Smith v. Murray*, 477 U.S. 527, 537, 106 S. Ct. 2661, 2668 (1986) (quoting *Carrier*, 477 U.S. at 496, 106 S. Ct. at 2650), or (2) the petitioner shows "by *clear and convincing* evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup v. Delo*, 513 U.S. 298, 323, 115 S. Ct. 851, 865 (1995) (emphasis in original) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336, 112 S. Ct. 2514, 2517 (1992)).

## C.    AEDPA Review of State Court Decisions Under § 2254(d) and (e)

When a constitutional claim upon which a petitioner seeks relief under § 2254 is not procedurally defaulted but has instead been adjudicated on the merits in state courts, this Court is still restricted in its ability to grant relief on those claims

by § 2254(d). The AEDPA "imposes a highly deferential standard for evaluating

state-court rulings" and "demands that state-court decisions be given the benefit

of the doubt." *Guzman*, 663 F.3d at 1345 (internal quotation marks and citation

omitted). To grant habeas relief on a claim, this Court must not only find that the

constitutional claims are meritorious, but also that the state court's resolution of

those claims:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

28 U.S.C. § 2254(d)(1)-(2); *see also Boyd v. Allen*, 592 F.3d 1274, 1292 (11th Cir.

2010) (quoting § 2254(d)). The burden of showing that an issue falls within §

2254(d)(1) or (d)(2) is upon the petitioner. *See Woodford v. Visciotti*, 537 U.S. 19,

25, 123 S. Ct. 357, 360 (2002). Section 2254(d)(1)'s "contrary to" and

"unreasonable application of" clauses have independent meanings. *See Alderman v.

Terry*, 468 F.3d 775, 791 (11th Cir. 2006) ("[T]he 'contrary to' and 'unreasonable

application' clauses are interpreted as independent statutory modes of analysis.")

(citation omitted). A state court's decision is contrary to "clearly established

precedents [of the Supreme Court of the United States] if it applies a rule that

contradicts the governing law set forth in [the Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of th[e] Court but reaches a different result." *Brown v. Payton*, 544 U.S. 133, 141, 125 S. Ct. 1432, 1438 (2005) (citation omitted). On the other hand, to determine whether a state court's decision is an "unreasonable application" of clearly established federal law, the Supreme Court has stated:

> The pivotal question is whether the state court's application of the [relevant constitutional] standard was unreasonable . . . For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the [relevant constitutional] standard itself.
>
> A state court's determination that a claim lacks merits precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. And as the [Supreme Court] has explained, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

*Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 785-86 (2011) (citation and quotation marks omitted) (emphasis in original); *see also Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S. Ct. 1933, 1939 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); *Guzman*, 663 F.3d at 1346 ("Ultimately, before a federal court may grant habeas

relief under § 2254(d), 'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'") (quoting *Harrington*, 131 S. Ct. at 786-87). As the Supreme Court has stated, "If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Harrington*, 562 U.S. at 102, 131 S. Ct. at 786.

Moreover, a state court's factual determination is entitled to a presumption of correctness under § 2254(e)(1). And commensurate with the deference accorded to a state court's factual findings, "the petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by clear and convincing evidence.'" *Ward,* 592 F.3d at 1155-56 (alterations in original) (quoting § 2254(e)(1)).

### D. The Burden of Proof and Heightened Pleading Requirements for Habeas Petitions

Additionally, because habeas corpus review is limited to review of errors of constitutional dimension, a habeas corpus petition "must meet [the] heightened pleading requirements [of] 28 U.S.C. § 2254 Rule 2(c)." *McFarland v. Scott*, 512 U.S. 849, 856, 114 S. Ct. 2568, 2572 (1994) (citation omitted). "[T]he petition

must 'specify all the grounds for relief available to the petitioner' and 'state the facts supporting each ground.'" *Mayle v. Felix*, 545 U.S. 644, 655, 125 S. Ct. 2562, 2570 (2005) (quoting Rule 2(c) of the Rules Governing § 2254 Cases in the U.S. District Courts). The burden of proof is on the habeas petitioner "to establish his right to habeas relief and he must prove all facts necessary to show a constitutional violation." *Blankenship v. Hall*, 542 F.3d 1253, 1270 (11th Cir. 2008) (citation omitted); *see also Smith v. Wainwright*, 777 F.2d 609, 616 (11th Cir. 1985) (holding that a general allegation of ineffective assistance of counsel is insufficient; a petition must allege specific errors in counsel's performance and facts showing prejudice).

### E.    The General Standard for Ineffective Assistance of Counsel Claims

In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), the Supreme Court established the following two-pronged standard for judging, under the Sixth Amendment, the effectiveness of attorneys who represent criminal defendants at trial or on direct appeal:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

> Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687, 104 S. Ct. at 2064 .

Because *Strickland*'s preceding two-part test is clearly framed in the conjunctive, a petitioner bears the burden of proving both "deficient performance" and "prejudice" by "a preponderance of competent evidence." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc); *see also Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, [ ] or vice versa."). Further, when assessing ineffective assistance of counsel claims:

> [I]t is important to keep in mind that in addition to the deference to counsel's performance mandated by *Strickland*, the AEDPA adds another layer of deference—this one to a State court's decision—when we are considering whether to grant federal habeas relief from a State court's decision. Thus, [a petitioner] not only has to satisfy the elements of the *Strickland* standard, but he must also show that the State court applied *Strickland* to the facts of his case in an *objectively unreasonable manner*.

*Williams v. Allen*, 598 F.3d 778, 789 (11th Cir. 2010) (brackets in original omitted) (citations and quotation marks omitted) (emphasis in original).

In order to establish deficient performance, a habeas petitioner "must show that counsel's representation fell below an objective standard of reasonableness."

*Strickland*, 466 U.S. at 688, 104 S. Ct. at 2064. That reasonableness is judged against "prevailing professional norms." *Id.*, 104 S. Ct. at 2065. Moreover, under *Strickland*, lower federal courts must be "highly deferential" in their scrutiny of counsel's performance. *Id.* at 689, 104 S. Ct. at 2065. As the *Strickland* Court outlined:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.*, 104 S. Ct. at 2065 (citations and quotation marks omitted).

Simply put, a habeas petitioner "must establish that no competent counsel would have taken the action that his counsel did take" to overcome the presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Chandler*, 218 F.3d at 1315. The reasonableness of

counsel's performance is judged from the perspective of the attorney, at the time of the alleged error, and in light of all the circumstances. *See, e.g.*, *Newland v. Hall*, 527 F.3d 1162, 1184 (11th Cir. 2008) ("We review counsel's performance 'from counsel's perspective at the time,' to avoid 'the distorting effects of hindsight.'") (quoting *Strickland*, 466 U.S. at 689).

To satisfy the prejudice prong, a habeas petition "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. Stated differently, "[a] finding of prejudice requires proof of unprofessional errors so egregious that the trial was rendered unfair and the verdict rendered suspect." *Johnson v. Alabama*, 256 F.3d 1156, 1177 (11th Cir. 2001) (citations and quotation marks omitted). Further, the fact that counsel's "errors had some conceivable effect on the outcome of the proceeding" is insufficient to show prejudice. *Strickland*, 466 U.S. at 693, 104 S. Ct. at 2067. Therefore, "when a petitioner challenges a death sentence, 'the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not

warrant death.'" *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007) (quoting *Strickland*, 466 U.S. at 695, 104 S. Ct. at 2069).

Because *Strickland* and § 2254(d) both mandate standards that are "'highly deferential'", "when the two apply in tandem, review is 'doubly' so." *Harrington*, 131 S. Ct. at 788 (citations omitted). The inquiry is not then "whether counsel's actions were reasonable," but is instead "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* The court must determine "whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Id.* at 785. This "[d]ouble deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249, 1268 (11th Cir. 2012).

Finally, "[s]tate court findings of historical facts made in the course of evaluating an ineffectiveness claim are subject to a presumption of correctness under 28 U.S.C. § 2254(d)." *Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir. 2001).

## 1.    The *Martinez v. Ryan* Rule

In *Martinez v. Ryan*, the Supreme Court announced a "narrow exception" to the procedural default rule of *Coleman*, 501 U.S. at 755, 111 S. Ct. at 2546, in the limited circumstances where a state law "requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding." 566 U.S. 1, 9, 14, 132 S. Ct. 1309, 1315, 1319 (2012). The exception applies only when four conditions are met:

> (1) a state requires a prisoner to raise ineffective-trial-counsel claims at the initial-review stage of a state collateral proceeding and precludes those claims during direct appeal; (2) the prisoner did not comply with state rules and failed properly to raise ineffective-trial-counsel claims in his state initial-review collateral proceeding; (3) the prisoner did not have counsel (or his appointed counsel was ineffective by not raising ineffective-trial-counsel claims) in that initial-review collateral proceeding; and (4) failing to excuse the prisoner's procedural default would cause the prisoner to lose a "substantial" ineffective-trial-counsel claim.

*Arthur v. Thomas*, 739 F.3d 611, 629 (11th Cir. 2014) (citing *Martinez*, 566 U.S. at 14, 132 S. Ct. at 1319). A following case, *Trevino v. Thaler*, 569 U.S. 413, 429, 133 S. Ct. 1911, 1921 (2013), extended the *Martinez* rule to state systems in which it was "virtually impossible" for ineffective assistance claims to be raised on direct appeal.

In other words, to prevail under *Martinez*, a petitioner must demonstrate that his trial counsel were ineffective under *Strickland* in their treatment of a particular issue and that his initial-review collateral appeal counsel were also

ineffective under *Strickland* for failing to raise a claim of ineffective assistance of trial counsel concerning that issue. As the Eleventh Circuit has explained, the petitioner must show "more than the mere fact [collateral counsel] failed to raise potentially meritorious claims; he must show that no competent counsel, in the exercise of reasonable professional judgment, would have omitted those claims." *Hittson v. GDCP Warden*, 759 F.3d 1210, 1263 (11th Cir. 2014). In this limited case, "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial." *Martinez*, 566 U.S. at 17, 132 S. Ct. at 1320.

The *Martinez* rule applies only in initial-review collateral proceedings; it "does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts." *Id.* The Eleventh Circuit has held that *Martinez* does not serve as a vehicle to allege a freestanding claim of ineffective assistance of state post-conviction counsel. *Lambrix v. Sec'y, Fla. Dept. of Corrs.*, 756 F.3d 1246, 1262-63 (11th Cir. 2014), *see also* 28 U.S.C. § 2261(e) ("The ineffectiveness or incompetence of counsel during State or Federal post-conviction proceedings in a capital case shall not be a ground for relief in a proceeding arising under section 2254.").

## IV.   DISCUSSION OF MILLS' CLAIMS

A.   **Mills' two-fold claim that the State's forensic expert's testimony was inadmissible under *Crawford v. Washington*, 541 U.S. 36 (2004), and that his defense counsel was constitutionally ineffective for failing to object to the testimony**

1.   **Substantive Claim**

Mills' first claim is that the admission of the State's forensic expert's testimony violated his right to confront witnesses against him pursuant to *Crawford*, 541 U.S. at 68 ("Where testimonial evidence is at issue . . . the Sixth Amendment demands . . . unavailability and a prior opportunity for cross-examination.").

By way of background, the State called several forensic experts who had participated in the investigation of the murders. The State's Department of Forensic Sciences ("DFS") lab director Rodger Morrison ("Morrison") testified, among other things, that he obtained DNA samples from Mills and JoAnn. (Vol. 8 at R. 594.) DNA analyst and crime scene investigator Robert Bass ("Bass") then testified that he was given DNA samples from Floyd and Vera Hill; that he conducted a DNA analysis of blood and fiber samples taken from the following items recovered from Mills' trunk the day after the murders: a black shirt and pair of blue work pants (with Mills' name on them), the blade of the machete, the ball-peen hammer, and the tire tool; and that Floyd and Vera Hill's DNA was found on these items. (Vol. 8, Tab #R-18, R. 624.) Bass also testified that he had obtained

some other unidentified DNA samples from the handles of the machete and the tire tool, which he ran against the Combined DNA Index System ("CODIS") database, a State-maintained database containing DNA profiles of all offenders convicted of a felony in Alabama since 1994—an estimated 157,000 profiles at the time of Mills' trial—and that the DNA on those unidentified samples did not match anybody in the CODIS database. (*Id.* at 626.) Bass testified that no DNA he found on any of the items involved in this case matched Mills' DNA. (*Id.*) When asked whether it was uncommon for a DNA sample taken from a murder weapon to not match anyone involved in a case, Bass attempted to answer by explaining that the murder weapons had been Floyd Hill's yard sale items; "they were laying out there for who knows who to pick up;" that Floyd Hill may have been wearing gloves when he handled them because there were gloves found in Floyd Hill's pockets; and that it is "very possible" for some people simply not to transfer DNA when they touch an item. (*Id.* at 618.)

Mills' defense at trial was that he was innocent; that JoAnn Mills, who testified against him, was lying, and that Benji Howe, who was a friend of Mills and JoAnn and also a suspect initially, could have committed the murders and framed Mills. (Vol. 10, Tab #R-30, R. 903-05.) However, Morrison also testified, among other things, that the investigators had not found Howe's DNA on the murder

weapons found in the trunk of Mills' car the day after the murders. Morrison explained that because Howe was a convicted felon, Howe's DNA profile was in the CODIS database, and that when Morrison sent in blood samples from the handles of the murder weapons to be searched against that database, there were no matches, indicating that Howe's DNA did not match that found on the murder weapons either. (Vol. 8, Tab #R-18, R. 636-37.)

Mills argues that Morrison's testimony violated his constitutional right to directly confront the analyst who actually collected Howe's DNA (at some point in the past) and entered it into the CODIS database. More specifically, Mills contends that, through Morrison's testimony, the State impermissibly introduced the statement of an out-of-court forensic analyst asserting that (1) a sample of Howe's DNA was at some point taken; (2) Howe's DNA profile was at some point entered into the database; (3) Howe's DNA profile was in the database and accurate at the time the search was conducted; and (4) the lack of a match in the database excluded Howe as a donor of the DNA found on the murder weapons. Mills argues that if Howe's DNA sample was corrupted, switched, or otherwise botched during the process of being added to the database in the past, Morrison's testimony that the database search "excluded" Howe would be unreliable. Mills argues that because the State made no showing of the analyst's unavailability, and he had no

opportunity to cross-examine him or her, introduction of the out-of-court analyst's conclusions violated the Confrontation Clause.

This claim is procedurally defaulted from federal habeas review because Mills failed to present it to the ACCA on direct appeal, and thus, failed to "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's appellate review process." *O'Sullivan*, 526 U.S. at 845. The Eleventh Circuit has held that "[i]t is well established that when a petitioner has failed to exhaust his claim by failing to fairly present it to the state courts and the state court remedy is no longer available, the failure . . . constitutes a procedural bar." *McNair v. Campbell*, 416 F.3d 1291, 1305 (11th Cir. 2005) (citing *Coleman*, 501 U.S. at 735 n.1).

Although Mills attempted to raise this claim in his petition for writ of certiorari to the Alabama Supreme Court, *see* Vol. 11, #R-42 at 16-31, the Alabama Supreme Court did not grant certiorari on this issue. Thus, this belated action does not change the fact that Mills failed to fairly present this claim to the state courts. The Supreme Court has held that the exhaustion requirement is not met "where the claim has been presented for the first and only time in a procedural context in which its merits will not be considered unless 'there are special and important reasons therefor[.]' Raising the claim in such a fashion does not . . . constitute 'fair

presentation.'" *Castille v. Peoples*, 489 U.S. 346, 351 (1989); *see also Mauk v. Lanier*, 484 F.3d 1352, 1357–58 (11th Cir. 2007) (holding that "the Supreme Court in *Castille* explicitly rejected the argument that 'the submission of a new claim to a State's highest court on discretionary review constitutes a fair presentation.'"). Similarly, Alabama procedural rules require that a "petition for writ of certiorari will be granted only when there are special and important reasons for the issuance of the writ." Ala. R. App. P. 39(a). Thus, there is no state-court decision for this Court to review on this issue because Mills failed to properly present this claim. Thus, Mills' substantive *Crawford* violation claim is now procedurally defaulted from this Court's review.

### 2.   Ineffective Assistance of Counsel Claim

Recognizing this procedural hurdle,[1] Mills also contends that his trial counsel was constitutionally ineffective for failing to object to the introduction of Morrison's testimony on Confrontation Clause grounds. Mills asserts that his counsel's alleged ignorance of *Crawford*, a case decided more than three years before trial, constituted deficient performance, especially since his defense strategy centered around Howe as a possible suspect. He further contends that his counsel's failure to object prejudiced Mills, as the State emphasized in closing that

---

[1]      *See* Petitioner's Reply Brief, Doc. 16 at 12 n.2.

Howe's DNA was not found on the murder weapons. (*See* Vol. 10, Tab #R-23, R. 917.) Mills argues that if his counsel had objected on Confrontation Clause grounds to Morrison's testimony about Howe's DNA being in the CODIS database, the trial court would have excluded the testimony, the jury would have been left with the possibility that the DNA on the handles of the murder weapons could have belonged to Howe, and, given the evidence that Howe had the same purported motive and opportunity to murder the Hills that Mills did,[2] there is a reasonable probability that the jury would have been left with a reasonable doubt and Mills would not have been convicted of capital murder or sentenced to death.

---

[2]      Mills points to the following evidence in support of his claim that Howe had the same motive and opportunity to murder the Hills that Mills did. Officer Larry Webb described Howe at trial as a "known [drug] user/dealer" (R1. 419), and Howe admitted at trial to having two felony convictions (R1. 870). Howe also admitted that he was an addicted methamphetamine user in June 2004 and that methamphetamine was expensive. (R1. 882.) When he was initially arrested as a suspect in the murders, he had one of Vera Hill's prescription pill bottles and $2,500 in cash on his person. Howe admitted that he knew the Hills from working at his father's grocery store and carrying their groceries. (R1. 875.) From this, Mills surmises that Howe would have been aware of Floyd Hill's purported habit of carrying large sums of cash. (*See* R1. 658–59.) Howe also admitted that he had driven Mills' car before (R1. 881), which, according to Mills, allowed the jury to infer that he would have known that the car's trunk could be opened easily without a key (*see* R1. 538, 792). Howe also admitted to being familiar with Millses' house. (R1. 884; *see also* R1. 790–91 (Mills' testimony that Howe stayed overnight at his house and had key).

     Mills also argues that the testimony of the two State witnesses who were called to establish an alibi for Howe on the evening of the murders, Thomas Green and Melissa Bishop, contradicted Howe's testimony on several points. (R1. 864-66, 868-870.) Green testified that Howe was with him most of the day but left with Melissa Bishop for several hours around the time it got dark. (R1. 864-66.) Melissa Bishop testified that she picked Howe up from Green's house sometime between noon and 3 p.m. that day and that they were only gone for a few minutes. (R1. 868-69.)

Mills raised this ineffective assistance of counsel claim for the first time in his Rule 32 proceedings,[3] and the ACCA rejected it on the merits in its review of the circuit court's denial of Mills' Rule 32 petition. (Vol. 21, Tab #R-64 at 45-47; *Mills v. State*, CR13-0724, Mem. Op. at 45-47 (Ala. Crim. App. Dec. 11, 2015)). The ACCA stated:

> Summary dismissal of these claims was appropriate. . . . As to the claim related to Morrison's testimony, the record indicates that both Morrison and Bass testified about the database at issue. Further, Morrison's testimony did not violate Mills' right to confrontation because Bass—who testified—conducted the testing of the DNA samples and entered the resulting profiles into the CODIS database. As to the suggestion that the comparison of the submitted evidence against the CODIS database and the profile of Howe was unreliable, Mills pleaded no facts that actually question the reliability of those matters.

(*Id.* at 47.)

Because the state courts addressed Mills' claim on the merits, Mills must demonstrate not only that the claim is meritorious but also that the ACCA's rejection of the claim was either an unreasonable determination of the facts in light of the evidence presented to the ACCA or was contrary to, or involved an

---

[3]     Alabama Rule of Criminal Procedure 32.2(d) mandates that all claims of ineffective assistance of counsel "must be raised as soon as practicable, either at trial, on direct appeal, or in the first Rule 32 petition, whichever is applicable." In his direct appeal, Mills was represented by the same lawyers who represented him at trial. Thus, he presented his ineffective assistance of trial counsel claims at the first opportunity where he was not represented by those lawyers. The State does not argue that Mills should have raised his ineffective assistance of trial counsel claims earlier.

unreasonable application of, clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1)-(2); *Boyd*, 592 F.3d at 1292.

Mills argues that it was an unreasonable determination of the facts and contrary to law for the ACCA to conclude that his right to confront witnesses was not violated because Bass, who testified, conducted the DNA testing and entered the samples into the CODIS database. Indeed, prior to Morrison's testimony, Bass identified the name of the national database as "CODIS" and testified that he entered the DNA profiles found on the murder weapons into the database. (Vol. 8, Tab #R-18, R. 624.) Thus, there was a certain amount of identifying testimony presented about the databases at issue. However, Mills is correct that the analyst who obtained a sample of Howe's DNA, prepared his DNA profile, and entered it into the database (sometime in the past), was not available to testify, such that Mills could not question that particular analyst to make sure that he had the training or skills necessary and did not make a mistake in entering Howe's DNA. Although the ACCA dispensed with this argument by finding that Mills did not plead any facts that "actually question[ed] the reliability" of Howe's DNA profile in the database, Mills asserts that this finding was contrary to *Crawford*, which holds that a Confrontation Clause claim may still be maintained despite a finding of the "reliability" of the evidence:

> Where testimonial statements are involved, we do not think the
> Framers meant to leave the Sixth Amendment's protection to the
> vagaries of the rules of evidence, much less to amorphous notions of
> "reliability." Certainly none of the authorities discussed above
> acknowledges any general reliability exception to the common-law
> rule. Admitting statements deemed reliable by a judge is
> fundamentally at odds with the right of confrontation. To be sure, the
> Clause's ultimate goal is to ensure reliability of evidence, but it is a
> procedural rather than a substantive guarantee. It commands, not that
> evidence be reliable, but that reliability be assessed in a particular
> manner: by testing in the crucible of cross-examination.

*Crawford*, 541 U.S. at 61.

Nonetheless, Mills' Confrontation Clause claim (which is procedurally
barred) must be viewed through the lens of his ineffective assistance of counsel
claim and viewed "doubly deferentially" in the context of this federal habeas
proceeding. *See Harrington*, 131 S. Ct. at 788. This standard of review leads the
Court to conclude that the ACCA's decision was not contrary to, nor did it involve
an unreasonable application of, clearly established Supreme Court precedent, i.e.,
*Strickland*, because Mills cannot demonstrate that he was prejudiced by his
counsel's failure to object to Morrison's testimony on Confrontation Clause
grounds. In other words, the Court is convinced that Mills would still have been
convicted of capital murder and sentenced to death had the jury not heard that
Howe's DNA did not match any DNA samples taken from the murder weapons.
This is because, even though Mills' DNA was also not a match for any of the items

in his trunk, Bass explained that it is not uncommon for some people's DNA not to transfer. And even without any DNA evidence in this case incriminating Mills, the other evidence against Mills was overwhelming. JoAnn gave eyewitness testimony inculpating Mills, both four days after the murders to law enforcement, and again at trial, and her testimony both times was consistent. A second eyewitness recalled a car resembling Mills' at the scene of the crime. Clothing labeled with Mills' name and the murder weapons were found in the trunk of his car the day after the murders, all of which contained the victims' DNA. A concrete block was also found with these items, which the State argued Mills and JoAnn were going to use to sink the evidence. (Vol. 10 at R. 920.) Mills also testified in his own defense, denying that he had committed the murders, and the jury was entitled to disbelieve him. Even if there was a question as to whether Howe's DNA would match that found on the murder weapons, Howe denied participation in the murders and had two alibis. Although Howe was found with one of Vera Hill's prescription pill bottles, he testified that Mills sold him some of her pills on the evening of the murders. Given the overwhelming evidence of guilt, the admission of the CODIS testimony did not affect the outcome of the trial, Mills is not entitled to relief.

**B.    Mills' three-fold claim that (1) the trial court violated his due process, Eighth Amendment, and Fourteenth Amendment rights when it failed to instruct the jury on lesser-included offenses of assault and robbery and felony murder, in violation of *Beck v.***

*Alabama*, 447 U.S. 625 (1980); (2) the trial court violated his Sixth Amendment right to counsel when it asked Mills himself to decide whether to give the lesser-included offenses instructions; and (3) defense counsel was constitutionally ineffective in failing to adequately assert Mills' right to have his counsel make this decision

## 1.    The Substantive Claims

Next, Mills argues that the trial court erred by not instructing the jury on two lesser-included offenses: (1) assault and robbery in the case of Vera Hill, based on the possibility that her death (more than two months after the offense) was caused by pre-existing disease rather than her wounds, and (2) felony murder as to both victims based on nullification of specific intent to kill by methamphetamine-induced intoxication. Mills also claims that the trial court deprived him of his right to counsel guaranteed by the Sixth Amendment by requiring Mills *himself* to consent to his defense counsels' decision on whether to give the lesser-included-offenses instructions, because such a decision is a strategic, tactical decision reserved only for counsel, not the defendant.

Mills raised both claims for the first time in his petition for certiorari to the Alabama Supreme Court, and that Court, in a thorough discussion, rejected the claims on the merits, utilizing a plain error review because Mills had not raised them on direct appeal to the ACCA. *See Ex parte Mills*, 62 So. 3d 574, 581-90 (Ala. 2010). The Alabama Supreme Court's analysis is as follows:

Mills argues first that "the trial court violated Mr. Mills' rights to counsel and due process when it ignored counsel's request for lesser-included-offense instructions that were supported by the evidence." (Mills' brief, p. 13.) Mills contends that the evidence at trial could have supported guilty verdicts on lesser offenses than capital murder. Specifically, Mills contends that the jury could have concluded (1) that he committed the murders but was so intoxicated that he could not have formed the intent necessary for a finding that he was guilty of capital murder[5] or, (2) as to counts two and three, that he did not cause Vera's death. He further maintains that his counsel "wanted the court to give such instructions." (Mills' brief, p. 14.)

> [Footnote] 5: Mills bases this contention on JoAnn's testimony during the State's case-in-chief that she and Mills had stayed up all night on June 23 using methamphetamine and that they both had used methamphetamine before driving to the Hills' residence on June 24.

Following the closing arguments at trial, the trial court held a conference with Mills and the attorneys regarding the jury instructions. The entirety of the discussions in the record regarding jury instructions as to lesser-included offenses is as follows:

> THE COURT: . . . Lesser-included offenses?
>
> MR. WILEY [co-counsel for Mills]: The only one that we could, you know, possibly fit in that we could come up with was, you know, like murder during the course of a, you know, felony murder. I don't know what y'all think about that or even what we think about it actually; that is to say, whether we want you to give it even if you would. I don't know. What do you think, Jack [Bostick, the district attorney]? Do you think there's a possible lesser-included offense?

MR. BOSTICK: Probably the only one would be robbery, 1st and assault, 1st on Vera if they believe she died from COPD [chronic obstructive pulmonary disease] and not from her wounds.

MR. WILEY: You're right about that. I probably should ask you to give that one. He is right about that.

MR. MATHIS [co-counsel for Mills]: Yes.

MR. WILEY: And that was quite an oversight on our—thank you, Jack.

THE COURT: Robbery, 1st?

MR. WILEY: And assault.

THE COURT: Well, it's perplexing to me too in a—I guess in a case like this you want to—if you have any question about it, you want to give as much—as far as the evidence will provide as far as lesser-included offenses for the defendant. I think the only way that a felony-murder charge would be appropriate is if there was evidence that [Mills] did not have the capacity because of methamphetamines to have a specific intent to commit capital murder. [Mills] testified he didn't use drugs. The accomplice testified they did use drugs. So I guess I'm going to put the monkey on [ Mills'] back, and I think it's clear that if I don't give a felony-murder charge, I want [Mills] himself to say that he waives any—and of course, if I do that, I'm going to have to give the charge dealing with the lack of mental capacity due to intoxication and drugs, and there's two sides to that coin too. If I do that, I don't want the jury to infer from that that I'm saying, 'Well, [Mills] lied on the stand about drug usage,' but if I don't give it and the jury—it's either going to be capital murder, or he walks, one of the two. So I want [Mills] on the record—and I want y'all to confer with him and tell

him what we're faced with here. If I don't give that felony-murder charge, you know, I want him to waive it on the record, and the only charge I will give will be capital murder, and then in the case of Mrs. Hill robbery, 1st and assault, 1st.

MR. WILEY: We've already talked about it briefly this morning as we were trying to come up with whether the, you know, the drug-induced intoxication or whatever would satisfy. We were just, you know, thinking if that would work, would we do it, but we need to confer some more.

THE COURT: Well, you need to confer with him because I think it's clear in the caselaw I've looked at that even you can't waive that; it has to be the defendant himself that would waive that. And you know, that's—I want him to recognize, and I'm sure y'all will tell him, the disadvantages and benefits of me giving that felony-murder charge.

MR. WILEY: Yes, sir. Well, we'll do that right now if that's all right.

THE COURT: Please do.

(Noon recess.)

(12:55 p.m. The following took place outside the presence of the jury.)

THE COURT: Okay. The jury is in the jury room now, and I wanted to take up a couple things before I charge the jury. Mr. Mills, I had a conversation with your attorneys prior to the lunch break discussing in my charge giving lesser-included offenses of capital murder, particularly with Ms. Vera Hill, the lesser-included offense of assault in the 1st degree and robbery in the 1st

degree if the jury believed that she died as a result of complications from her lung condition, heart and lung condition, rather than from blunt-force trauma. Also there were discussions regarding lesser-included offenses of capital murder being felony murder and possibly with an intoxication charge of manslaughter. Now, they informed me that it's your desire, over their objection, but it's your desire for me to only charge the jury as to the capital murder in Count 1 of Floyd Hill, Count 2 of Vera Hill, and then in Count 3 the capital murder of two or more people and not to give any lesser-included charges. Is that your desire?

[MILLS]: Yes, sir.

THE COURT: And you understand that that's over your attorneys' objection?

[MILLS]: Yes, sir.

THE COURT: And I'm not going to delve into your rationale behind that, but I know your attorneys have talked to you at length before and after the lunch break about waiving on your part any charge of any lesser-included offense. Am I right about that?

[MILLS]: Yes, sir.

THE COURT: Are you satisfied with the representation your lawyers have given you in advising you about the advantages, disadvantages and the ramifications associated with the Court not charging the jury as to any lesser-included offenses?

[MILLS]: Yes, sir.

THE COURT: Okay. And you waive those voluntarily—

[MILLS]: Yes, sir.

THE COURT: —and freely of your own free will?

[MILLS]: Yes, sir.

THE COURT: And you've talked to your—you've got three lawyers sitting over there, and it's my understanding they advised you for the Court to give lesser-included offenses, charges on lesser-included offenses, and you of your own free will and volition have instructed them to instruct the Court not to give lesser-included charges—

[MILLS]: Yes, sir.

THE COURT: —is that right?

[MILLS]: Yes, sir.

THE COURT: Okay. That's what I will do. I'm going to do what you have requested with full understanding of the ramifications of not giving those lesser-included charges. I do want to ask your attorneys to discuss with you one more item. In the charge on the three capital-murder charges one of the elements the State of Alabama has to prove beyond a reasonable doubt is a specific intent to kill. Now, it is the law of Alabama that voluntary intoxication, although it's not a complete defense to murder, or in this case capital murder, it can negate a specific intent to kill. But in order to do that, it's got to be so compelling and so strong as far as the intoxication— when I say intoxication, I'm talking about either induced by alcohol or drugs—that you don't know what you're doing, the person, in essence, is drunk out of their gourd and doesn't realize what they're doing. And I know there's been conflicting testimony about that, but I am prepared and I will give, if you desire, a charge on specific

intent, and certainly I'll give the charge on that being one of the elements that have to be established beyond a reasonable doubt by the State, but also when I give them that charge, I'm prepared to give them the law in Alabama as it relates to voluntary intoxication and how it can negate that, specifically, 'For it to negate—for voluntary intoxication to negate specific intent—it has to be such that the person is totally devoid of judgment and would be unable to form a specific intent. While voluntary intoxication does not excuse crime or justify crime, its excessiveness may produce such a mental condition as to render the intoxicated person incapable of forming specific intent.' Now, that goes toward the intent element of all three of the capital-murder charges that the [district attorney] has to prove beyond a reasonable doubt. In other words, the person intoxicated literally does not know what they're doing in order to negate specific intent. I'm prepared to give that charge, but I want you to discuss with your attorneys the fact that you have testified, I believe, that you weren't under the influence of drugs on this particular day, June the 24th of '04, that you weren't doing drugs, and I don't want to plant in the jury's mind any—to discredit your testimony in that regard by giving that charge.

So if y'all would, I want y'all to discuss that with him and let me know what his desire is with regard to any charge regarding voluntary intoxication.

MR. WILEY: Yes, sir.

THE COURT: Or maybe y'all have already done that.

MR. WILEY: Well, just one second.

THE COURT: Sure.

(Discussion off the record between defendant and counsel.)

MR. WILEY: *Your Honor, we've decided to ask you not to give the charge on voluntary intoxication.*

THE COURT: Okay. And that's your desire, Mr. Mills—

[MILLS]: Yes, sir.

THE COURT: —after consulting with your three attorneys?

[MILLS]: Yes, sir.

THE COURT: Okay. And you've had an opportunity to think through that and talk to your attorneys about that? And I'm not trying to delve into y'all's trial tactics or anything like that, but did y'all advise him for me to give it, and he independently decided he didn't want that, or did y'all—I guess I'm delving into attorney/client privilege, but—

MR. WILEY: No. That's fine. We don't mind that at all, Your Honor, because we understand we're all trying to do the right thing in an important case. He was of the opinion that it shouldn't be given, and we were of the opinion that it probably—buried in the charge with everything else that you're going to say over a period of 20 minutes, it probably wouldn't be anything that the jury would latch onto in a detrimental way to him. However, when we looked at it the other way, how can it be helpful to him? You know, what's the likelihood—I mean, versus the possible detrimental effect, what's the possibility that the jury is going to find him not guilty—if they find that he committed these murders, what's the possibility they're going to find him

not guilty because he was so intoxicated he didn't know what he was doing? Almost none was what we came to, so there you have it.

THE COURT: Okay. Do you understand that, Mr. Mills?

[MILLS]: Yes, sir.

THE COURT: And it's your decision, having been advised by your attorneys, for the Court not to give any charge regarding voluntary intoxication?

[MILLS]: Yes, sir.

THE COURT: Okay."

Thus, the record indicates that Mills' defense counsel was initially unsure whether to request instructions regarding lesser-included offenses or voluntary intoxication. Possible lesser-included offenses identified in the transcript above were (1) felony murder as to the deaths of both Floyd and Vera, which would have been based on an instruction regarding voluntary intoxication, and (2) robbery and assault as to Vera, which would have required the jury to conclude that Mills was involved in the crimes against Vera but that he did not cause her death.

For the jury to have found that Mills was guilty of a lesser-included offense such as felony murder, robbery, or assault, the jury would have had to disregard Mills' testimony that he was not involved in the crimes. As recognized in the discussions quoted above, both the trial court and Mills' attorneys recognized that instructions as to lesser-included offenses would have been inconsistent with Mills' testimony and could have prompted the jury to infer that Mills' testimony was false. Indeed, Mills' counsel discussed that dilemma on the record: defense counsel stated that because of the likelihood the instructions would cast serious doubts on the credibility of Mills' testimony,

defense counsel ultimately advised Mills not to request instructions as to voluntary intoxication.

As to instructions regarding the lesser-included offenses of robbery and assault as to the count charging Mills with the capital murder of Vera, the record indicates that after he had conferred extensively with his counsel, Mills requested the trial court not to give the jury those lesser-included-offense instructions. The trial court noted that Mills' attorneys had advised him to request lesser-included-offense instructions but that Mills did not want those instructions. Mills responded in the affirmative when the trial court asked if he was satisfied with the advice of his attorneys and whether he had a "full understanding of the ramifications of not giving those lesser-included charges."

Mills contends that his defense counsel, and not Mills himself, had the responsibility for making the decision whether to request instructions on possible lesser-included offenses. He argues that the decision to request lesser-included-offense instructions is "strategic" and "tactical" in nature and, he says, is therefore reserved exclusively for defense counsel. Consequently, he argues that the trial court erred in following Mills' wishes regarding lesser-included-offense instructions rather than permitting his attorneys to decide whether to request those instructions.

As an initial matter, it is not clear from the record that Mills' attorneys would have requested instructions on lesser-included offenses.[6] Although the trial court noted that Mills' "all-or-nothing" strategy was "over [his] attorneys' objection," defense counsel later advised Mills not to seek the voluntary-intoxication instruction. Furthermore, at the completion of the trial court's instructions to the jury, Mills' attorneys stated that they had no objections to the charges. Finally, as noted above, a lesser-included-offense instruction would have been inconsistent with Mills' testimony that he did not commit the murders and could have implicitly suggested that Mills' trial testimony was false. Thus, we are not persuaded by Mills' contentions that his attorneys necessarily would have requested any lesser-

included-offense instructions if the trial court had recognized his attorneys as having the ultimate authority to do so.

> [Footnote] 6: The record does not support Mills' contention that his counsel actually requested lesser-included-offense instructions. *See, e.g.,* Mills' brief, p. 32 ("[T]he trial court failed to honor trial counsel's request for lesser-included offenses . . . .").

The State cites Rule 1.2, Ala. R. Prof. Conduct, and *Burton v. State,* 651 So. 2d 641 (Ala. Crim. App. 1993), *aff'd,* 651 So. 2d 659 (Ala. 1994), for the proposition that a trial court does not interfere with the attorney-client relationship by following the defendant's wishes regarding trial strategy. Rule 1.2 states that an attorney is to "abide by [his] client's decisions concerning the objectives of representation." In *Burton,* the appellant argued that the trial court had interfered with his attorney-client relationship during the penalty phase by calling two of his codefendants as witnesses "after his attorney had told the court that [the witnesses] could add nothing that would help the appellant in mitigation." 651 So. 2d at 656. The record revealed, however, that the appellant clearly had wanted the two witnesses to testify; indeed, the trial court had conducted "a lengthy colloquy with the appellant concerning his desire to have his two codefendants testify at the penalty phase of the proceedings." 651 So. 2d at 656. Citing Rule 1.2, Ala. R. Prof. Conduct, the Court of Criminal Appeals held that "[t]here was no interference with the attorney-client relationship here, when the trial court was honoring the appellant's wishes." 651 So. 2d at 656.

The State also cites *Scott v. State,* 937 So. 2d 1065 (Ala. Crim. App. 2005), in which the appellant, Scott, argued that the trial court had "'interfered' with defense counsel's trial strategy and ordered counsel to call to the stand three witnesses Scott wanted to testify and who defense counsel believed would be harmful to the case." 937 So. 2d at 1071–72. The Court of Criminal Appeals rejected Scott's argument. Among other things, the court noted that the trial court, as

the trial court had done in *Burton, supra,* conducted an extensive colloquy with Scott on the issue. Additionally, the trial court allowed defense counsel several hours to discuss the matter with Scott. Moreover, defense counsel formally objected to the trial court's allowing Scott to decide which witnesses to call, and defense counsel moved for a mistrial, arguing that the trial court erroneously allowed Scott to decide matters of trial strategy. Finally, the Court of Criminal Appeals, quoting *Burton,* 651 So.2d at 656, held that there was no error because "'there was no interference with the attorney-client relationship.'" 937 So. 2d at 1074.

The State argues that *Burton* and *Scott* support the trial court's failure to give lesser-included-offense instructions in the present case. The State contends that

> "the holdings of *Burton* and *Scott* do not suggest that a trial court must always submit to the desires of a defendant over the decisions of trial counsel regarding matters of trial strategy. Instead, each case simply holds that a trial court does not commit error for following what a defendant requests."

(State's brief, p. 29.)

Mills argues, however, that *Burton* and *Scott,* decisions of the Court of Criminal Appeals, are not binding on this Court and that we should reject those cases because, Mills argues, those decisions "fl[y] in the face of" certain decisions of the United States Supreme Court that Mills contends stand for the proposition that defense counsel has exclusive control over all matters of trial strategy. (Mills' brief, p. 29 n. 8.)

Among the United States Supreme Court decisions Mills cites is *Florida v. Nixon,* 543 U.S. 175, 187, 125 S. Ct. 551, 160 L.Ed.2d 565 (2004), in which the Supreme Court stated:

> "An attorney undoubtedly has a duty to consult with the client regarding 'important decisions,' including

questions of overarching defense strategy . . . . That obligation, however, does not require counsel to obtain the defendant's consent to 'every tactical decision.' . . . But certain decisions regarding the exercise or waiver of basic trial rights are of such moment that they cannot be made for the defendant by a surrogate. A defendant, this Court affirmed, has 'the ultimate authority' to determine 'whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal.' . . . Concerning those decisions, an attorney must both consult with the defendant and obtain consent to the recommended course of action."[7]

> [Footnote] 7: In *Nixon*, the defendant challenged his "counsel's strategic decision to concede, at the guilt phase of the trial, the defendant's commission of murder, and to concentrate the defense on establishing, at the penalty phase, cause for sparing the defendant's life." 543 U.S. at 178. The Florida Supreme Court had held that counsel's concession, because it was made without the express consent of the defendant, "automatically rank[ed] as prejudicial ineffective assistance of counsel necessitating a new trial." 543 U.S. at 178. The United States Supreme Court reversed the judgment of the Florida Supreme Court and held that the performance of the defendant's counsel was not automatically deficient merely because counsel had not obtained the defendant's express consent to the strategy of conceding guilt. 543 U.S. at 187–92.

Mills also cites, for example, *Taylor v. Illinois,* 484 U.S. 400, 418–19, 108 S. Ct. 646, 98 L.Ed.2d 798 (1988), in which the United States Supreme Court stated:

"Although there are basic rights that the attorney cannot waive without the fully informed and publicly acknowledged consent of the client, the lawyer has—and must have—full authority to manage the conduct of the trial. The adversary process could not function effectively if every tactical decision required client approval."[8]

> [Footnote] 8:   The United States Supreme Court made the above-quoted statement in *Taylor* in response to the defendant's argument that he "should not be held responsible for his lawyer's misconduct." 484 U.S. at 417. The defendant's lawyer had failed to identify a defense witness in response to a pretrial discovery request, and the trial court, as a sanction for that failure to disclose the witness, refused to allow the witness to testify. The United States Supreme Court upheld the lower court's refusal to permit the witness to testify. 484 U.S. at 401–02.

([*Taylor*] footnote omitted [by Alabama Supreme Court].) The gist of Mills' arguments in this regard is that the decision whether to request a lesser-included-offense instruction is not one over which a defendant has "ultimate authority"; therefore, he says, the trial court errs if it allows the defendant to make the decision whether to request a lesser-included-offense instruction.

In support of his position, Mills cites the decision of the Colorado Supreme Court in *Arko v. People,* 183 P.3d 555 (Colo. 2008). In *Arko,* the defendant was convicted of attempted reckless manslaughter. On appeal, he argued "that the trial court erroneously refused his trial counsel's request to instruct the jury on the lesser non- included offense of third-degree assault," and he contended "that the trial court was obligated to submit this instruction to the jury, even though

he himself objected to the submission of this instruction." 183 P.3d at 557.

The Colorado Supreme Court ultimately held that "the decision to request a lesser offense instruction is strategic and tactical in nature, and is therefore reserved for defense counsel." 183 P.3d at 558. In reaching that conclusion, the Colorado Supreme Court relied in part on the commentary to Standard 4–5.2 in the third edition of the American Bar Association's *Standards for Criminal Justice*. The court noted:

> "The commentary to the American Bar Association's Standards for Criminal Justice also supports the conclusion that the decision whether to request lesser offense instructions rests with defense counsel. The current third edition overrules the previous edition that allocated the decision to request lesser offense instructions to the defendant. The commentary to the third edition states only that defense counsel must confer with the defendant regarding lesser offense instructions: 'It is also important in a jury trial for defense counsel to consult fully with the accused about any lesser included offenses the trial court may be willing to submit to the jury.' *ABA Standards for Criminal Justice: Prosecution Function and Defense Function,* Standard 4–5.2, Commentary (3d ed. 1993).

> "The second edition stated that 'the defendant should be the one to decide whether to seek submission to the jury of lesser included offenses.' *ABA Standards for Criminal Justice: Prosecution Function and Defense Function,* Standard 4–5.2, Commentary (2d ed. 1980). The omission of this language from the third edition indicates that under the current standards, the decision whether to submit lesser offense instructions is not a decision for the defendant, but rather for defense counsel after consultation with the defendant.

"Recent cases analyzing the effect of this change have concluded that under the current ABA standards, the decision whether to request lesser offense instructions is for defense counsel. *See Cannon v. Mullin,* 383 F.3d 1152, 1167 (10th Cir. 2004) (based on change in third edition, '[w]hether to argue a lesser-included offense is a matter to be decided by counsel after consultation with the defendant'); *Simeon* [*v. State*], 90 P.3d [181,] at 184 [ (Alaska Ct. App. 2004) ] (relying in part on the change in the ABA standards to hold that the decision to request lesser offense instructions rests with counsel); *Mathre v. State,* 619 N.W.2d 627, 629–31 (N.D. 2000) (holding that defense counsel was not ineffective for failing to consult with defendant about seeking lesser offense instructions, because under current ABA standards, the decision is not one that must be made by defendant).

"Additionally, we note that several jurisdictions that give the defendant ultimate authority over the decision to seek lesser offense instructions rely at least in part on the second, outdated edition of the ABA standards. *See People v. Brocksmith,* 162 Ill.2d 224, 205 Ill. Dec. 113, 642 N.E.2d 1230, 1232 (1994) (relying on second edition of ABA standards to conclude that the decision to request lesser offense instructions should be treated as the decision to plead guilty); *State v. Boeglin,* 105 N.M. 247, 731 P.2d 943, 945 (1987) (same); *In re Trombly,* 160 Vt. 215, 627 A.2d 855, 857 (1993) (same). The change in the third edition undermines such reliance."

183 P.3d at 559-60.

Initially, we note that the facts in *Arko* are distinguishable from those in the present case in these significant respects: (1)  Mills' counsel consulted extensively with him about whether to request lesser-included-offense instructions or instructions about voluntary intoxication, *see ABA Standards for Criminal Justice: Prosecution Function and Defense Function,* Standard 4–5.2, Commentary (3d ed.

1993) ("the *ABA Standards* ") ("It is also important in a jury trial for defense counsel to consult fully with the accused about any lesser included offenses the trial court may be willing to submit to the jury."); (2)  Mills' counsel ultimately decided not to request an instruction regarding voluntary intoxication; and (3) at no point did Mills' counsel clearly ask the trial court to give instructions on lesser-included offenses.

More than that, however, we are not persuaded by the reasoning of the Colorado Supreme Court in *Arko*. The *Arko* court cites several cases as standing for the proposition that "the decision whether to request a lesser offense instruction is a decision for defense counsel." *Arko*, 183 P.3d at 559 n.2. However, those cases involve claims alleging ineffective assistance of counsel in which the appellants challenged the decisions of their defense counsel regarding lesser-included-offense instructions.[9] From the fairly well settled proposition that the decision whether to request lesser-included-offense instructions is a tactical decision to be made by counsel and to be evaluated for reasonableness in a claim alleging ineffective assistance of counsel, the *Arko* court concluded that a trial court errs if it permits the defendant to make the decision regarding lesser-included-offense instructions, even if the defendant has been extensively advised by his counsel about the matter.

> [Footnote] 9: The Colorado Supreme Court cited *United States v. Mays*, 466 F.3d 335, 342 (5th Cir. 2006) (rejecting claim of ineffective assistance of counsel regarding counsel's decision to request a manslaughter instruction; defendant wanted only self-defense argued to the jury); *Tinsley v. Million*, 399 F.3d 796, 808 (6th Cir. 2005) (rejecting claim of ineffective assistance of counsel regarding counsel's decision not to request a self-defense instruction or lesser-included-offense instruction; this was "a permissible exercise of trial strategy" because the primary line of defense was that

defendant was not the shooter); *Neal v. Acevedo*, 114 F.3d 803, 806 (8th Cir. 1997) ("[T]rial counsel's decision not to request the lesser-included offense instructions was reasonable trial strategy because the instructions would have been inconsistent with [the defendant's] alibi defense."); *State v. Sheppard*, 270 Mont. 122, 130, 890 P.2d 754, 757 (1995) ("This Court has previously held that when defense counsel makes a tactical decision to forgo an instruction that is inconsistent with the defense, we will not find error supporting an ineffective assistance of counsel claim."); *State v. Edwards*, 119 Ohio App. 3d 106, 111–12, 694 N.E.2d 534, 538 (1997) ("[T]his court finds that appellant's trial counsel had the authority to make the decision to forgo a jury instruction[ ] on the lesser included offenses of voluntary manslaughter or involuntary manslaughter, because that decision is not so inherently personal to appellant that it could be waived only by appellant. Therefore, this court finds that the decision not to ask for an instruction on lesser included offenses is a decision that could be made by trial counsel without the express authority of the appellant. Thus, based upon a review of the record in the present case, this court cannot say that the decision of trial counsel to forgo a jury instruction on lesser included offenses to murder was unreasonable under the circumstances. Appellant has not met his burden of demonstrating that he was entitled to relief based upon his claim of ineffective assistance of counsel."); *State v. Eckert*, 203 Wis. 2d 497, 510, 553 N.W.2d 539, 544 (Ct. App. 1996) ("[W]e conclude that a

58

defendant does not receive ineffective assistance where defense counsel has discussed with the client the general theory of defense, and when based on that general theory, trial counsel makes a strategic decision not to request a lesser-included instruction because it would be inconsistent with, or harmful to, the general theory of defense.").

As set forth above, the *Arko* court cited the commentary to the *ABA Standards* as "support[ing] the conclusion that the decision whether to request lesser offense instructions rests with defense counsel." That commentary indeed supports that conclusion for the limited purpose of evaluating a claim alleging that counsel has been ineffective in regard to requesting lesser-included-offense instructions. But we do not think it supports the conclusion that the defendant may never make the ultimate decision regarding a matter of trial strategy such as the one involved here.

Similarly, we do not read the decisions of the United States Supreme Court in *Nixon, supra,* or *Taylor, supra*—which hold that counsel does not need the client's approval for every tactical decision—as implying that a trial court commits reversible error if it permits the defendant to make a tactical decision after the defendant has been advised by counsel regarding that decision. Simply because defense counsel may make the tactical decision whether to request certain jury instructions, it does not follow that the trial court is required to follow the wishes of defense counsel as to every decision regarding trial strategy under any circumstance, even over the objection of the defendant.[10]

> [Footnote] 10: In this regard, the State argues:
>
> "In Mills' view, anytime there is a disagreement between counsel and the defendant on any matter of trial strategy, and if the trial court follows any decision

> other than that of defense counsel, it would
> result in reversible error. Such a result is
> simply ridiculous. It strains logic to suggest
> that defense counsel could totally and under
> any circumstance deprive his client of the
> opportunity to pursue a strategy of complete
> innocence rather than seek a compromise
> verdict based on lesser-included offenses."
>
> (State's brief, p. 41.)
>
> Based on the foregoing, we conclude that under these
> circumstances—i.e., Mills received extensive time to discuss the
> matter with his attorneys and his attorneys did not clearly object to
> Mills' decision not to request lesser-included-offense instructions—
> the trial court did not commit plain error in permitting Mills to decide
> whether to request instructions as to lesser-included offenses.

*Id.*

Pursuant to 28 U.S.C. § 2254(d)(1)-(2) and *Boyd*, 592 F.3d at 1292, Mills'

task is to establish not only that his claims are meritorious but also that the Alabama

Supreme Court's rejection of the claims was either an unreasonable determination

of the facts in light of the evidence presented or was contrary to, or involved an

unreasonable application of, clearly established Supreme Court precedent. Each of

the two claims is addressed separately.

### i.    The *Beck* Substantive Claim

Mills contends that the Alabama Supreme Court's decision was contrary to

*Beck v. Alabama*, 447 U.S. 625 (1980), which he contends stands for the proposition

that a trial court cannot refuse to give a requested lesser-included-offense
instruction in a capital murder case where the instruction is supported by the
evidence. Under Alabama's capital murder statute at the time *Beck* was decided,
the trial judge was "specifically prohibited from giving the jury the option of
convicting the defendant of a lesser included offense." *Id.* at 627. The concern with
Alabama's statute was that a capital conviction will be unreliably obtained if the
jury is only provided with the extreme choices of death or acquittal. The Supreme
Court explained that the jury's natural reticence to let a defendant it believes has
committed a homicide walk free creates an unacceptable risk that the jury will fail
to "accord the defendant the full benefit of the reasonable-doubt standard" with
regard to the elements of capital murder. *Id.* at 634. Instead, the jury, faced with a
difficult choice between returning a legally unjustified capital murder conviction
and a morally unjustified acquittal, will be tempted impermissibly "'to resolve its
doubts in favor of conviction.'" *Id.* (quoting *Keeble v. United States*, 412 U.S. 205,
213 (1973)). Therefore, the Supreme Court held, the Eighth Amendment and due
process require that a court instruct the jury on any applicable lesser-included
offenses requested by a capital defendant if they are supported by the evidence. *Id.*
at 638.

As an initial matter, the trial court in Mills' case did not violate *Beck*'s directive because it did not prohibit Mills from instructing the jury on lesser-included offenses—rather, it expressly permitted Mills, after time to consult with his counsel, to decide whether he wanted to give the instructions, but he decided against giving them. Nor is *Beck* even implicated in Mills' case because the evidence here would not have supported a verdict for the lesser-included offenses of felony murder by virtue of voluntary intoxication or robbery and assault. *Id.* at 627. As noted above, Mills testified in his own defense that he did not kill the Hills. (Vol. 9, Tab #R-19, R. 810-12.) As the Alabama Supreme Court noted, "both the trial court and Mills' attorneys recognized that instructions as to lesser-included offenses would have been inconsistent with Mills' testimony and could have prompted the jury to infer that Mills' testimony was false." *Ex parte Mills*, 62 So. 3d at 585.

Moreover, there was simply no rational basis for giving lesser-included offense instructions for felony murder by virtue of voluntary intoxication or robbery and assault in this case. The purpose of the felony murder doctrine is to hold felons accountable for unintended deaths caused by their dangerous conduct. *See Dobyne v. State*, 672 So. 2d 1319, 1345 (Ala. Crim. App. 1994). But there was evidence presented that Mills killed both Vera and Floyd Hill by repeatedly striking them

with a machete, ball-peen hammer, and tire tool. The evidence would not have supported that Mills' did not intend to cause their deaths.

Nor would the evidence have supported a mere assault and robbery instruction. The idea was that the jury might find that Vera Hill died from her preexisting chronic obstructive pulmonary disease ("C.O.P.D.") and not from her blunt force wounds, because she lived for several months after the attack. (Vol. 10, Tab #R-23, R. 923.) But Dr. Kenneth Snell, the State's medical examiner, testified that the cause of Vera Hill's death was the result of bronchopneumonia as a complication of blunt force trauma to head. (*Id.* at 511.) Dr. Snell's opinion as to the cause of death of Vera Hill was also consistent with two other medical examiners. (*Id.* at 503.) Mills offered nothing at trial, nor does he offer anything in his habeas petition, to contest this opinion or suggest that Vera Hill died from anything but the injuries she received from Mills. Indeed, Dr. Sherry Melton, one the trauma surgeons at UAB who treated Vera Hill, testified that the main injury the trauma team was concerned with and required surgery was the fracture to Vera Hill's skull. (Vol. 8, Tab #R-17, R. 451.) Dr. Melton stated that she and her team became aware of Vera Hill's medical history and that she had a history of C.O.P.D. or bad lungs, but that this "was not the major concern." (*Id.* at 452.) Dr. Melton further stated that C.O.P.D. can be a life-threatening disease over a long period but

63

that people can live with it for ten to thirty years. (*Id.*) In contrast, Dr. Melton stated that the head injuries that Vera Hill received were life-threatening and that Vera Hill would have died within hours of receiving the injuries if she had not received the type of medical attention she did. (*Id.* at 453.) Finally, Dr. Melton testified that although Vera Hill was released from the hospital, she did not believe that Vera Hill would survive for very long because of the trauma to the head. (*Id.* at 456.) The evidence would not have supported mere robbery and assault instructions.

In sum, because the trial court did not refuse to give lesser-included-offense instructions, and because the lesser-included-offense instructions would not have been supported by the evidence in this case, the Alabama Supreme Court's decision was not contrary to *Beck*.[4]

### ii.    The Deprivation of Counsel Substantive Claim

Mills also contends that the trial court denied him his right to counsel in violation of the Sixth Amendment when it required Mills to personally consent to

---

[4]    Mills contends that since the Alabama Supreme Court did not mention *Beck*, this Court must review his *Beck*-violation claim *de novo*. Mills relies upon *Johnson v. Secretary, Department of Corrections*, 643 F.3d 907, 930 (11th Cir. 2011) (de novo review required where state court issued reasoned opinion but did not complete constitutional analysis). The Alabama Supreme Court *did* complete an analysis of whether Mills' due process and Sixth Amendment rights were violated. The Court was not required to mention *Beck*, considering it did not apply. Even assuming the Alabama Supreme Court should have analyzed Mills' *Beck*-violation claim, Mills' claim fails under *de novo* review.

his defense attorneys' decision on whether to give the lesser-included-offense instructions. He argues that the Alabama Supreme Court's decision rejecting this claim, as quoted above, was contrary to *Powell v. Alabama*, 287 U.S. 45, 68–69 (1932) (denial of due process to refuse to let a party be heard through counsel), *United States v. Cronic*, 466 U.S. 648, 659 & n.25 (1984) ("[t]he Court has uniformly found constitutional error without any showing of prejudice when counsel was . . . prevented from assisting the accused during a critical stage of the proceeding"); and *Strickland*, 466 U.S. at 688-89 ("[Any] particular set of detailed rules for counsel's conduct . . . would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.").

The Alabama Supreme Court conducted an extremely thorough evaluation of this claim, *see Ex Parte Mills*, 62 So. 3d at 585–90, *supra*, analyzing not only Alabama state court cases and rules of professional conduct but two United States Supreme Court cases relied upon by Mills, *Florida v. Nixon*, 543 U.S. 175 (2004), and *Taylor v. Illinois*, 484 U.S. 400 (1988), as well as a Colorado Supreme Court case. The Alabama Supreme Court refused to "read the decisions of the United States Supreme Court in *Nixon, supra*, or *Taylor, supra*—which hold that counsel does not need the client's approval for every tactical decision—as implying that a

65

trial court commits reversible error if it *permits* the defendant to make a tactical decision *after the defendant has been advised by counsel regarding that decision.*" *Ex Parte Mills*, 62 So. 3d at 590 (emphasis added). In other words, the Alabama Supreme Court reasoned that, merely because the decision whether to request lesser-included-offenses is a strategic one that defense counsel may make without the express permission or input from the defendant, that does not mean that the trial court errs when it allows the defendant to make the decision after having time to discuss the matter with counsel, which is what happened here. The Court is not persuaded that this decision is contrary to, or was an unreasonable application of, the rules espoused in *Powell*, *Chronic*, or *Strickland*, *supra*, because those rules were applied to different scenarios. *See Harrington*, 562 U.S. at 786 ("The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."). The Court is certainly not persuaded that the Alabama Supreme Court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 131 S. Ct. at 786-87.

For these reasons, Mills has failed to show that the state court's decision was objectively unreasonable.

## 2.    The Ineffective Assistance of Counsel Claim

As stated, Mills also alleges that his trial counsel was ineffective for failing to raise the claim either at trial or on direct appeal that the trial court erred in (1) refusing to give the lesser-included-offenses instructions of felony murder and assault and robbery and (2) requiring Mills to make the decision whether to give them, rather than his counsel.

Mills properly[5] presented this ineffective assistance of counsel claim for the first time during his Rule 32 proceedings, and the ACCA rejected this claim on the merits in its review of the circuit court's denial of Rule 32 relief. (Vol. 21, Tab #R-64 at 28-43; *Mills v. State*, CR13-0724, Mem. Op. at 28-43 (Ala. Crim. App. Dec. 11, 2015)). The ACCA found that the claim was refuted by the record and by the Alabama Supreme Court's opinion on direct appeal and otherwise without merit. (*Id.* at 30.) The ACCA first quoted a large portion of the Alabama Supreme Court's opinion on direct appeal that rejected Mills' substantive claim that the jury should have been instructed on lesser-included offenses. (*Id.* at 30-43; *see also* portion of Alabama Supreme Court's decision quoted *supra*, pages 42-60.) The ACCA then stated:

> The Alabama Supreme Court extensively addressed the circumstances surrounding Mills' decision not to request instructions as to voluntary intoxication or lesser-included offenses. Critically, given Mills' insistence that he was actually innocent and his trial counsel's pursuit

---

[5]    *See* note 3, *supra*.

of that theory with supporting alibi witnesses and arguments that the crimes were likely committed by someone other than Mills, the instructions that Mills now says were warranted would have been inconsistent with his defense theory. The Alabama Supreme Court noted repeatedly that Mills received extensive counsel regarding the decision not to request those instructions and that there was no plain error in the circuit court's handling of that issue. The opinion in *Ex parte Mills* refutes the claims made in Mills' Rule 32 petition that his attorneys were ineffective in any of the issues related to instructions on voluntary intoxication or lesser-included offenses, the circuit court's summary dismissal of this claim was appropriate.

(*Id.* at 43.)

Mills has not established that the ACCA's analysis was objectively unreasonable based on the facts presented or contrary to or an unreasonable application of clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1)-(2); *Boyd*, 592 F.3d at 1292. With regard to the deficient performance prong of *Strickland*, the ACCA impliedly concluded that it was not met by noting that Mills received extensive counsel regarding the decision not to request lesser-included-offense instructions and that the decision to forego the instructions was a reasonable strategic decision. Indeed, there was certainly a strategic reason to decline to request the lesser-included offense instructions—they would have been inconsistent with Mills' testimony that he did not commit the murders and would have implicitly suggested that Mills' trial testimony was false. Mills' counsel, the State's counsel, and the trial judge discussed this dilemma at length. Mills cannot

establish constitutionally deficient performance based on such a strategic, nuanced decision. Indeed, numerous courts have rejected ineffective assistance of counsel claims premised on defense counsels' decisions regarding requesting lesser-included-offense instructions—in both cases where counsel requested one and in cases where counsel declined to request one—because the matter is a quintessential exercise of trial strategy. *See Ex Parte Mills*, 62 So. 3d at 589 n.9 (citing cases).

Further, although the ACCA did not discuss prejudice, Mills cannot establish that he was *actually* prejudiced pursuant to *Strickland*.[6] Mills contends that, had his counsel more adequately communicated with him that they should request lesser-included-offense instructions, there was a reasonable probability that he would have requested the lesser-included-offense instructions, that the trial court would have given them, and that Mills would not have been convicted for capital murder and sentenced to death. However, Mills fails to point to any evidence supporting such a conclusion outside of pure speculation. As an initial matter, as noted by the Alabama Supreme Court on direct appeal, and quoted by the ACCA in denying this claim, "it is not clear from the record that Mills'

---

[6]    Mills contends that this Court must consider prejudice de novo, citing *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) ("Because the state courts found the representation adequate, they never reached the issue of prejudice and so we examine this element of the *Strickland* claim de novo."). Under any standard, Mills has not established prejudice.

attorneys would have [even] requested instructions on lesser-included offenses."
*Ex parte Mills*, 62, So. 3d at 585. Indeed, although the trial court noted that Mills'
decision to instruct the jury only on first degree murder was "over [his] attorneys'
objection," Mills' defense counsel later advised Mills *not* to seek the voluntary-
intoxication instruction, which at least raises the question whether Mills' counsel
also may have ultimately counseled against the assault and robbery instruction. *See*
*id.* at 584–86. Additionally, at the completion of the trial court's instructions to the
jury, Mills' attorneys stated that they had no objections to the jury charges as
given. *See id.* at 586. Moreover, Mills cannot establish with any actuality that, had
the jury had been instructed on voluntary intoxication and assault and robbery, that
the jury would have convicted Mills of something less than capital murder,
considering that Mills' testimony was that he had no involvement in the murders,
and both the assault and robbery and voluntary intoxication instructions required a
finding that Mills did kill, or at least harm, the Hills.

Because Mills has not established that he was actually prejudiced by his trial
counsel's alleged failures, he is not entitled to relief on this claim.

### C.    Mills' claim that he was denied effective assistance of counsel during the guilt phase of his trial

Mills next argues that his defense counsel did not render reasonably effective
legal representation during the guilt phase of his trial and thereby denied him his

rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United
States Constitution. Mills divides this claim into fourteen sub-claims, each of which
is addressed in turn.

### 1.    Mills' claim that his trial counsel failed to adequately advise him with regard to whether to testify

Mills asserts that his counsel failed to discuss this matter with him at all prior
to the start of trial, and that during the trial, his counsel simply told Mills that he
would need to decide if he wanted to testify and let them know.

Mills raised this claim for the first time in his Rule 32 proceedings, and the
ACCA rejected it on the merits in its review of the circuit court's denial of Mills'
Rule 32 petition, holding that this claim was insufficiently pleaded. (Vol. 21, Tab
#R-64 at 19-20; *Mills v. State*, CR-13-0724, Mem. Op. at 19-20 (Ala. Crim. App.
Dec. 11, 2015)). The ACCA noted that Mills only alleged that he was "unable to
discuss the complicated strategic considerations involved in such a decision[.]" (*Id.*
at 20.) The ACCA held that "[t]his bare assertion of prejudice is insufficient to
meet Mills' burden of pleading." (*Id.*)

Mills has not demonstrated that the ACCA's decision was an unreasonable
determination of the facts or contrary to clearly established Supreme Court
precedent. He cites *United States v. Hung Thien Ly*, 646 F.3d 1307, 1313 (11th Cir.
2011), in which the Eleventh Circuit noted: "In cases where a defendant is

represented by counsel, counsel is responsible for providing the advice needed to render the defendant's decision of whether to testify knowing and intelligent." Mills also cites the Alabama Rules of Professional Conduct and the American Bar Association's Standards for Criminal Justice for the general proposition that counsel should discuss and advise the client on such matters. These general statements, however, do not establish that Mills' claim, as pleaded, entitles him to relief. Mills merely raises the bare allegation that his counsel's discussions with him were insufficient. He fails to allege any facts concerning what aspects of his decision to testify, or his testimony itself, would have been different, had counsel discussed the issue with him more thoroughly. Mills has failed to demonstrate how the ACCA's decision that this claim was properly summarily dismissed was objectively unreasonable, and thus, he is due no relief.

> **2.    Mills' claim that his trial counsel failed to adequately advise him with regard to instructing the jury on lesser-included offenses**

This allegation is essentially the same claim that Mills alleges in Part IV.B.2., *supra*, at pages 66-70. For the reasons stated in that section, Mills is due no relief on this claim.

> **3.    Mills' claim that his trial counsel failed to investigate the State's case against him and failed to adequately investigate and present any reasonable theory of defense**

Mills' claim is made up of seven sub-claims of alleged failure-to-investigate, and each is addressed below. Mills raised each of these seven sub-claims for the first time in his Rule 32 proceedings, and the ACCA rejected each on the merits in its review of the circuit court's denial of Mills' Rule 32 petition. (Vol. 21, Tab #R-64 at 19; *Mills v. State*, CR-13-0724, Mem. Op. at 19 (Ala. Crim. App. Dec. 11, 2015)). Mills argues that the ACCA's conclusions with regard to each sub-claim were unreasonable applications of the Supreme Court's holdings in *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.") (quoting *Strickland*, 466 U.S. at 691); *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) ("It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.") (quoting 1 ABA Standards for Criminal Justice 4–4.1 (2d ed. 1982 Supp.)); and *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (finding trial counsel ineffective where failure to uncover and present evidence

could not be seen as a tactical decision because counsel had not "fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background").

However, the Court wishes to note at the outset that counsel's duty to investigate "does not necessarily require counsel to investigate every evidentiary lead." *Williams v. Allen*, 542 F.3d 1326, 1337 (11th Cir. 2008). "Under *Strickland*, strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* (quotation marks and citations omitted). *Compare Strickland*, 466 U.S. at 699 (stating that counsel's "decision not to seek more character or psychological evidence than was already in hand was . . . reasonable"), *with Porter v. McCollum*, 558 U.S. 30, 39-40, (2009) (noting that counsel "failed to uncover and present any evidence of Porter's mental health or mental impairment, his family background, or his military service," and "[t]he decision not to investigate did not reflect reasonable professional judgment").

"In assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. Of course, "a complete failure to investigate may constitute deficient performance of counsel." *Parker v. Sec'y for Dep't of Corr.*,

331 F.3d 764, 787 (11th Cir. 2003); *see also Housel v. Head*, 238 F.3d 1289, 1294 (11th Cir. 2001) (explaining that "a failure to investigate can be deficient performance in a capital case when counsel totally fails to inquire into the defendant's past or present behavior or life history"). That said, "no absolute duty exists to investigate particular facts or a certain line of defense." *Chandler*, 218 F.3d at 1318. Finally, "[a] decision to limit investigation is 'accorded a strong presumption of reasonableness,'" *Mills v. Singletary*, 63 F.3d 999, 1021 (11th Cir. 1995) (internal quotation marks omitted), and "to be effective a lawyer is not required to 'pursue every path until it bears fruit or until all hope withers.'" *Williams v. Head*, 185 F.3d 1223, 1237 (11th Cir. 1999) (quoting *Foster v. Dugger*, 823 F.2d 402, 405 (11th Cir. 1987)).

The Court also notes that *Wiggins*, *Rompilla*, and *Williams*, on which Mills relies, are specific applications of *Strickland* to materially different factual circumstances from those present in this case. Counsel in *Rompilla* were held to have conducted an inadequate investigation despite having interviewed the defendant, five members of the defendant's family, and three mental-health experts because counsel failed to examine the defendant's prior conviction for rape and assault, a "readily available" public document located "at the very courthouse where" the defendant's trial would be held. *See* 545 U.S. at 381–84. Counsel's

failure to investigate the defendant's prior conviction was unreasonable because that conviction could serve as an "aggravator" under Pennsylvania's death-penalty law and counsel knew, as evidenced in a "plea letter" written by counsel, that prosecutors planned to seek the death penalty on the basis of that conviction. *Id.* at 383–84; *see also id.* at 390 ("Other situations, where a defense lawyer is not charged with knowledge that the prosecutor intends to use a prior conviction in this way, might well warrant a different assessment.").

In *Wiggins*, defense counsel's investigation into mitigating evidence drew from three sources: reports prepared for the defense by a psychologist; a pre-sentence report containing vague indications of Wiggins' troubled background; and Department of Social Service ("DSS") records documenting Wiggins' various foster care placements. 539 U.S. at 523. Despite having this information, Wiggins' counsel introduced no evidence concerning his life history during the sentencing hearing. *Id.* at 515. During state post-conviction proceedings, Wiggins presented testimony from a social worker who had prepared an elaborate social history report on Wiggins' background. Defense counsel had procured no such report, despite admitting that doing so was standard among capital practitioners in Maryland at the time and despite having funds available to do so. *Id.* at 523–25. The report contained evidence that Wiggins suffered severe physical and sexual abuse at the

hands of his mother and while in the care of a series of foster parents. *Id*. at 516-17. The Supreme Court held that the decision of Wiggins' trial counsel not to expand the scope of their investigation into his background fell short of prevailing professional standards, especially considering the "red flags" in Wiggins' DSS records that defense counsel had seen. *Id*. at 525.

Similarly, counsel in *Williams* were held to have conducted an inadequate investigation by failing to uncover extensive records graphically describing Williams' "nightmarish" childhood, including records indicating that his parents had been imprisoned for the criminal neglect of Williams and his siblings, that Williams had been severely and repeatedly beaten by his father, and that he had been committed to the custody of the social services bureau for two years during his parents' incarceration (including one stint in an abusive foster home), and that Williams was "borderline mentally retarded" and did not advance beyond sixth grade in school. 529 U.S. at 395.

Keeping these principles and case illustrations in mind, the Court turns to Mills' specific sub-claims.

       i.      **Mills' claim that his trial counsel failed to adequately communicate with him prior to trial**

Mills asserts that his trial counsel held only three brief meetings with him prior to trial, and that only two of those three meetings involved any substantive discussion of the case.

Mills raised this sub-claim for the first time in his Rule 32 proceedings, and the ACCA rejected it on the merits in its review of the circuit court's denial of Mills' Rule 32 petition. (Vol. 21, Tab #R-64 at 19; *Mills v. State*, CR-13-0724, Mem. Op. at 19 (Ala. Crim. App. Dec. 11, 2015)). Specifically, the ACCA held that Mills' claim was insufficiently pleaded because his Rule 32 petition "does not allege . . . any facts that trial counsel would have discovered through 'meaningful interviews,' nor does the petition allege how such additional facts gleaned through more interviews would have had a reasonable probability of affecting the outcome of his trial." (*Id.*) The court also cited *Washington v. State*, 95 So. 3d 26, 61-62 (Ala. Crim. App. 2012) for the proposition that there is no Sixth Amendment right to a meaningful relationship between client and counsel. (*Id.*)

Mills has failed to establish how the ACCA's decision was objectively unreasonable. Indeed, the Supreme Court has rejected the substantive argument Mills raised in his Rule 32 proceedings: "No court could possibly guarantee that a defendant will develop . . . rapport with his attorney—privately retained or provided by the public. . . . Accordingly, we reject the claim that the Sixth

Amendment guarantees a 'meaningful relationship' between an accused and his counsel." *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983). Thus, because the ACCA's holding that Mills' claim was subject to summary dismissal was reasonable, Mills is due no relief.

> **ii.     Mills' claim that his trial counsel failed to investigate the State's key witness, JoAnn Mills, to find evidence that would have supported Mills' testimony and impeached JoAnn's testimony**

Mills contends that if his counsel had interviewed Mills' father, Donnie Mills; Mills' siblings, Kim Mobley and Johnnie Mills; or other friends and acquaintances, they would have learned that JoAnn had a long history of drug use; that she was addicted to methamphetamine; that she and Mills were having marital problems and she in fact was having an affair with Benji Howe at the time of the murders; and that she and Howe used drugs together. Mills argues that had counsel investigated and presented this evidence, he would have been able to impeach JoAnn's testimony, which was crucial to the State's case against Mills. He also suggests that evidence concerning infidelity, Howe, and marital problems between JoAnn and Mills would have allowed the jury to draw the inference that JoAnn and Howe had a motive to fabricate their stories and cover for each other to falsely accuse Mills of murder.

Mills raised this claim for the first time in his Rule 32 proceedings, and the ACCA rejected it on the merits in its review of the circuit court's denial of Mills' Rule 32 petition. (Vol. 21, Tab #R-64 at 22-23; *Mills v. State*, CR-13-0724, Mem. Op. at 22-23 (Ala. Crim. App. Dec. 11, 2015)). The ACCA held that this claim was insufficiently pleaded, without merit, and refuted by the record. (*Id.* at 22.) In support, the court first listed specific examples of how "trial counsel questioned JoAnn extensively on cross-examination," which refuted Mills' allegation that they failed to investigate JoAnn and her potential testimony. (*Id.* at 23.) The court then noted that the State presented witnesses at trial to corroborate Howe's alibi, which refuted Mills' suggestion that Howe committed the murders. Finally, the court found that "although the petition lists witnesses whom counsel should have interviewed and states generally what the substance of those witnesses' testimony would have been concerning 'JoAnn's infidelities,' it is not clear that any of that testimony would have in fact been admissible at Mills' trial." (*Id.*)

Mills has failed to show that the ACCA's decision was objectively unreasonable. The record indeed shows that Mills' trial counsel specifically questioned JoAnn about her methamphetamine and other drug use, her relationship with Mills, and inconsistencies in statements she had given to the police. JoAnn was questioned about the specific types of drugs she ingested around

the time of the crime and even about her significant weight gain since the murders due to the unavailability of drugs in jail. (Vol. 9, Tab #R-18, R. 724, 729.) JoAnn also explained that she and Mills had an "on-again-off-again" relationship in which they "would fight and break up and get back together." (*Id.* at 771-72.) Mills also testified about the length of their relationship, the nature of their marriage, and that he and JoAnn had separated but got back together a month before the murders. (*Id.* at 787.) JoAnn also gave detailed testimony about first having denied involvement in the murders, but, three days later, confessing to law enforcement that Mills committed the murders in her presence.

Despite this, Mills presses that *no* evidence was presented at trial that JoAnn was allegedly involved in a romantic affair with Howe, who was arrested as an initial suspect in the murders. But the ACCA rejected this part of the claim as well, impliedly finding that Mills' counsel's alleged failure to adequately investigate and present "JoAnn's infidelities" was not prejudicial to Mills for several reasons. As noted, the ACCA reasoned that evidence had already been presented of JoAnn's rocky relationship history with Mills, thus implying that any additional evidence about JoAnn's infidelities would have been cumulative and unlikely to change the outcome of the trial. The ACCA also noted that it was not clear that such evidence about JoAnn's "infidelities" would have been admissible at trial. Mills merely

speculates that evidence that JoAnn was having an affair with Howe would have been admissible as impeachment evidence of bias. But even assuming the trial court would have allowed JoAnn to be cross-examined on her alleged affair with Howe, the ACCA also found that Mills could not establish that the outcome of the trial would have been different because Howe's alibi was corroborated by two State witnesses. Thus, it was unlikely that the jury would have inferred from the mere fact that JoAnn and Howe were having an affair that Howe actually committed the murders and JoAnn and Howe lied to implicate Mills. Although Mills' contends that these alibi witnesses' testimony contradicted Howe's testimony on some points, he ignores the other overwhelming evidence against him, including JoAnn's eyewitness testimony, a second witness linking his vehicle to the crime scene, and the clothing, murder weapons containing the victims' DNA, and concrete block found in his trunk. Given the overwhelming evidence of guilt, the admission of testimony that JoAnn was having an affair with Howe would not have affected the outcome of the trial.

Mills simply cannot show that the state court's resolution of this claim was objectively unreasonable, particularly where he fails to cite any Supreme Court case that conflicts with the state court's decision. Thus, Mills is due no relief.

        **iii.** **Mills' claim that his trial counsel failed to investigate a central suspect in the case, Benji Howe, to find**

**evidence to support Mills' testimony and impeach Howe's testimony**

Mills also asserts that trial counsel failed to adequately investigate Benji Howe's role in the crime and his story to the police. Mills points out the following facts as relevant to this claim. The day after the murders, Howe was arrested with $2,500 in cash and one of Vera Hill's prescription pill bottles on his person. Floyd Hill was known to carry a good deal of cash, and no significant amount of cash was ever recovered from Mills or JoAnn. Howe told the police that Mills gave him the pill bottle the night before, which would be the night of the murders. He also told the police that Mills had sold him $100 worth of prescription pills. At trial, Howe claimed that the $2,500 had been given to him by his brother after his brother sold his truck. The police officers released Howe from custody immediately after he provided his statement. Mills contends that had trial counsel conducted an adequate investigation, they would have been able to challenge the story Howe told the police and would have discovered that Howe had a criminal history of convictions on drug-related charges, including distribution of prescription drugs. They would have discovered that Howe had a reputation in the community as being involved in drugs and other illegal activity, while Mills had never been charged with any drug-related crimes and had only $14 to his name at the time of his arrest.

Relatedly, Mills argues that his trial counsel were ineffective in failing to interview Thomas Green and Melissa Bishop, who were both members of JoAnn's, Mills', and Howe's circle of friends and who testified at trial for the State. According to Mills, they would have corroborated evidence that Howe and JoAnn had reignited a romantic relationship shortly before the crime and that they were using drugs together.

Mills raised this claim for the first time in his Rule 32 proceedings, and the ACCA rejected it on the merits in its review of the circuit court's denial of Mills' Rule 32 petition. (Vol. 21, Tab #R-64 at 23-24; *Mills v. State*, CR-13-0724, Mem. Op. at 23-24 (Ala. Crim. App. Dec. 11, 2015)). The court held that the record refuted Mills' claim that his trial counsel did not adequately investigate Howe's potential role in the crime. (*Id.* at 24.) In particular, the court found that evidence was already presented that Howe was a known user and dealer of drugs, that he had previously been convicted of two felony drug convictions, and trial counsel had specifically questioned Howe concerning the fact that he had received $2,500 from his brother for selling a truck. (*Id.*) Moreover, the court noted that Mills' claim that his trial counsel should have presented testimony from witnesses Green and Bishop to show that Howe and JoAnn were in a romantic relationship was refuted by the

record, given that Green and Bishop did testify at trial, but that their testimony supported of Howe's testimony. (*Id.*)

Mills has failed to establish that the ACCA's rejection of this claim was objectively unreasonable. Mills cannot demonstrate *Strickland* prejudice because the very evidence that Mills alleged should have been presented was presented at trial. Specifically, evidence was presented that Howe had criminal convictions and a reputation for using and dealing drugs. (Vol. 7, Tab #R-17, R. 419, 422-23; Vol. 10, Tab #R-20, R. 870.) In any event, even assuming this evidence as true, simply the fact that Howe had been involved in drug activity does not establish a reasonable probability that the jury would have found reasonable doubt. Nor would general evidence that Howe was involved in drug activity have any relevance to the Hills' murders.

Mills takes issue with the ACCA's conclusion that Green and Bishop would not likely have testified that JoAnn and Howe were romantically involved because their testimony generally supported Howe's testimony. Mills is correct that this is speculation, as counsel never cross-examined Green, Bishop or any witness about JoAnn's romantic relationship with Howe. Mills pleaded that, if asked, Green and Bishop would have testified that JoAnn and Howe were romantically involved in the months leading up to the crime. (Vol. 15, Tab #R-53, C. 21-22, ¶ 27.) But as

discussed in the preceding section, evidence that JoAnn and Howe were having an affair would not have changed the outcome of the trial, given the overwhelming evidence of Mills' guilt.

Thus, Mills cannot show that the state court's finding that this claim was subject to summary dismissal was objectively unreasonable.

### iv. Mills' claim that trial counsel failed to investigate his cell phone records and evidence of tendonitis and/or carpal tunnel syndrome in his right hand

Mills asserts that trial counsel failed to obtain his cell phone records which would have shown that he had been in contact with his father, Donnie Mills, via cell phone several times between 4:00 and 7:00 p.m.—the time during which the crime was committed. Mills contends that these conversations would have corroborated his account of the day and contradicted JoAnn's account, which did not mention any calls to Donnie. Mills also argues that his counsel were ineffective for failing to contact and interview Donnie, who would have corroborated these facts and testified that he spoke with his son several times during this time. Mills asserts that had his counsel adequately investigated this evidence, they would have been able to present evidence corroborating Mills' account and undermining JoAnn' s credibility.

Mills also contends that trial counsel failed to speak to doctors or nurses at Northwest Medical Center who had treated him in the months prior to the crime for tendonitis and/or carpal tunnel syndrome in his right hand. Mills asserts that these medical witnesses could have confirmed the degree of weakness and impairment in his right hand and offered opinions that the severity of Mills' injury would have prevented him from using his right hand to forcefully swing a ball-peen hammer, machete, or tire tool. He contends that this evidence would have helped corroborate the stressors on him that led to his heavy drug use around the time of the crime, and testimony about the extent of the injuries would have supported his counsel's otherwise weak and conjectural suggestion to the jury that Mills was physically unable to commit the crime.

Mills raised these claims for the first time in his Rule 32 proceedings, and the ACCA rejected them on the merits in its review of the circuit court's denial of Mills' Rule 32 petition. (Vol. 21, Tab #R-64 at 20-22; Mills v. State, CR-13-0724, Mem. Op. at 20-22 (Ala. Crim. App. Dec. 11, 2015)). The ACCA found that Mills' claims were properly dismissed because they were insufficiently pleaded and without merit. (*Id*. at 22.) First, the court found that Mills *did* present testimony from Sherri Sanchez, who was the girlfriend of Mills' father, Donnie, in order to support Mills' account of the crime. Specifically, the court noted that Sanchez

testified that Donnie was on the phone with Mills at 7:00 pm during the evening the crime occurred, that Mills and JoAnn came over to Donnie's house later that evening, and that Mills had carpal tunnel in his right hand and could not open his cigarettes. (*Id.* at 21, citing Vol. 9, Tab #R-19, R. 779-84.) The ACCA also noted that "[s]imply the fact that Mills called his father several times over a span of hours does not lead to any probability, let alone a reasonable one, that the jury would have had a reasonable doubt concerning guilt." (Vol. 21, Tab #R-64 at 21.) The court further noted that the fact that Mills had tendonitis or carpal tunnel in his right hand, even if true, would not have established that he could not have committed the murders. (*Id.* at 22.)

Mills has failed to establish that the ACCA's summary dismissal of this claim was objectively unreasonable. Notably, Mills fails to cite any specific holding from the United States Supreme Court that conflicts with the state court's decision. Thus, Mills is due no relief on this claim.

> v.    **Mills' claim that trial counsel failed to investigate the circumstances around the eyewitness testimony of Jennifer Yaden**

Jennifer Yaden's eyewitness testimony provided evidence that a white vehicle was parked outside the Hill residence sometime during the afternoon on June 24. Although she was unable to identify the make or model of the car, the

State used her testimony to corroborate Mills' presence at the crime scene, because Mills drove a white car. Mills contends that trial counsel should have done more to debunk the reliability of Yaden's statements. Mills asserts that, had trial counsel adequately investigated the scene of the crime, they would have discovered that between Yaden's house and the Hills' home is a thick group of trees, which would have been in full bloom in June and would have thus blocked the line of sight from Yaden's living room. If counsel had presented this information to the jury, Mills contends, the jury would have understood Yaden's testimony to be unreliable.

Mills raised this claim for the first time in his Rule 32 proceedings, and the ACCA rejected it on the merits in its review of the circuit court's denial of Mills' Rule 32 petition. (Vol. 21, Tab #R-64 at 24-25; Mills v. State, CR-13-0724, Mem. Op. at 24-25 (Ala. Crim. App. Dec. 11, 2015)). The ACCA held that Mills' claim was subject to summary dismissal because, even assuming as true his allegation that a thick group of trees would have blocked the line of site from Yaden's living room to the Hills' home, "this fact is completely irrelevant and does not contradict Yaden's testimony in any way." (*Id.* at 24.) The court noted that the record established that Yaden testified she saw a white car while she was driving by the Hills' residence, not while she was in her own home. (*Id.*)

The record fully supports the reasonableness of the state court's finding. Specifically, Yaden saw the white car when she was driving by the victims' residence, not when she was in her home. (Vol. 7, Tab #R-17, R. 429, 431.) Moreover, the record indicates that Mills' trial counsel extensively questioned Yaden in an effort to weaken her testimony. (*Id.* at 430-35.) Finally, Mills failed to plead or present any evidence in state court concerning what else trial counsel could have done or what specific information counsel could have elicited to challenge the reliability of Yaden's testimony. Similarly, Mills has presented nothing to demonstrate that the ACCA's findings concerning this claim were objectively unreasonable. Thus, Mills is due no relief.

> ### vi. Mills' claim that trial counsel failed to investigate his history of drug use and possible intoxication on the day of the offense

Mills names a host of individuals whom he says trial counsel should have interviewed prior to trial: Donnie Mills, his father; his siblings Kim Mobley and Johnny Mills; his former employers, co-workers and clients, including Ben Hightower, Shane Lolley, Ferris Busby, or Marlon Wakefield; and Thomas Green and Melissa Bishop, who testified at trial and knew Mills socially. Mills contends that all of these witnesses would have told his trial counsel about his long history of drug use; that he grew up in an environment where methamphetamine use was the

norm; that both of his parents were addicted to methamphetamine and used drugs throughout his childhood; that Mills used methamphetamine for the first time when he was a teenager; that his father provided him with drugs and used drugs with him; that Mills soon became dependent on methamphetamine and began to use it almost every day; and that in the weeks prior to the offense, Mills had relapsed and began using methamphetamine again after a period of abstinence. Mills contends that this evidence would have supported a defense theory of reduced culpability due to intoxication, citing an Alabama state court decision recognizing that voluntary intoxication "can be a complete defense in cases where an accused is charged with a crime requiring a specific intent, for the reason that if specific intent is an essential element of a crime, and such specific intent is lacking because of the incapacity of the accused to entertain specific intent, the crime has not been committed. *See Coon v. State*, 494 So. 2d 184, 187 (Ala. Crim. App. 1986).

Mills raised this claim for the first time in his Rule 32 proceedings, and the ACCA rejected it on the merits in its review of the circuit court's denial of Mills' Rule 32 petition. (Vol. 21, Tab #R-64 at 25-27; *Mills v. State*, CR-13-0724, Mem. Op. at 25-27 (Ala. Crim. App. Dec. 11, 2015)). The ACCA noted that Mills' contention that his trial counsel should have investigated his drug use and intoxication at the time of the offense was "premised on a theory at odds with the

preceding claims [in the Rule 32 petition] that Mills had no involvement with the crimes." (*Id.* at 25.) As the court noted, pursuing such contentions would have assumed that Mills committed the crimes, in contrast to his testimony during trial. (*Id.*) The court further found that the Alabama Supreme Court had noted on direct appeal that there was an "inherent conflict" between Mills' trial strategy of showing that he was innocent and a strategy of attempting to emphasize that Mills had extensive drug use and was intoxicated on the day of the offense to suggest that he lacked the specific intent to commit murder. (*Id.* at 25-26, citing *Ex parte Mills*, 62 So. 3d at 585.) Based on this record, the ACCA held that Mills' claim was without merit and properly dismissed, as his allegations related solely to a matter of trial strategy. (*Id.* at 27.)

The record supports the reasonableness of the state court's decision. During the guilt phase, Mills chose to testify in his own defense, in which he stated that he did not use drugs around the time of the crime. (Vol. 9, Tab #R-19, R. 791.) If his trial counsel had presented evidence of Mills' long history of drug use, this evidence would have directly contradicted his own client's testimony.

Mills argues that the ACCA's decision was contrary to *Strickland* and objectively unreasonable because it characterized his trial counsel's performance as strategic, when in reality, his counsel failed to investigate at all. He contends that it

was deficient performance for counsel to have failed to investigate other defense theories before making the decision to present an all-or-nothing defense hinging on Mills' testimony denying involvement in the murders, which was contradicted. In Mills' view, if his counsel had investigated his history of drug abuse prior to trial, they could have mounted an intoxication defense from the beginning and advised Mills not to testify. In other words, according to Mills, counsel's decision not to pursue an intoxication defense was the result of ignorance, not investigation, and thus not the kind of strategic decision that *Strickland* insulates from scrutiny.

But as the Supreme Court noted in *Strickland*, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." 466 U.S. at 691 ("For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable."). *See also e.g.*, *Williams v. Head*, 185 F.3d 1223, 1237 (11th Cir. 1999) ("An attorney does not render ineffective assistance by failing to discover and develop evidence of childhood abuse that his client does not mention

to him."). Mills certainly does not contend that he pleaded with his defense counsel to further investigate his longtime drug abuse so that they could pursue an intoxication defense, but they refused. Rather, Mills asserts that there were two "red flags" that should have alerted counsel to his drug use and the availability of a voluntary intoxication defense: they knew that Donnie, Mills' father, was incarcerated at the time of the trial for possession of a baggie of what "appeared to be methamphetamine" (Vol. 10, Tab #R-28, R. 984), and they knew that JoAnn had told law enforcement about Mills' substance abuse. The Court disagrees. Based on the factual record, a fairminded jurist could easily conclude that Mills' counsel's investigation into his background constituted reasonable assistance of counsel under the circumstances known to his counsel at the time. After all, counsel met multiple times with Mills prior to trial, and there is no indication in the record that Mills ever admitted to drug use or to committing the murders. Given the benefit of hindsight, Mills pictures a different defense theory that may have been more successful and thus asserts that his counsel's actions were inadequate. Although Mills' counsel probably could have investigated Mills' background further than they did, as will always be true for any lawyer not blessed with unlimited time and resources, the record shows that both the scope and content of their investigation were the result of informed strategic decisions. *See Mills*, 63 F.3d

at 1021 ("[a] decision to limit investigation is 'accorded a strong presumption of reasonableness'").

Additionally, the vast differences between this case and the facts of *Rompilla*, *Wiggins*, and *Williams*, as discussed within the introduction section to Mills' ineffective assistance claims based on failure-to-investigate, *see* pages 75-77, *supra*, preclude those cases from being controlling here.

Thus, Mills is due no relief on this claim.

### vii.    Mills' claim that his trial counsel failed to investigate his mental state at the time of the offense

Mills lists the same litany of individuals that he names in the previous section, asserting that had his trial counsel contacted them, his counsel would have learned that he had suffered multiple traumatic events in the period leading up to the murders. Mills contends that all of these witnesses would have told trial counsel that while Mills succeeded temporarily in going clean from drugs from 2003 to early 2004, he suffered a relapse in spring 2004, approximately a month before the crime, due to multiple stressors in his life. He recounts these stressors to include his mother's massive aneurysm in October 2003 that left her unable to speak or recognize loved ones; his father's stroke and heart attack in December 2003 that resulted in long-term physical disability and emotional distress; his separation from JoAnn and the discovery of her infidelities in the spring of 2004;

and his affliction of tendonitis and/or carpal tunnel syndrome that caused him pain and prevented him from working as a mechanic, leaving him destitute. Mills contends that this evidence would have led his counsel to pursue a defense theory of reduced culpability due to extreme emotional distress at the time of the murders.

Mills raised this claim for the first time in his Rule 32 proceedings, and the ACCA rejected it on the merits in its review of the circuit court's denial of Mills' Rule 32 petition. (Vol. 21, Tab #R-64 at 25-27; *Mills v. State*, CR-13-0724, Mem. Op. at 25-27 (Ala. Crim. App. Dec. 11, 2015)). As with the claim discussed in the preceding section, the ACCA rejected this claim since this allegation would have been in "inherent conflict" with Mills' trial strategy. (*Id.* at 25.) As noted above, Mills testified at trial that he was not involved in the crime and did not murder the Hills. (Vol. 9, Tab #R-19, R. 811-12.) As the ACCA correctly recognized, investigating Mills' mental health would have not been relevant where Mills denied all involvement in the crime. Such evidence would only have been relevant if Mills admitted to being involved in the murders but asserted that such evidence of his mental state reduced his culpability for the crime. (Vol. 21, Tab #R-64 at 25.)

Several reasons from the state-court record support the state court's decision. First, although Mills contends that his counsel should have investigated his mental state at the time of the offense, he failed to specifically plead in his Rule

32 petition how any of the allegedly traumatic events had any relationship to the murders. Notably, Mills attacked and robbed the Hills on June 24, 2004. Many of the alleged traumatic events Mills listed in his petition occurred in 2003 with the most recent event occurring several months before the murders in March 2004. Mills failed to plead any factual basis in the state court to show how these temporally distant events affected his mental state at the time of the offense. Second, Mills failed to identify in his Rule 32 petition any specific mental disease or defect that he allegedly suffered from that would have made his mental state relevant at the time of the offense, and general mental issues do not qualify as a defense under Alabama law. *See* § 13A-3-1, Ala. Code 1975 ("Mental disease or defect does not otherwise constitute a defense."). Simply the fact that Mills may have been upset by his parents' medical issues does not qualify as a severe mental illness. Nor does that fact that Mills had a pain in his right hand qualify as a severe mental illness. Finally, for all of the reasons discussed in the previous section addressing Mills' longstanding drug use, Mills' attempt to show that his counsel's failure to investigate these "stressors" was not strategic but was the result of ignorance, fails.

> **4.  Mills' claim that his trial counsel was ineffective in failing to object to DFS lab director Rodger Morrison's testimony that he had been able to exclude Benji Howe as the source of DNA on the murder weapon handles**

Mills argues that his trial counsel should have objected to Morrison's testimony on two grounds: (1) it violated Mills' right to confront witnesses pursuant to *Crawford*; and (2) it did not meet the heightened reliability standards for expert testimony pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

The *Crawford* allegation is essentially the same claim that Mills alleges in Part IV.A.2., *supra*, at pages 35-40. For the reasons stated in that section, Mills is due no relief on this claim.

With regard the *Daubert* claim, Mills argues that his trial counsel failed to object to the fact that the State produced no evidence identifying or describing the method of analysis underlying the comparison of Howe's DNA profile to the material recovered from the murder-weapon handles. The Supreme Court in *Daubert* held that "under the [Federal] Rules [of Evidence] the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589. The *Daubert* Court noted that "many factors will bear on the inquiry [into whether an expert's reasoning or methodology is reliable], and we do not presume to set out a definitive checklist or test." *Id.* at 593. Nevertheless, the Court did identify certain factors that may be pertinent to such an inquiry, including "whether [the theory or technique at issue] can be (and

has been) tested"; whether it "has been subjected to peer review and publication"; the "known or potential rate of error" of the technique, as well as the "existence and maintenance of standards controlling [its] operation"; and the degree to which the relevant scientific community accepts the theory or technique as reliable. *Id.* at 593–94.

Mills raised this claim in his Rule 32 proceedings, arguing that Morrison's testimony was unreliable "because the State produced no evidence even identifying or describing the method of analysis underlying the purported comparison of Howe's DNA profile to the material recovered from the murder-weapon handles, let alone attesting to testing, peer review, error rate, or general acceptance." (Vol. 21, Tab #R-64 at 46; *Mills v. State*, CR-13-0724, Mem. Op. at 46 (Ala. Crim. App. Dec. 11, 2015) (quoting Mills' brief at 50-51)). The ACCA rejected it on the merits in its review of the circuit court's denial of Mills' Rule 32 petition. (Vol. 21, Tab #R-64 at 45-47; *Mills v. State*, CR-13-0724, Mem. Op. at 45-47 (Ala. Crim. App. Dec. 11, 2015)). The ACCA held: "As to the suggestion that the comparison of the submitted evidence against the CODIS database and the profile of Howe was unreliable, Mills pleaded no facts that actually question the reliability of those matters." (*Id.* at 47.)

Mills has failed to demonstrate that this decision was objectively unreasonable. As the state court found, Mills failed to plead what specific objections or argument his trial counsel should have made against Morrison's testimony or the reliability of the DNA evidence in general. Nor did he plead what testimony would have actually been found to be inadmissible had his trial counsel objected. Mills also failed to plead that Morrison would not have been able to provide additional information had trial counsel objected. And even if Mills' trial counsel had objected on these grounds, "'[t]he failure of testimony to name the DNA method used goes to the weight of the evidence, not its admissibility.'" *Morris v. State*, 60 So. 3d 326, 371 (Ala. Crim. App. 2010) (quoting *Broadnax v. State*, 825 So. 2d 134, 174 (Ala. Crim. App. 2000)).

Mills has failed to point to facts in the state-court record to demonstrate that the state court findings were unreasonable. Thus, he is due no relief.

### 5.    Mills' claim that trial counsel failed to identify and consult necessary expert witnesses

Mills contends that his trial counsel should have retained an expert to testify at trial regarding the cause of death of Vera Hill, an expert on eyewitness identification to rebut Jennifer Yaden's testimony that she saw a white car at the Hillses' residence at the time of the crime, a forensic expert to challenge Morrison's testimony about Howe's DNA in the CODIS database, a mental health

expert to provide an opinion as to Mills' mental health, and a psychology expert to testify about the psychological effects of chemical dependency on methamphetamine.

Mills raised this claim for the first time in his Rule 32 proceedings, and the ACCA rejected it on the merits in its review of the circuit court's denial of Mills' Rule 32 petition. (Vol. 21, Tab #R-64 at 27; *Mills v. State*, CR-13-0724, Mem. Op. at 27 (Ala. Crim. App. Dec. 11, 2015)). The court found that the circuit court's summary dismissal of this claim was appropriate because Mills failed to identify by name any expert who could have testified in his case or assisted with his defense. (*Id.* at 27.) The court held that Mills' claim was insufficiently pleaded and that it "failed to comply with the full-fact pleading requirements of Rule 32.6(b), Ala. R. Crim. P," citing numerous decisions from the ACCA that affirmed the summary dismissal of claims based on a Rule 32 petitioner's failure to plead the name of an expert in a Rule 32 petition. (*Id.*)

Mills cannot establish that the ACCA's decision was objectively unreasonable. As noted above, the court cited caselaw holding that a Rule 32 petition is required to plead the name of an expert and that expert's expected testimony. (*Id.*; *see, e.g., Lee v. State*, 44 So. 3d 1145, 1166-67 (Ala. Crim. App. 2009) ("a petitioner fails to meet the specificity requirements of Rule 32.6(b), Ala.

R. Crim. P., when the petitioner fails to identify an expert by name or plead the contents of that expert's expected testimony"). Mills has failed to identify any holding from the Supreme Court that conflicts with this decision.

Moreover, Mills failed to plead specific facts concerning what the unnamed experts' testimony would have been. For example, Mills alleged that his trial counsel should have retained an expert regarding cause of death who could have provided a "sound medical opinion" that Vera Hill died from COPD. Yet Mills failed to plead any specific facts concerning what the unnamed expert's "sound medical opinion" would have been, nor did he plead that an expert had actually concluded that Vera Hill had died from COPD. This pleading failure establishes that the ACCA's decision that this claim was insufficiently pleaded was not unreasonable. *See Lee v. Comm'r, Ala. Dep't of Corrs.*, 726 F.3d 1172, 1196 (11th Cir. 2013) ("Further, despite his factual allegations that he may have suffered head trauma in a car accident, Lee has never alleged that a physician, mental health professional, or other expert has concluded that Lee actually sustained a head injury or is otherwise mentally impaired or impacted from the accident."). Finally, other than bare allegations, Mills failed to specifically plead how he was prejudiced under *Strickland* by the failure to retain these experts. For these reasons, Mills

cannot establish that the ACCA's decision that this claim was insufficiently pleaded and subject to summary dismissal was objectively unreasonable.

6.    **Mills' claim that trial counsel failed to object when the prosecutor, according to Mills, argued in opening statements that Mills was the "kind of person" who would commit a crime and when a law enforcement officer testified that Mills was a suspect based on the suspicions he developed while working in law enforcement**

Mills alleges that that his trial counsel was ineffective for failing to object to what he contends was prosecutorial misconduct. Mills argues that his trial counsel should have objected when the prosecutor argued in opening statements that Mills was a suspect in the murders because law enforcement officers believed that he was the "kind of person" who would likely commit a crime. Mills also contends that his trial counsel should have objected to testimony from a law enforcement officer that Mills was identified as a suspect based on his personal suspicions about Mills that he developed while working in law enforcement. Mills says this testimony's illegal purpose was to show that Mills was known to be a bad character and would be readily identified as a suspect in a murder even in the absence of other evidence tying him to the crime.

Mills raised this claim for the first time in his Rule 32 proceedings, and the ACCA rejected it on the merits in its review of the circuit court's denial of Mills' Rule 32 petition. (Vol. 21, Tab #R-64 at 43-45; *Mills v. State*, CR-13-0724, Mem.

Op. at 43-45 (Ala. Crim. App. Dec. 11, 2015)). The court held that the "prosecutor's opening statement did not refer to Mills as the 'kind of person' who would have committed the crimes." (*Id.* at 44.) The court noted that "[i]nstead, the prosecutor explained that Mills was developed as a suspect because a witness stated that she had noticed a white car coming and going from the Hills' house around the time of the murders and that Mills was one of the people in the rural area who owned a white car. (R. 374.)" (*Id.*) The court further found that the testimony from the law enforcement officer did not tend to show evidence of bad character but was admissible to show how Mills became a suspect. (*Id.*) The court then held that Mills' trial counsel was not ineffective for failing to object to every possible instance because objections "are a matter of trial strategy." (*Id.* at 44-45.)

Mills has failed to plead how the ACCA's decision that this claim was subject to summary dismissal was objectively unreasonable. The state-court record confirms that Officer Larry Webb ("Webb") did not testify that Mills was developed as a suspect based solely on Webb's personal suspicions, but rather based on the fact that, among other things, Mills owned a vehicle that matched the description of the vehicle observed near the crime scene. (Vol. 7, Tab #R-17, R. 418-419.) Webb further testified that because the murders occurred in a small community, the potential suspect would likely need to know this particular area,

and Mills and his wife had been seen in this area before and had family in the area. (*Id.* at 419-20.) Thus, Mills' contention that this evidence was admitted to show evidence of bad character is meritless and refuted by the record. Contrary to his contention, this evidence was introduced to explain how Mills was developed as a suspect based on the information provided and available to law enforcement. Indeed, the argument and testimony of which Mills complains were introduced in conjunction with other information regarding the way the investigation developed. (*Id.* at 373-75, 516-19.) Because Mills cannot show that the ACCA's decision was objectively unreasonable or contrary to Supreme Court precedent, he is due no relief.

> **7.     Mills' claim that trial counsel failed to object to DFS DNA analyst and crime scene investigator Robert Bass's testimony concerning DNA testing of items found in Mills' trunk**

Mills alleges that his trial counsel was ineffective for failing to object on *Daubert* grounds to the testimony of Robert Bass, a DFS employee, concerning DNA material obtained from items that were found in Mills' car. Mills asserts that Bass simply testified to his opinion that certain stains contained human DNA, and that the DNA material in those stains "match[ed]" the DNA of the victims, but he did not explain the process used in the purported tests, nor how he applied that process to any particular comparison.

Mills raised this claim for the first time in his Rule 32 proceedings, and the ACCA rejected it on the merits in its review of the circuit court's denial of Mills' Rule 32 petition. (Vol. 21, Tab #R-64 at 45-47; *Mills v. State*, CR-13-0724, Mem. Op. at 45-47 (Ala. Crim. App. Dec. 11, 2015)). Specifically, the court held the following:

> The record indicates that Bass testified that he tested and obtained the DNA profiles from the submitted evidence and that he entered those DNA profiles into the database of convicted offenders, which database Bass identified as "CODIS." (Trial R. 624-26.) Further, Mills did not plead any facts that would have shown that Bass's testimony or the testing methods he used were actually unreliable. Indeed, in cross-examining Bass, Mills' counsel emphasized that Bass's testing revealed that Mills' own DNA was not on any of the tested evidence; thus, attacking the reliability of Bass's methods would not have necessarily benefitted Mills.

(*Id*. at 46-47.)

Similar to Mills' claim that his counsel should have objected on *Daubert* grounds to Morrison's testimony, Mills has failed here to produce any evidence showing that this decision was objectively unreasonable. For the same reasons as stated in the section on Morrison's testimony, *see* Part IV.C.4., *supra*, at pages 98-100, Mills is due no relief on this claim.

**8. Mills' claim that his trial counsel failed to object to the introduction of bad character evidence concerning alleged domestic violence by Mills against JoAnn and Mills' marital infidelity**

Mills alleges that his trial counsel was ineffective for failing to object to the prosecution's reference to alleged domestic violence between Mills and JoAnn, during the State's cross-examination of Mills concerning a meeting the couple had with an investigator. Mills points to a specific exchange during his cross-examination, as follows:

> Q:   Now, back a few months before [Mills was arrested for the Hill killings] you testified that you and JoAnn had had some rough times?
>
> A:   Yes, sir.
>
> Q:   And in fact, both of y'all had come in to see Ken Mays, is that correct?
>
> A:   Yes, sir.
>
> Q:   Y'all had a falling out; he's a domestic violence investigator, but he does protection orders and all that kind of stuff or assists people in getting it, and he kind of tried to negotiate a truce between y'all, didn't he?
>
> A:   Yes, sir.

(R1. 823–24.) Mills contends that this questioning was irrelevant, violated the prosecutor's prior agreement not to raise the topic of domestic violence, and impermissibly conveyed to the jury information about Mills' reputation for violence and a specific prior act of violence.

Mills also argues that his trial counsel were ineffective for failing to object when the prosecutor questioned Mills about a married woman Mills had met in December 2006 who had visited Mills in jail and had "since gotten divorced," for the purpose of suggesting that Mills had been unfaithful to JoAnn. (R1. 817.) According to Mills, the error was compounded when the State ended its closing argument by using this testimony to bolster JoAnn's testimony, suggesting she was more credible than Mills because she was "upset" by Mills' infidelity while in jail. (R1. 919–20.)

Mills raised this claim for the first time in his Rule 32 proceedings, and the ACCA rejected it on the merits in its review of the circuit court's denial of Mills' Rule 32 petition. (Vol. 21, Tab #R-64 at 47-50; *Mills v. State*, CR-13-0724, Mem. Op. at 47-50 (Ala. Crim. App. Dec. 11, 2015)). First, the ACCA rejected Mills' claim that the prosecutor improperly cross-examined him on his reputation for violence and a specific prior act of violence, explaining that when placed in context, the questioning on cross-examination was in response to matters raised by Mills on direct examination. The court further noted that the prosecutor did not elicit any specific details or facts suggesting that Mills had a reputation for violence or had engaged in any specific act of violence. The ACCA's analysis is worth repeating here:

On direct examination, Mills had testified that he and JoAnn had had an "on and off" relationship and had gotten back together about a month before the crimes. (Trial R. 787.) Mills also testified that he was not aware of JoAnn ever using drugs. (*Id.*) Further, he testified that when he was told he was under arrest for capital murder, he said to law enforcement, "You all know me better than this." (Trial R. 807.)

On cross-examination, the following exchange occurred:

> "Q. And then you testified you talked to the officers and told them this wasn't like--you said, 'You know me. This ain't nothing I'd do'?

> "A. Right. Mr. Webb and Ted Smith was there and Bryan McCraw.

> "Q. Now, back a few months before this happened you testified that you and JoAnn had had some rough times?

> "A. Yes, sir.

> *"Q. And in fact, both of y'all had come in to see Ken Mays; is that correct?*

> *"A. Yes, sir.*

> *"Q. Y'all had a falling out; he's a domestic violence investigator, but he does protection orders and all that kind of stuff or assists people in getting it, and he kind of tried to negotiate a truce between y'all, didn't he?*

> *"A. Yes, sir.*

> *"Q. And he tried to sit both of y'all down and see, you know, can we just go ahead and divide up the property and y'all go your separate ways—*

> "A. Yes, sir.

"Q. --for the time being?

"A. Yes, sir.

"Q. And in fact, in your statement to him you said that you had heard she was doing drugs?

"A. Yes, sir.

"Q. So you had--at least at that time you claimed she was doing drugs?

"A. I heard that she was, yes, sir, but to my knowledge I had not seen it.

"Q. And she accused you of doing drugs?

"A. Yes, sir, she had.

"Q. So both of y'all were pointing the finger at the other one for drug use?

"A. Yes, sir.

"Q. And this was back in what, April of that year?

"A. Approximately, yes, sir.

"Q. It was about three months before this happened?

"A. Yes, sir. That's what the argument was about."

(Trial R. 823-25 (emphasis added).)

The specific questioning that Mills alleges was improper is emphasized above. Placed in context, that questioning was merely in response to matters raised by Mills testimony on direct examination

and was not improper. The prosecutor did not elicit any details that Mills had a reputation for violence or suggest that Mills had engaged in any specific act of violence. As the State notes, "[a] passing reference to an investigator's job-title does not mean that the prosecutor introduced bad-character evidence against Mills. . . . The reference to Investigator Mays's job-title was simply just a passing foundational comment to explain the circumstances that Mills talked with Mays." (State's brief, pp. 63-64.)

(*Id.* at 47-49).

The ACCA also rejected Mills' claim that the prosecutor improperly questioned Mills about a married woman he had met in December 2006 to suggest that he had been unfaithful to JoAnn. The court similarly held that "placed in context, the prosecutor's questioning and comments were not improper." The ACCA's complete analysis on this sub-claim was as follows:

As with the previous claim, placed in context the prosecutor's questioning and comments were not improper. The record indicates that the prosecutor elicited testimony from Mills that while he was in jail he had sent letters addressed to Sherri Sanchez for her to deliver to JoAnn; those letters told JoAnn that Mills was still in love with her. It was after that testimony that the prosecutor asked about the woman who had visited Mills in December 2006 and had "since gotten divorced." In closing, the prosecutor stated:

"Ladies and gentlemen, JoAnn Mills told us what happened. The physical evidence in this case backs her up. They didn't shake her. She was upset. Who wouldn't be? She has to relive this every single day. I mean, that's all she's got to do. And of course, Jamie is sending her letters down at the jail, 'I love you,' and all this kind of stuff. You'll read that. And he testified, 'Well, yeah, I've got somebody else who's been visiting me. She's from

> Walker County.' So he's playing both sides there, you
> know, trying to keep JoAnn in line and also getting set up
> so, 'Hey, they cut me loose, I'm good to go.'"

(Trial R. 919-20.)

The circuit court did not err in summarily dismissing this claim.

(*Id.* at 49-50.)

Mills has failed to show how the ACCA's decision was objectively unreasonable. The state court's decision was strongly supported by the record. First, the prosecutor never elicited details that Mills personally had a reputation for violence, nor questioned Mills about a specific act of prior violence. Instead, the prosecutor simply laid a foundation for additional questioning about a statement Mills had made to Investigator Ken Mays ("Mays"), which Mills had opened the door to on direct examination. The prosecution questioned Mills on the fact that Mills and his wife had marital difficulties and that Mays visited the couple. (Vol. 9, Tab #R-19, R. 823.) In a preference to his question, the prosecutor identified that Mays' profession was a domestic violence investigator and then questioned Mills about his discussions with Mays and statements that he made to Mays during this visit. (*Id.* at 823-25.) At no point did the prosecutor allude to or question Mills about specific instances of violent conduct or domestic violence. The reference to Mays's job title was simply just a passing foundational comment to explain the

circumstances that Mills talked with Mays. In fact, the questioning regarding Mills'

actual statement to Mays involved a completely different subject matter (JoAnn's

use of drugs), and Mills failed to cite to another instance in the record where Mays'

job description was mentioned again.

In any event, even accepting Mills' allegations as true, Mills failed to plead a

sufficient factual basis that could overcome the presumption of reasonableness and

show that trial counsel was deficient given that objections are a matter of trial

strategy. Nor did Mills plead how he was prejudiced.

Finally, Mills also failed to plead a specific factual basis for prejudice based

on his claim that his trial counsel failed to object when the prosecutor questioned

Mills about a woman who visited him in jail. Even assuming his contention that the

prosecutor's comment was objectionable, Mills failed to plead any specific facts

other than a bare conclusory allegation that could show there was a reasonable

probability that jury would have found reasonable doubt in the absence of this

passing comment. For these reasons, Mills is due no relief.

> ### 9. Mills' claim that his trial counsel failed to object to the admissibility of Dr. Kenneth Snell's testimony as to Vera and Floyd Hills' causes of death

Mills alleges that his trial counsel was ineffective for failing to object to the

testimony of Dr. Kenneth Snell relating to the cause of death for Floyd and Vera

Hill. Mills argues that Dr. Snell's testimony concerning the cause of death was unreliable and violated his Confrontation Clause rights, because Dr. Snell did not perform the autopsies, was not present for the autopsies, and did not prepare the autopsy reports upon which he based his opinion.

Mills raised this claim for the first time in his Rule 32 proceedings, and the ACCA rejected it on the merits in its review of the circuit court's denial of Mills' Rule 32 petition. (Vol. 21, Tab #R-64 at 50-51; *Mills v. State*, CR-13-0724, Mem. Op. at 50-51 (Ala. Crim. App. Dec. 11, 2015)). The court held that the underlying claim that Dr. Snell's testimony was unreliable was without merit because the ACCA and then the Alabama Supreme Court had both held on direct appeal that Dr. Snell's testimony was properly admitted, and that even if there was error, it was harmless because Mills did not challenge Dr. Snell's conclusions at trial as to the causes of the victims' deaths but instead relied upon the sole theory that Mills did not commit the crimes. (*Id.* at 51, citing *Mills v. State*, 62 So. 3d 553 (Ala. Crim. App. 2008) and *Ex parte Mills*, 62 So. 3d at 594.) The court also held that Mills' underlying claim that the testimony of Dr. Snell violated the Confrontation Clause was without merit. Specifically, the court noted that similar claims alleging a violation of the Confrontation Clause had been rejected. (*Id.*, citing *Thompson v. State*, 153 So. 3d 127, 29 (Ala. Crim. App. 2012.)) Thus, the court concluded that

because Mills' underlying claims were meritless, his claim that trial counsel was ineffective for not objecting also failed. (*Id.*)

Mills has failed to establish that the ACCA's decision was objectively unreasonable or point to a specific holding from the Supreme Court that conflicts with the state court's decision. First, as the ACCA correctly noted in the Rule 32 proceedings, both the ACCA and the Alabama Supreme Court on direct review discussed at length why Dr. Snell's testimony was properly admitted. The Alabama Supreme Court's thorough discussion is worth repeating here:

> Mills argues next that the admission of testimony at trial from Dr. Kenneth Snell regarding Floyd's and Vera's causes of death was plain error. The Court of Criminal Appeals addressed this issue as follows:

>> "[Mills] also argues that the trial court erroneously allowed Dr. Kenneth Snell of the Alabama Department of Forensic Sciences ('DFS') to testify about the causes of the victims' deaths and also erroneously allowed the State to introduce the autopsy reports into evidence. Specifically, he contends that the trial court should have excluded Snell's testimony and the autopsy report because they were both based on the notes and findings of Dr. Johnny Glenn, who allegedly 'was so mentally incapacitated at the time of the autopsies that he was unable to do much of his work and was forced to retire shortly thereafter because of advanced [A]lzheimer's disease.' ([ Mills'] brief at p. 11.)

>> "Glenn performed the autopsy on Floyd on June 25, 2004, and performed the autopsy on Vera on September 14, 2004. Sometime after he had performed the

autopsies, Glenn left DFS because he had been diagnosed with Alzheimer's disease. Subsequently, James Lauridson prepared autopsy reports. At trial, Snell testified regarding the causes of the victims' deaths.

"Initially, we note that the autopsy reports were not admitted into evidence during [Mills'] trial. Rather, the defense admitted the reports as exhibits only for the hearing on the admissibility of Snell's testimony. Therefore, [Mills'] argument regarding the autopsy reports is moot.

"With regard to Snell's testimony, during an off-the-record discussion, the defense stated that it expected the State to call a witness to testify as to the causes of death based on Glenn's autopsy notes and based on the autopsy photographs; that Glenn was apparently incompetent at the time of the autopsies; and that it would object to the State witness drawing conclusions based on the notes of someone who was incompetent at the time he took the notes. The defense then stated that it would like to conduct a voir dire examination out of the presence of the jury to determine what information the witness intended to use to form his opinion. After the State qualified Snell as an expert, the defense conducted a voir dire examination of Snell. Thereafter, [Mills] did not argue that the trial court should exclude Snell's testimony. Also, [Mills] did not object when Snell testified before the jury as to the causes of death. Therefore, we question whether he properly preserved this argument for our review.

"Moreover,

'[i]t is well settled that any challenge to the facts upon which an expert bases his opinion goes to the weight, rather than the

admissibility, of the evidence. *Dyer v. Traeger*, 357 So. 2d 328, 330 (Ala. 1978).'

"*Baker v. Edgar*, 472 So.2d 968, 970 (Ala. 1985). During the discussion about Snell's testimony, the district attorney informed the trial court that Glenn was no longer with DFS because he had developed Alzheimer's disease; that he did not think that Alzheimer's disease was an issue during Floyd's autopsy; and that Alzheimer's disease was possibly manifesting itself during Vera's autopsy. Defense counsel asserted that he had read in the newspaper that Glenn had resigned in early Fall 2004 and that Glenn's work was left in disarray.

"Mathis Dyer testified that he had worked with DFS as a death investigator; that he was present during the autopsies of Floyd and Vera; that he probably made some of the photographs, but sometimes the medical examiner took some as well; and that he was present when the photographs from Floyd's and Vera's autopsies were made.

"Gerald Howard testified that he was a forensic pathology technician at DFS; that he assisted the pathologist in all aspects of the autopsy; and that this included making photographs, helping with the identification, the evisceration, the cleanup, and maintaining the facilities used to do the autopsy. He also testified that he was present during the autopsies of Floyd and Vera; that he was involved in collecting evidence, evisceration, and processing the evidence that was collected during the autopsies; that Glenn supervised, dictated, and took notes; that, if there was something Glenn needed to look at closer, he would come in, look, and make sure it was noted and photographed; and that Glenn made sure they noted anything significant that happened during the autopsy.

"Snell testified that, in determining the cause of Floyd's death, he relied on the autopsy report prepared by Lauridson and the autopsy photographs. In determining the cause of Vera's death, he relied on her discharge summary from the University of Alabama Birmingham Hospital, which discussed her course of treatment while she was in the hospital; an autopsy report that had been prepared by Lauridson and that was based on Glenn's notes; the autopsy photographs; and a diagram Glenn generated at the time of the autopsy. With regard to the autopsy reports, Snell testified that he relied strictly on the factual portions of the reports to form his opinions; that he did not initially read the opinion portions of the reports; that he made his determination as to the causes and manner of the victims' deaths; and that he then compared his findings with Lauridson's findings in the autopsy reports. He also testified that he reviewed a cause of death letter Glenn had written to the coroner regarding Floyd; that he did not actually rely on the letter to formulate his opinion as to the cause of death; that he simply reviewed the letter; and that, in his opinion, it was accurate. Finally, he testified that his opinion as to the causes of the victims' deaths was in agreement with the opinions of Lauridson and Glenn; that the factual portions of the autopsy report comported with Glenn's diagram of Vera; that the autopsy photographs and the autopsy reports were in agreement; and that, if he had had any disagreements with the opinions of Glenn and Lauridson, he would have had difficulty saying that he believed the reports to be true.

"The State presented evidence that Dyer and Howard were present during the autopsy, that Howard assisted in all portions of the autopsy, and that the autopsy diagram and autopsy reports were consistent with the photographs. Also, there was not any evidence indicating that there were irregularities in the autopsies or that the

118

photographs from the autopsies were inaccurate. Therefore, Snell properly based his opinions on the photographs and autopsy reports. Furthermore, even if Glenn was incompetent at the time of either autopsy, any challenge to the facts that formed the basis for Snell's opinion went to the weight the jury assigned to his testimony. Therefore, there was not any error, much less plain error, in the admission of Snell's testimony regarding the causes of death. *See* Rule 45A, Ala. R. App. P."

*Mills I*, 62 So. 3d at 567-69.

In his materials to this Court, Mills contends that the admission of Dr. Snell's testimony was plain error under *Ex parte Wesley*, 575 So. 2d 127 (Ala. 1990), and *Madison v. State*, 620 So. 2d 62 (Ala. Crim. App. 1992). In *Ex parte Wesley*, this Court held that the trial court committed reversible error in admitting, over the repeated objections of the defendant, the opinion testimony of a psychologist who testified that the defendant could have appreciated the criminality of his conduct on the date in question. This Court held that the opinion testimony was inadmissible because it was based on certain information in police reports and medical records that were not themselves introduced into evidence. 575 So.2d at 130. In *Madison*, the Court of Criminal Appeals considered the testimony of a psychologist who gave an opinion regarding the defendant's mental condition at the time of the crime. 620 So. 2d at 68. The defendant contended on appeal that the admission of that testimony constituted plain error because it was substantially based on information not introduced into evidence. The Court of Criminal Appeals agreed with the defendant.

The *Madison* court noted that the following information, which the psychologist relied upon in giving his opinion regarding the defendant's mental condition, was never introduced into evidence: information received from the mother of the defendant's child; information received from the defendant's girlfriend; information received from the officer who arrested the defendant and took a statement from him; information received from the chief jailer and his

assistant regarding the defendant's conduct while he was in jail; information received from a state psychologist who had observed the defendant weekly for five years while the defendant was imprisoned at Holman Correctional Facility; "portions of the 'police file'; records from 'the Atmore, Alabama vicinity,' presumably the same as those referred to as from Holman prison"; a taped statement the defendant gave police after his arrest; and some court-proceeding transcripts. 620 So. 2d at 70. The prosecution made almost no attempt to introduce any of that evidence, and yet "[f]rom his opening statement to his final summation during the guilt phase of the trial, the prosecutor urged the jury to give special weight and consideration to [the psychologist's] testimony." 620 So. 2d at 71.

Stating that it was "apparent" that the psychologist had considered all the above information "as critical in arriving at his opinion," the Court of Criminal Appeals noted that "[t]he inescapable conclusion is that [the psychologist's] opinion was based substantially on information not available for the jury's consideration, and thus, in accordance with the rule of evidence [stated in *Ex parte Wesley* ], his testimony was inadmissible." 620 So. 2d at 71. The Court of Criminal Appeals held that, under the circumstances, the admission of that testimony was plain error.

In Mills' case, the State argues that Dr. Snell's testimony regarding the Hills' causes of death was not inadmissible under *Ex parte Wesley* because, the State says, the facts Dr. Snell relied upon in forming his opinion were in evidence. In this regard, the State notes that Dr. Snell testified that he relied only on certain "factual" portions of the items—such as the autopsy reports prepared by Dr. James Lauridson based on Dr. Johnny Glenn's notes or the diagram prepared by Dr. Glenn—that were not in evidence. The State contends, however, that the information in those "factual" portions of the items not in evidence was in conformity with the autopsy photographs that were introduced into evidence.

The State also maintains that Dr. Snell's testimony was admissible under the exception noted in *Ex parte Wesley* "where the expert is a deputy coroner who uses a toxicologist's autopsy report as

part of the basis for his testimony." 575 So. 2d at 129 (citing *Jackson v. State*, 412 So. 2d 302 (Ala. Crim. App. 1982), and *Woodard v. State*, 401 So. 2d 300 (Ala. Crim. App. 1981)). In both *Jackson* and *Woodard*, the Court of Criminal Appeals held that a coroner who had personally observed the bodies could give an opinion about the cause of death even though the coroner's opinion was also based on information in autopsy reports that the coroner had not prepared. *Jackson*, 412 So. 2d at 306; *Woodard*, 401 So. 2d at 303.

Mills attempts to distinguish *Jackson* and *Woodard* by arguing that unlike the coroners who testified in those cases, Dr. Snell was not present when the autopsies were performed and did not personally observe the bodies of Floyd and Vera Hill. We find that distinction unavailing. In this case, Dr. Snell relied on the photographs from the autopsies, which were admitted into evidence. As noted in *Mills I*, there was an abundance of evidence indicating, among other things, that the photographs accurately depicted the bodies at the time the autopsies were performed and that the photographs were consistent with the factual information in the autopsy reports and the diagram. Mills asserts that "the idea that a set of photographs could convey all of the detailed information, including measurements and impressions, contained in a six-page narrative autopsy report . . . is unsupportable." (Mills' reply brief, p. 13.) But Mills has not offered any reason why Dr. Snell's observation of the bodies by means of examining the autopsy photographs should not be considered the functional equivalent of the coroners' personal observation of the bodies in *Jackson* and *Woodard*. Consequently, the State has shown that Dr. Snell's testimony was admissible under the limited exception recognized in *Jackson* and *Woodard*. Moreover, even if there had been error in the admission of Dr. Snell's testimony, the error would have been harmless. Mills did not challenge Dr. Snell's conclusions at trial as to the causes of the victims' deaths; rather, the sole theory Mills argued to the jury was that he did not have any involvement in the murders. Accordingly, there was no plain error in the admission of Dr. Snell's testimony.

*Ex parte Mills*, 62 So. 3d at 590-94 (footnotes omitted). The record supports the

Alabama Supreme Court's analysis of the underlying claim. Dr. Snell testified that

he based his opinion on a discharge summary from the University of Alabama Birmingham Hospital, an autopsy report prepared by Dr. Lauridson, and photographs of the autopsy.  (Vol. 8, Tab #R-18, R. 497.)  The UAB medical records as well as the autopsy photographs were admitted into evidence.  While the prosecution did not specifically introduce the autopsy report itself (Mills later introduced the report in a hearing on the admissibility of Dr. Snell's testimony), Dr. Snell testified that he did not rely on the autopsy report as a whole or the opinions in the report, but only the factual information in the report. (*Id*. at 502.) Dr. Snell further explained that the factual information in the autopsy report was in agreement with the photographs of the autopsy. (*Id*. at 503.) Thus, because Mills' underlying claim that it was error for the trial court to admit Dr. Snell's testimony was meritless, it was reasonable for the ACCA to conclude that an ineffective assistance of counsel claim based on that argument also fails.

The ACCA's other conclusion—that Mills' ineffective assistance of counsel claim based on failure to object on confrontation clause grounds was meritless— was also reasonable. As the ACCA noted, an autopsy report is non-testimonial and thus, does not violate the Confrontation Clause. *See Thompson*, 153 So. 3d at 127-29. Indeed, the cases cited in *Thompson* make clear that, at the time of Mills' trial in 2007, courts consistently held that "it was not a violation of the Confrontation

Clause to admit an autopsy report without the medical examiner's testimony or testimony indicating that he or she was not available." *Id.* at 128. Thus, trial counsel was not unreasonable for failing to make such an objection where Alabama courts held that such testimony did not violate *Crawford*. Further, contrary to Mills' contention, Dr. Snell did not base his testimony on out-of-court statements by Dr. Glenn and Dr. Lauridson. As noted above, Dr. Snell specifically testified that he did not base his opinion on the opinions of Dr. Glenn and Dr. Lauridson, but only on the factual information included in the reports. (Vol. 8, Tab #R-18, R. 502-503.) And this factual information was already available through, and consistent with, the autopsy photographs. (*Id.*) Moreover, a forensic technician and a forensic investigator who were present during the Hills' autopsies and who confirmed that the factual information in the reports were consistent with the photographs, testified during trial. *Mills*, 62 So. 3d at 568-69. Thus, Mills was not denied his right of confrontation.

Because Mills has failed to establish that the ACCA's summary dismissal of this claim was objectively unreasonable, he is due no relief.

> **10.   Mills' claim that his trial counsel failed to object to alleged bolstering of JoAnn Mills' testimony and improper vouching for the State's investigation**

Mills alleges that the State improperly bolstered JoAnn Mills' testimony and vouched for her credibility by eliciting testimony from Investigator Ken Mays that he believed that JoAnn was lying in her initial statement to police, which she gave the day after the murders and in which she exculpated Mills. Mills contends that Mays's testimony that he believed that JoAnn lied in her initial statement, thereby implying that she told the truth in her second statement (which she gave three days later and which inculpated Mills) and in her trial testimony, usurped the jury's role with respect to the central question for the jury: whether to believe JoAnn or Mills. Mills also argues that the prosecutor went on to improperly vouch for JoAnn's testimony *himself* by claiming in closing argument that she "told the same story" at trial and "didn't vary a whole lot" from her second statement to police. (Vol. 10, R. at 916.) Mills contends that his trial counsel was ineffective for failing to object to any of the foregoing.

Mills raised this claim for the first time in his Rule 32 proceedings, and the ACCA rejected it on the merits in its review of the circuit court's denial of Mills' Rule 32 petition. (Vol. 21, Tab #R-64 at 51-53; *Mills v. State*, CR-13-0724, Mem. Op. at 51-53 (Ala. Crim. App. Dec. 11, 2015)). The court held that Mills' underlying claim was without merit, reasoning as follows:

> This underlying claim on which this ineffective assistance claim is based has no legal merit. *See, e.g., Johnson v. State*, 120 So. 3d 1130,

124

1210 (Ala. Crim. App. 2009) ("The testimony given by the investigator was made in response to questions concerning the investigator's decisions concerning his course of investigation. *See Mills v. State*, 62 So. 3d 553 (Ala. Crim. App. 2008) (wherein officer believed that he had a better rapport with Mills' wife so he had Mills picked up and gained consent to search from Mills' wife). An officer clearly may testify to his evaluation of individuals involved in an investigation, including furtive gestures or suspicious circumstances or other matters of perceived credibility based on the officer's expertise. *See generally W.D.H. v. State*, 16 So. 3d 121 (Ala. Crim. App. 2008)."). Here, JoAnn gave two different statements to law enforcement, and the complained-of testimony and arguments were in response to Mills' argument that JoAnn had initially told the truth and his suggesting that she had been pressured into implicating Mills. Finally, the prosecutor's comments were legitimate comments based on the evidence, *see, e.g., Johnson*, 120 So. 3d at 1169-70; those comments urged the jury to believe that JoAnn was credible based on the evidence.

Accordingly, this claim was properly summarily dismissed.

(*Id.*)

Mills has failed to demonstrate that the ACCA's decision was objectively unreasonable. As the state court correctly noted, to explain the reasons an investigation was conducted in a particular manner, a law enforcement officer may testify regarding the truthfulness of the interviewee. *See Johnson*, 120 So. 3d at 1210 ("An officer clearly may testify to his evaluation of individuals involved in an investigation, including . . . matters of perceived credibility based on the officer's expertise."). Here, JoAnn provided statements to law enforcement on two

different occasions, giving different versions of the events. (Vol. 9, Tab #R-19, R. 837, 848.) Mills' defense counsel attempted to present evidence at trial that the law enforcement officer who questioned JoAnn the first time on the day after the murders, Ken Mays, pressured JoAnn to implicate Mills. For example, defense counsel questioned Mays on the fact that he had told JoAnn during her first questioning to "start telling the truth." Mays was also questioned at length about the fact that he told JoAnn that police had DNA evidence linking Mills to the crime, when in actuality there was no DNA evidence linking Mills. (*Id.* at 839-43.) In closing, Mills recalled this evidence to argue that "[law enforcement] decided it was Jamie [Mills], and then they started setting up their case to convict Jamie [Mills]." (*Id.* at 903-04.)

To rebut this evidence and argument, after defense counsel questioned Mays on this basis, the prosecutor elicited from Mays on cross-examination that, based on his training and experience, it was Mays' perception that JoAnn was initially untruthful. (*Id.* at 846.) Placed in this context, the record demonstrates that the purpose of the testimony was not to bolster JoAnn's testimony, but was instead presented to show why Mays interviewed JoAnn in this particular manner.

Moreover, Mills presented no evidence to show that he was prejudiced. The jury was already aware of the fact that Mays did not believe that JoAnn was telling

the truth during her first statement to law enforcement. Prior to the testimony at issue, defense counsel had questioned Mays on the fact that Mays told JoAnn that he did not believe she was telling the truth. (*Id.* at 838-40.) Thus, Mills could not be prejudiced by Mays simply restating what was already in the record. Additionally, the prosecutor never argued that the jury should believe that JoAnn was untruthful in her first statement because Mays believed she was untruthful. Finally, the trial court instructed the jury that the jurors "are the judges of the evidence and credibility of the witnesses," and the jury was solely responsible for weighing the testimony of the witnesses. (Vol. 10, R. 935, 937.)

The record also supports the ACCA's rejection of Mills' allegation that the prosecutor himself vouched for JoAnn's credibility in closing argument. Here, the prosecutor's comments that JoAnn Mills told the "same story" at trial that she told police in her second statement was a legitimate comment based on the evidence. *See Harris v. State*, 2 So. 3d 880, 921 (Ala. Crim. App. 2007) (holding that a prosecutor "may argue every legitimate inference from the evidence and may examine, collate, sift, and treat the evidence in his own way") (citations omitted). Notably, during her cross-examination, Mills' defense counsel elicited the fact that JoAnn's trial testimony was essentially the same story she told police after she was arrested. (Vol. 9, Tab #R-18, R. 776.) Thus, there was a legitimate basis for the

prosecutor's argument. Furthermore, the prosecutor never argued that the jury should believe JoAnn's testimony because he personally believed she was credible. He instead gave several reasons to find her credible, namely that she did not have to review her prior statement to law enforcement to refresh her memory for testifying at trial, and that Mills' defense counsel was only able to show that her trial testimony differed from her second statement to police on minor issues, like whether the clothes and murder weapons were placed in a garbage bag or blue duffel bag. (*Id.* at 915-917.)

Accordingly, because there was no merit to Mills' underlying claim that the State improperly bolstered JoAnn's testimony to his detriment, the ACCA's decision that Mills' counsel was not constitutionally ineffective for failing to object on that ground was reasonable. Thus, Mills is due no relief.

> **11. Mills' claim that his trial counsel failed to object when the prosecutor implied during closing argument that Mills bore a burden and saved most of his summation for rebuttal closing**

Mills alleges that his trial counsel was ineffective for failing to object to the prosecutor's closing argument in which he contends that the prosecution shifted the burden of proof to Mills. The specific argument to which Mills complains was as follows:

> I have to convince 12 of you beyond a reasonable doubt . . . . Mr. Wiley
> has to reach one person, and that's it, to hang the jury and all's for
> naught; we have to do this over again. All he's got to do is reach one
> and put a little idea in their head, give them something, and that's it.
> He calls that a victory. I wouldn't in this case if I was him. That would
> probably be a defendant's worst nightmare.

(Vol. 10, R. at 910.) Mills also complains that the prosecutor complained in closing that Mills did not test and offer his own forensic evidence, but merely "jab[bed] at the State" and "poke[d] holes." (*Id.* at 909, 918–19.) Additionally, Mills argues that at both stages of the trial, the prosecutor improperly deferred most of his summation to rebuttal, where it could not be challenged. Mills contends that trial counsel's failure to object to the prosecutor's misconduct was unreasonable and that the State's closing argument undermined Mills' rights to a fair trial and the presumption of innocence.

Mills raised this claim for the first time in his Rule 32 proceedings, and the ACCA rejected it on the merits in its review of the circuit court's denial of Mills' Rule 32 petition. (Vol. 21, Tab #R-64 at 53-54; *Mills v. State*, CR-13-0724, Mem. Op. at 53-54 (Ala. Crim. App. Dec. 11, 2015)). Specifically, the court held that Mills' claim was subject to summary dismissal because he failed to meet his burden of pleading pursuant to Rule 32.3, which provides that "[t]he petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts

necessary to entitle the petitioner to relief." (*Id.* at 54.) Further, the court held that Mills' claim was without merit because "the prosecutor did not suggest that the defendant had the burden of proof," but rather simply reinforced that the prosecution, not the defense, bore the burden of proof. (*Id.*)

Mills has not established that the ACCA's decision finding that this claim was insufficiently pleaded and subject to dismissal was objectively unreasonable or contrary to Supreme Court precedent. *See Borden v. Allen*, 646 F.3d 785, 812 (11th Cir. 2011) ("A ruling by an Alabama court under Rule 32.6(b) is . . . a ruling on the merits."). First, the record supports the ACCA's decision. Contrary to Mills' claim, the record establishes that the prosecutor simply reminded the jury that "I have to convince 12 of you beyond a reasonable doubt for you to find somebody guilty." (Vol. 10, Tab #R-23, R. 910.) The prosecutor then mentioned that defense counsel could suggest a "little" idea in only one juror's mind and that could cause the jury not to find guilt beyond a reasonable doubt. (*Id.*) The prosecutor never stated that the defense was required to present anything. Nor did the prosecutor suggest that the defense bore any burden of proof during the guilt phase of the trial.

Second, although Mills cites *In re Winship*, 397 U.S. 358 (1970), that case reaffirmed the general proposition that the due process clause protects the accused against conviction except upon proof beyond a reasonable doubt. *Id.* at 364. The

Court in *Winship* had to decide whether juveniles, like adults, are constitutionally entitled to proof beyond a reasonable doubt when they are charged with a violation of criminal law. *Id.* at 365. The ACCA's determination the Mills' counsel was not constitutionally ineffective for failing to object to the prosecutor's closing argument is not contrary to or an unreasonable application of *In re Winship*.

Further, trial counsel was not unreasonable in not objecting to the prosecutor's closing arguments because often such objections can either alienate the jury by interrupting proceedings or draw attention to an unfavorable fact. The Eleventh Circuit has explained:

> Decisions about whether to object—and when, and in what form—are tactical choices consigned by *Strickland* to a lawyer's reasoned professional judgment. Good lawyers, knowing that judges and juries have limited time and limited patience, serve their clients best when they are judicious in making objections. In any trial, a lawyer will leave some objections on the table. Some of those objections might even be meritorious, but the competent lawyer nonetheless leaves them unmade because he considers them distractive or incompatible with his trial strategy.

*Bates v. Sec'y, Fla. Dep't of Corr.*, 768 F.3d 1278, 1295 (11th Cir. 2014).

Finally, as the ACCA correctly found, Mills failed to specifically plead how he was prejudiced under *Strickland* based on these isolated comments. Indeed, after closing arguments, the trial judge instructed the jury on the State's burden of

proof, the fact that Mills "has no burden of proof whatsoever," and the concept of

reasonable doubt. (Vol. 10, R. at 939.) Thus, Mills is due no relief on this claim.

> **12.   Mills' claim that his trial counsel failed to conduct an adequate voir dire, challenge for cause biased jurors, and object to the removal of jurors for cause**

Mills contends that his trial counsel conducted an inadequate voir dire by

failing to strike biased jurors. Specifically, he asserts that trial counsel were

ineffective in (1) failing to object when the trial court removed venire members J.H.

and S.W.; (2) failing to make a for-cause challenge against venire members D.B.

and B.T. because each of these potential jurors had a relationship with one or both

of the victims which, according to Mills, rendered them biased against him; and (3)

failing to move to strike venire members H.P. and D.B., who initially indicated that

they would vote for the death penalty in all cases.

Mills raised this claim for the first time in his Rule 32 proceedings, and the

ACCA rejected it on the merits in its review of the circuit court's denial of Mills'

Rule 32 petition. (Vol. 21, Tab #R-64 at 56-59; *Mills v. State*, CR-13-0724, Mem.

Op. at 56-59 (Ala. Crim. App. Dec. 11, 2015)). The court held that Mills' claim was

due to be dismissed because it was insufficiently pleaded, he pleaded only

conclusory allegations of prejudice, and it was contradicted by the record. (*Id.*)

The ACCA's analysis was as follows:

As to the allegation that counsel should have objected to the circuit court's removal of potential jurors J.H. and S.W., Mills alleged no factual basis for this claim. [Footnote] 6 Accordingly, this claim was insufficiently pleaded.

> [Footnote] 6. It appears that Mills may be referring to the trial court's removal of potential jurors S.W. and J.H. for cause because both potential jurors indicated they could not impose the death penalty. (Trial R. 171-75, 198.) If indeed that is the case, Mills would not be entitled to any relief on his claim that trial counsel should have objected to their removal for cause.

As to the allegation regarding jurors D.B. and B.T., the record indicates that both jurors stated they could be fair and would base their decisions on the evidence. Specifically, the following exchange with D.B. occurred during voir dire:

> "[Defense counsel]: . . . [D.B.], tell me a little bit more about--your wife is a social worker?
>
> "[D.B.]: Yeah.
>
> "[Defense counsel]: She cared for Mrs. Hill? Was that the—
>
> "[D.B.]: Yeah.
>
> "[Defense counsel]: And did she come home and tell you about Ms. Hill and her condition and so forth and so on?
>
> "[D.B.]: No, I never did hear anything about her condition until after we got back from vacation.
>
> "[Defense counsel]: Well, the question's the same to you. Is your wife's relationship with Ms. Hill such that it

would influence your ability negatively to sit on this jury and fairly determine whether or not Jamie is guilty or not guilty based solely on the evidence?

"[D.B.]: I don't believe so. I think I could make a fair assumption.

"[Defense counsel]: Very well. Thank you very much."

(Trial R. 225-26.) The following exchange occurred with B.T.:

"[Defense counsel]: Okay. ... Yes, sir, [B.T.]?

"[B.T.]: Yeah, I knew Floyd and Vera Hill all my life. I first met them when I was probably four or five year old because my daddy was friends with them. I remember going to their house when I was just a small kid. And Floyd, of course, he was a block mason. He built two houses for Daddy, and he's done a lot of work for me, you know, block laying, and we was just good friends. I mean, I knew the people all my life. They were pretty close friends.

"[Defense counsel]: I know you can anticipate my question, which is because of that relationship would you be able to--would that relationship color your ability to sit as a juror in this case and be fair and make a decision only on the evidence you heard in the case?

"[B.T.]: I would be fair. I would base mine on the evidence. I would be fair with that. I would base it solely on the evidence.

"[Defense counsel]: And your relationship with the Hills would not enter into it at all?

"[B.T.]: No. Huh-uh.

"[Defense counsel]: Thank you very much."

(Trial R. 303-04.) As the State points out in its brief on appeal, the record indicates no legal basis to remove these jurors for cause. *See, e.g., Burgess v. State*, 827 So. 2d 134, 147-48 (Ala. Crim. App. 1998), aff'd, 827 So. 2d 193 (Ala. 2000).

Finally, as to potential jurors H.P. and D.P., both initially indicated they would vote only for the death penalty, but both jurors subsequently stated they would follow the court's instructions and would not exclude as an appropriate sentence life imprisonment without the possibility of parole. (Trial R. 323-24, 332-34.)

Summary dismissal of these claims was appropriate.

(*Id.*)

Mills' task is to demonstrate that the ACCA's decision was objectively unreasonable or contrary to Supreme Court precedent. The Court's analysis with regard to each set of jurors is addressed below.

### i.     Jurors J.H. and S.W.

Regarding Mills' first sub-claim, as to jurors J.H. and S.W., the ACCA was correct in holding that Mills failed to plead any specific factual basis for this claim. For instance, Mills failed to specifically plead what objection his trial counsel should have made, how the trial court erred in removing these jurors for cause, any facts concerning the reasons these jurors were struck, or even the basis for their removal. The ACCA assumed that Mills was contending that the trial court improperly removed them for cause on the ground that they stated in their juror

questionnaires that they could not impose the death penalty. The ACCA concluded that this underlying claim was facially meritless and thus, there was no legitimate basis for an objection on that ground. (Vol. 6, Tab #R-11, R. 172-174, 198.)

Mills contends that the ACCA's decision was contrary to, or an unreasonable application of, *Uttecht v. Brown*, 1551 U.S. 1, 9 (2007) ("[A] criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment. . . ."), and *Wainwright v. Witt*, 469 U.S. 412, 424 n.5 (1985), asserting that "the removal of these jurors for cause was improper as they never 'expressed views that would "prevent or substantially impair the performance of their duties in accordance with their instructions or their oaths."'"

The precursor to these two cases was *Witherspoon v. Illinois*, in which the trial court had excused half the venire—every juror with conscientious objections to capital punishment. 391 U.S. 510 (1968.) The Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed it was chosen by excluding potential jurors for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Id.* at 522. As the Court explained:

> The most that can be demanded of a venireman in this regard is that he be willing to consider all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to

> vote against the penalty of death regardless of the facts and
> circumstances that might emerge in the course of the proceedings.

*Id*. at 522 n.21.

> This legal standard was later clarified in *Witt*, as follows:

> We therefore take this opportunity to clarify our decision in
> *Witherspoon*, and to reaffirm the above-quoted standard from *Adams*
> [*v. Texas*, 448 U.S. 38, 45, 100 S. Ct. 2521, 65 L.Ed.2d 581 (1980) ] as
> the proper standard for determining when a prospective juror may be
> excluded for cause because of his or her views on capital punishment.
> That standard is whether the juror's views would "prevent or
> substantially impair the performance of his duties as a juror in
> accordance with his instructions and his oath." We note that, in
> addition to dispensing with *Witherspoon*'s reference to "automatic"
> decisionmaking, this standard likewise does not require that a juror's
> bias be proved with "unmistakable clarity." This is because
> determinations of juror bias cannot be reduced to question-and-answer
> sessions which obtain results in the manner of a catechism. What
> common sense should have realized experience has proved: many
> veniremen simply cannot be asked enough questions to reach the point
> where their bias has been made "unmistakably clear"; these
> veniremen may not know how they will react when faced with
> imposing the death sentence, or may be unable to articulate, or may
> wish to hide their true feelings. Despite this lack of clarity in the
> printed record, however, there will be situations where the trial judge
> is left with the definite impression that a prospective juror would be
> unable to faithfully and impartially apply the law. . . . [T]his is why
> deference must be paid to the trial judge who sees and hears the juror.

*Witt*, 469 U.S. at 424-26 (footnotes omitted).

> In *Uttecht*, the Court then reviewed its *Witherspoon-Witt* line of opinions and

identified "four principles of relevance":

First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause. *Witherspoon*, 391 U.S. at 521, 88 S. Ct. 1770. Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes. *Witt*, 469 U.S. at 416, 105 S. Ct. 844. Third, to balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible. *Id.*, at 424, 105 S. Ct. 844. Fourth, in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts. *Id.*, at 424-434, 105 S. Ct. 844.

551 U.S. at 9. In short, the juror must be "substantially impaired in his or her ability to impose the death penalty" in order to properly be excused for cause. *See id.*

In applying this standard, reviewing courts owe deference to a trial court's ruling on whether to strike a particular juror regardless of whether the trial court engages in an explicit analysis regarding substantial impairment. Indeed, even the granting of a motion to excuse for cause constitutes an implicit finding of bias. *Uttecht*, 551 U.S. at 7. "The judgment as to 'whether a venireman is biased . . . is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province. Such determinations [are] entitled to deference even on direct review; the respect paid such findings in a habeas proceeding certainly should be no less.'" *Id.* (quoting *Witt*, 469 U.S. at 428). A trial court's "finding

may be upheld even in the absence of clear statements from the juror that he or she is impaired." *Id.*

Here, the trial record shows that the judge questioned J.H. individually, at length, about his statement on his juror questionnaire that he could not return a verdict of death. (Vol. 6, R. at 171-75.) The trial judge, who was in the best position to judge J.H.'s demeanor, apparently believed that his statements and demeanor warranted excusing him from the venire from which Mills' jury was chosen. A fairminded jurist could conclude that the trial court was fair in exercising its broad discretion in deciding to excuse J.H. J.H's statements were ambiguous as to whether he would be able to give appropriate consideration in a case which involved the potential for imposition of the death penalty. Because there was "ambiguity in the prospective juror's statements," the trial court was "entitled to resolve it in favor of the State." *Uttecht*, 551 U.S. at 7, (quoting *Witt*, 469 U.S. at 434). Thus, the ACCA's finding that J.H. was properly excused was neither contrary to nor an unreasonable application of the *Witherspoon-Witt-Uttecht* line of cases.

The same is true for S.W. The trial judge questioned her individually, at length, about her statement in her jury questionnaire that she did not want to be responsible for sentencing an individual to death. (Vol. 6, R. at 195-98.) Her

statements were also ambiguous, and the court was entitled to resolve that ambiguity in favor of the State and remove her for cause. *See Uttecht*, 551 U.S. at 7. The ACCA reasonably found that because Mills' underlying claim that S.W. was improperly removed for cause was without merit, an ineffective assistance claim premised on failure to object on that ground was similarly so.

### ii.    Jurors D.B. and B.T.

Regarding Mills' second sub-claim, that his counsel was ineffective for failing to make a for-cause challenge against venire members D.B. and B.T. because each had a relationship with one or both of the victims which rendered them biased against Mills, the ACCA reasonably noted that under Alabama law, no legal basis existed for striking those jurors, and thus Mills' counsel's failure to move to strike them was not deficient. While D.B. and B.T. knew the Hills before the start of trial (D.B.'s wife was a social worker who had cared for Vera Hill and B.T. had known Floyd Hill well since childhood), both jurors agreed that they could be fair and would base their decisions on the evidence. (Vol. 6, R. at 225-26, 303-04.) The ACCA appropriately relied upon Alabama law in holding that there was no basis to remove them:

> Ultimately, the test to be applied is whether the juror can set aside [his] opinions and try the case fairly and impartially, according to the law and the evidence. This determination again is to be based on the juror's answers and demeanor and is within the discretion of the trial

judge. Thus, a prospective juror should not be disqualified for prejudices or biases if it appears from his or her answers and demeanor that the influence of those prejudices and biases can be eliminated and a verdict rendered according to the evidence.

*Burgess v. State*, 827 So. 2d 134, 148–49 (Ala. Crim. App. 1998*), aff'd sub nom. Ex parte Burgess*, 827 So. 2d 193 (Ala. 2000).

Additionally, contrary to Mills' contention, this case is nothing like the cases in which the Supreme Court has previously found that defendants were denied a fair trial by an impartial jury because of pretrial publicity or pervasive community prejudice. Mills cites *Irvin v. Dowd*, 366 U.S. 717, 728 (1961), but *Irvin* is clearly distinguishable on its facts. In that case, "the rural, Indiana community of 30,000 where the defendant was tried was subjected to a barrage of inflammatory publicity immediately before trial, including information on the defendant's prior convictions, his confession to 24 burglaries and six murders, including the one for which he was tried, and his unaccepted offer to plead guilty in order to avoid the death sentence." *United States v. Campa*, 459 F.3d 1121, 1149 (11th Cir. 2006). The Supreme Court ruled that the defendant was entitled to a change of venue because the prejudice against him was "clear and convincing," as reflected by the fact that eight of the twelve jurors had formed an opinion that he was guilty before the trial began. *Id.* The record reflects that the pretrial community atmosphere in this case was unlike that which existed in *Irvin*.

### iii.   Jurors H.P and D.B.

Finally, Mills contends that his counsel was ineffective for failing to move to strike potential jurors H.P and D.B. for cause because they both initially indicated they would vote for the death penalty in a capital proceeding. However, both jurors later stated that they could follow the court's instructions and consider both life without parole and the death penalty. (Vol. 6, R. at 323-24, 332-34.) Because these jurors indicated they could impartially base their decisions on the facts and the law, the ACCA reasonably held that Mills' trial counsel had no legal basis for raising a for-cause challenge.

Mills has failed to present any evidence to demonstrate that the ACCA's decision was objectively unreasonable. Thus, he is due no relief.

### 13.   Mills' claim that his trial counsel failed to object to the alleged breaks in the chain of custody of items removed from the trunk of his vehicle

Mills contends that his trial counsel failed to object to alleged breaks in the chain of custody of the murder weapons—a tire tool, a ball-peen hammer, and a machete—as well as several items of clothing found in the trunk of Mills' car. Mills argues that there was no evidence presented concerning how these items were presented to DFS or how these items were preserved and handled while at DFS.

In support of this claim, Mills recounts the following trial testimony. Following a search of Mills' car trunk, Guin Police Chief Brian McCraw ("McCraw") took custody of the three murder weapons and several items of clothing. (R1. 548–49, 553–55.) McCraw testified that he inventoried these and other items, put them in "brown paper bags," and transported them in his patrol car to DFS in Huntsville on June 25, 2004. (R1. 549.) When he arrived, he released the evidence to a "tall guy" at DFS, who "logged all of it and gave [McCraw] a receipt." (R1. 550.) DFS DNA analyst and crime scene investigator Robert Bass testified that he performed testing on these items, and that DNA material recovered from the items "match[ed]" DNA samples from victims Floyd and Vera Hill. (R1. 609, 612.) Investigator Ken Mays testified that he retrieved the items from DFS on May 9, 2006, and returned them to the Marion County Sheriff's Department, where they were held in an evidence locker until trial. (R1. 566–67, 574–75.)

Mills contends that as the proponent of the evidence, the State carried the burden of establishing the chain of custody, and that the chain of custody evaporated for almost two years—the time between receipt of the items from Mills' car trunk by a "tall guy" at DFS and the recovery of those items from DFS

by Mays. Mills contends that the State presented no evidence that, during that two-year gap, the evidence was properly safeguarded, handled, and preserved.

In addition, Mills argues that Bass should not have been allowed to testify to the results of tests performed on the items recovered from Mills' trunk. According to Mills, because the State did not show that the evidence was in substantially the same condition when it was tested as at the commencement of the chain, the trial court erred both in admitting the evidence itself and in admitting Bass's testimony.

Mills raised this claim for the first time in his Rule 32 proceedings, and the ACCA rejected it on the merits in its review of the circuit court's denial of Mills' Rule 32 petition. (Vol. 21, Tab #R-64 at 59; *Mills v. State*, CR-13-0724, Mem. Op. at 59 (Ala. Crim. App. Dec. 11, 2015)). The ACCA noted that the Alabama Supreme Court reviewed the underlying substantive claim on direct appeal and held that there was no plain error in the admission of this evidence. (*Id.*) Moreover, the court held that Mills' claim was insufficiently pleaded because he failed to plead sufficient facts to show that had counsel objected, this evidence would not have been admitted, and that there was a reasonable probability the outcome of his trial would have been different. (*Id.*)

Mills has failed to point to any evidence in the state-court record to establish that this decision was objectively unreasonable. As the ACCA noted, the Alabama

Supreme Court had already rejected Mills' substantive allegation that the evidence

should not have been admitted due to breaks in the chain of custody. The Alabama

Supreme Court's thorough analysis is repeated here:

> Mills next contends that plain error occurred in the admission of several items seized from the trunk of his vehicle as well as the admission of forensic-testing results related to those items. On the date Mills was stopped and arrested, JoAnn consented to a search of the Millses' vehicle. Investigator Ted Smith discovered a blue duffel bag in the trunk of the Millses' vehicle, and Officer Bryan McCraw, chief of the Guin Police Department, obtained a search warrant to examine the duffel bag and its contents. McCraw testified at trial that he recovered a machete, a tire iron, a hammer, and various clothes from the duffel bag. McCraw testified that he made an inventory of all the evidence, placed the evidence in brown paper bags, and then transported the evidence on June 24, 2004, to the Department of Forensic Sciences ("DFS") lab located in Huntsville. The record reflects that the bags were labeled with descriptions of their contents, but the record does not indicate whether the bags were sealed. McCraw stated that he took the physical evidence into the DFS office and gave it to a DFS employee who logged the evidence and gave McCraw an evidence receipt. At trial, McCraw identified each item of evidence that he had secured from the trunk of the Millses' vehicle and delivered to DFS.

> Robert Bass, a DNA analyst for DFS, testified about his examination and testing of the evidence. Bass gave a general description of the protocols used to test items at DFS, such as opening the bags, inventorying, and looking for stains. Bass was not questioned about who delivered the items to him or whether the items were in sealed bags when they were submitted to him. He identified the items submitted in the blue duffel bag, and he testified that he examined each item of evidence for any DNA evidence to compare to the DNA profiles of Floyd, Vera, Mills, and JoAnn. Bass found DNA profiles matching Vera's DNA profile on blood found on the black t-shirt, the hammer, and the tire iron. He also detected a DNA profile from blood

located on the blue work pants and the machete and a secondary profile on the tire iron; those profiles matched Floyd's DNA profile. None of the DNA profiles matched Mills' DNA profile.

McCraw did not identify the name of the DFS employee to whom he submitted the evidence when he relinquished control of it to DFS, and Mills contends that there is no evidence regarding the receipt, disposition, or handling of this evidence during the almost two years it was in DFS's custody. Citing *Ex parte Holton*, 590 So. 2d 918 (Ala. 1991), *Birge v. State*, 973 So. 2d 1085 (Ala. Crim. App. 2007), and *Ex parte Cook*, 624 So. 2d 511 (Ala. 1993), Mills contends that there were missing links in the chain of custody for that evidence and that the admission of the evidence was plain error.

In *Ex parte Holton*, this Court stated:

"[T]he State must establish a chain of custody without breaks in order to lay a sufficient predicate for admission of evidence. *Ex parte Williams*, 548 So. 2d 518, 520 (Ala. 1989). Proof of this unbroken chain of custody is required in order to establish sufficient identification of the item and continuity of possession, so as to assure the authenticity of the item. *Id.* In order to establish a proper chain, the State must show to a 'reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain.' *McCray v. State*, 548 So. 2d 573, 576 (Ala. Crim. App. 1988). Because the proponent of the item of demonstrative evidence has the burden of showing this reasonable probability, we require that the proof be shown on the record with regard to the various elements discussed below.

"The chain of custody is composed of 'links.' A 'link' is anyone who handled the item. The State must identify each link from the time the item was seized. In order to show a proper chain of custody, the record must show each link and also the following with regard to each link's

possession of the item: '(1) [the] receipt of the item; (2) [the] ultimate disposition of the item, i.e., transfer, destruction, or retention; and (3) [the] safeguarding and handling of the item between receipt and disposition.' Imwinklereid, *The Identification of Original, Real Evidence*, 61 Mil. L. Rev. 145, 159 (1973).

"If the State, or any other proponent of demonstrative evidence, fails to identify a link or fails to show for the record any one of the three criteria as to each link, the result is a 'missing' link, and the item is inadmissible. If, however, the State has shown each link and has shown all three criteria as to each link, but has done so with circumstantial evidence, as opposed to the direct testimony of the 'link,' as to one or more criteria or as to one or more links, the result is a 'weak' link. When the link is 'weak,' a question of credibility and weight is presented, not one of admissibility."

590 So. 2d at 919–20.

In *Ex parte Cook*, *supra*, the defendant, who had been convicted of murder, contended that the trial court committed reversible error in admitting, over the defendant's objection, several items of physical evidence—specifically, cigarette butts, a knife scabbard, blood-soaked gauze, socks, and jeans. This Court held that the cigarette butts, scabbard, gauze, and socks should not have been admitted over the defendant's objection. 624 So. 2d at 512–14. In particular, this Court stated:

"A link was also missing in the chain of custody of the cigarette butts, scabbard, gauze, and socks. Although [Officer] Weldon testified that she directed and observed the collection, the State did not establish when these items were sealed or how they were handled or safeguarded from the time they were seized until Rowland [, a forensic serologist,] received them [and

tested them]. This evidence was inadmissible under [*Ex parte*] *Holton* [, 590 So. 2d 918 (1991)].

> "The cigarette butts were prejudicial to [the defendant], because they established that someone with her blood type was in [the victim's] house. Likewise, the socks found in [the defendant's] mobile home were prejudicial, because they were stained with blood that matched [the victim's] type. The erroneous admission of these items probably injuriously affected [the defendant's] substantial rights, and she is entitled to a new trial. *See* Rule 45, Ala. R. App. P."

624 So. 2d at 514.

In *Birge*, *supra*, the victim was thought to have died of natural causes and had been transported to Indiana for burial. 973 So. 2d at 1087. However, after law enforcement began to investigate, the victim's body was exhumed, and an autopsy was performed in Indiana. At trial, there was testimony that the victim had died from an overdose of prescription drugs. That cause-of-death testimony was based on the results of testing of samples taken from the victim's body during the autopsy. 973 So. 2d at 1088–89.

Citing missing links in the chain of custody, the defendant in *Birge* objected to the introduction of the toxicology results and the cause-of-death testimony based on those results. The doctor who performed the autopsy testified at trial and stated that he had watched his assistant place the samples in a locked refrigerator. The doctor testified that the next day his assistant would have delivered the samples to a courier, who then would have delivered them to an independent lab for testing. However, neither the doctor's assistant who secured the samples, nor the courier who transported the samples to the lab, nor the analyst who tested the samples testified at trial. The doctor also testified that there may have been several people who had handled the specimens during that time. Additionally, there were significant discrepancies between the doctor's notes about the specimens in his autopsy report and the description of those

specimens in the toxicology report from the independent lab that had tested them. The Court of Criminal Appeals ultimately concluded that there were numerous missing links in the chain of custody and that, because those missing links related to the crux of the case against the defendant, the trial court had committed reversible error in admitting the evidence over the defendant's objection. 973 So. 2d at 1094–95, 1105.

In contrast to *Ex parte Cook* and *Birge*, however, the State here offered sufficient evidence on each link in the chain of custody of the evidence Mills complains of. Investigator Smith first discovered the evidence in the trunk. Officer McCraw recovered the evidence pursuant to a search warrant, inventoried it, bagged it, secured it, and delivered it to the custody of the DFS employee who logged the evidence and gave McCraw a receipt for it. Bass, who examined and tested the evidence at DFS, testified generally about the protocols used to test items at DFS, and he testified specifically about the testing he performed on the evidence.

Although the "tall" DFS employee to whom McCraw submitted the items was never identified and did not testify at trial, McCraw's testimony was sufficient direct evidence indicating that the items were secured until they were delivered to DFS. As to whether there was sufficient circumstantial evidence indicating that the items remained secure until Bass tested them, the State cites *Lee v. State*, 898 So. 2d 790, 847–48 (Ala. Crim. App. 2001), in which the Court of Criminal Appeals stated:

> The purpose for requiring that the chain of custody be shown is to establish to a reasonable probability that there has been no tampering with the evidence. . . .
>
> Tangible evidence of crime is admissible when shown to be 'in substantially the same condition as when the crime was committed.' *And it is to be presumed that the integrity of evidence routinely handled by governmental officials was suitably preserved [unless the accused makes] a minimal showing of ill will, bad faith, evil motivation, or some evidence*

> *of tampering.* If, however, that condition is met, the Government must establish that acceptable precautions were taken to maintain the evidence in its original state.
>
> The undertaking on that score need not rule out every conceivable chance that somehow the [identity] or character of the evidence underwent change. [T]he possibility of misidentification and adulteration must be eliminated, we have said, not absolutely, but as a matter of reasonable probability. So long as the court is persuaded that as a matter of normal likelihood the evidence has been adequately safeguarded, the jury should be permitted to consider and assess it in the light of surrounding circumstances.

(Emphasis added.)

As noted above, Mills did not challenge the chain of custody as to any of the now-challenged items at trial. Unlike *Birge*, in which evidence indicated that several different unidentified individuals could have handled the specimens and there were discrepancies in the records about the specimens, nothing in the present case indicates that the items were tampered with or altered in any manner from the time McCraw relinquished custody of them to DFS until the time Bass tested them at DFS. Mills also has made no "showing of ill will, bad faith, evil motivation, or some evidence of tampering" while the items were at DFS. *Lee*, 898 So.2d at 847. Thus, this link, at worst, is a "weak" link rather than a "missing" link in the chain of custody. *See Ex parte Holton*, 590 So. 2d at 920 ("If, however, the State has shown each link and has shown all three criteria as to each link, but has done so with circumstantial evidence, as opposed to the direct testimony of the 'link,' as to one or more criteria or as to one or more links, the result is a 'weak' link. When the link is 'weak,' a question of credibility and weight is presented, not one of admissibility.").

Both *Ex parte Cook* and *Birge* are distinguishable from the present case in additional respects as well. Unlike *Ex parte Cook*, in which the officer who supervised the collection of the items did not

maintain custody of them from the time they were seized until they were submitted for testing, 624 So.2d at 513, the officer who seized the physical evidence at issue in Mills' case, Officer McCraw, testified that he collected the evidence, secured it, and maintained custody of it until he transported it to DFS. In contrast to *Birge*, there was testimony in Mills' case from the officer, Officer McCraw, who secured and transported the evidence to the lab for testing. There also was testimony from Bass, the person who performed the forensic tests on the evidence submitted to DFS. Finally, the forensic evidence at issue, although certainly damaging to Mills, was not the "crux" of the State's case against Mills; JoAnn's testimony was crucial evidence in the State's case against Mills, as was the fact that the items, even apart from forensic testing of those items, were found in Mills' car the day after the murders. Accordingly, no plain error occurred as to this issue.

*Ex parte Mills*, 62 So. 3d at 597-98 (footnotes and some citations omitted).

The record supports the Alabama Supreme Court's disposition of Mills' underlying chain of custody claim. As the Alabama Supreme Court noted, each of the items of evidence at issue was tagged when they were collected by law enforcement, and the collecting officer identified each of the items at trial. (Vol. 8, Tab #R-18, R. 552-54.) The officer who collected the evidence also bagged and labeled the items before personally delivering the items to DFS, where a DFS employee logged the items and provided a receipt to the officer. (*Id.* at 548-50.) At trial, the DFS analyst who tested the items discussed the procedures he used for cataloging and testing the items. (*Id.* at 606-07.) Consequently, evidence existed regarding each link's receipt, disposition, and handling of the items.

Further, Mills does not identify a holding of the Supreme Court that is in conflict with the ACCA's decision. Because the underlying claim lacked merit, so did the ineffective assistance of counsel claim. Accordingly, Mills is due no relief.

### 14.   Mills' claim that his trial counsel failed to adequately litigate the motion for new trial

Mills argues that his trial counsel was ineffective in litigating his motion for a new trial by not presenting sufficient evidence in support of his claims. By way of background, JoAnn testified at trial that she had not made any deals in exchange for her testimony. Mills thoroughly cross-examined her regarding whether she had made any deals in exchange for her testimony. The prosecutor stated that the State had not made any promises to JoAnn; that the State had not suggested that a promise might be made after she testified truthfully; and that there was not any inducement whatsoever for JoAnn's testimony. In an unverified motion for a new trial, Mills' defense counsel asserted:

> The co-defendant Jo Ann Mills whose self-serving testimony constituted the sole direct evidence against the defendant perjured herself by declaring that her testimony was given neither in an attempt to procure leniency for herself, nor pursuant to an expressed or implied plea bargain agreement or arrangement, nor as a result of an expresses or implied offer of leniency. Charged with three counts of capital murder she in fact pleaded guilty to murder and was sentenced to life in prison thirty days after the verdict in this case.

(C.R. 120.) The motion for a new trial did not include any evidence to indicate that JoAnn had in fact made a deal with the State at the time of trial. Rather, the motion was based on counsel's bare assertions that JoAnn had committed perjury and that she had subsequently pled guilty to a lesser included offense.

The trial court denied Mills' motion for a new trial. The ACCA affirmed the denial on direct appeal, reasoning that there is no error in a trial court's denial of a motion for a new trial where no evidence is offered in support of that motion. *Mills*, 62 So. 3d at 571.

Mills now contends that his trial counsel's failure to provide evidence or move the court for discovery or an evidentiary hearing at which to produce evidence in support of the claim in the motion for new trial was constitutionally deficient.

Mills raised this claim for the first time in his Rule 32 proceedings, and the ACCA rejected it on the merits in its review of the circuit court's denial of Mills' Rule 32 petition. (Vol. 21, Tab #R-64 at 81-82; *Mills v. State*, CR-13-0724, Mem. Op. at 81-82 (Ala. Crim. App. Dec. 11, 2015)). The state court held that the claim was insufficiently pleaded. (*Id.* at 82.) Specifically, the court held that "Mills did not plead any facts that could have been discovered and presented at the hearing on the motion for new trial." (*Id.*)

Mills must demonstrate that the ACCA's conclusion was unreasonable or contrary to law. *See Borden*, 646 F.3d at 812 ("A ruling by an Alabama court under Rule 32.6(b) is . . . a ruling on the merits."). However, Mills still fails to allege what specific evidence or arguments his trial counsel could have presented during the motion for new trial to show that JoAnn lied on the stand and was in fact testifying against Mills in exchange for a lesser sentence. Mills' failure to state any facts supporting this claim dooms his claim. *See Mayle*, 545 U.S. at 655 ("[T]he petition must 'specify all the grounds for relief available to the petitioner' and 'state the facts supporting each ground.'") (quoting Rule 2(c) of the Rules Governing § 2254 Cases in the U.S. District Courts).

Mills argues that *if it was true that JoAnn perjured herself and the State failed to disclose this*, Mills would have a claim under *Brady*, 373 U.S. at 87; *Giglio*, 405 U.S. at 154-55 (finding due process violation where key state witness's credibility was "an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it"); and *Napue*, 360 U.S. at 269 (holding that "conviction obtained through use of false evidence, known to be such by representatives of the State" violates Fourteenth Amendment), and that he would have been entitled to a new trial. Such speculation does not meet Mills' burden of pleading facts in support of

his claim. Because Mills cannot point to any reason that the ACCA's decision holding that this claim was insufficiently pleaded was objectively unreasonable, he is due no relief.

### D.    Mills' claim that he was denied effective assistance of counsel during the penalty phase of his trial

Mills argues that his defense counsel did not render reasonably effective legal representation during the penalty phase of his trial and thereby denied him his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Mills divides this claim into six sub-claims, each of which is addressed in turn.

### 1.    Mills' claim that his trial counsel failed to conduct a mitigation investigation or prepare for the penalty phase of trial

Mills raises six sub-claims in support of his contention that his trial counsel failed to conduct an adequate mitigation investigation in preparation for the penalty phase of his trial. Mills raised each of these six sub-claims for the first time in his Rule 32 proceedings, and the ACCA rejected each on the merits in its review of the circuit court's denial of Mills' Rule 32 petition. (Vol. 21, Tab #R-64 at 19; *Mills v. State*, CR-13-0724, Mem. Op. at 19 (Ala. Crim. App. Dec. 11, 2015)).

The Court notes that in assessing *Strickland* prejudice flowing from counsel's performance in this context, courts are required to "evaluate the totality

of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—in re-weighing it against the evidence in aggravation." *Williams*, 529 U.S. at 397-98. "That same standard applies—and will necessarily require a court to 'speculate' as to the effect of the new evidence— regardless of how much or how little mitigation evidence was presented during the initial penalty phase." *Sears v. Upton*, 561 U.S. 945, 955 (2010). Where a petitioner challenges a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695, 104 S. Ct. at 2069.

Thus, before addressing each sub-claim individually, the Court notes that at the sentencing hearing before the jury, the State presented argument and evidence on the following aggravating circumstances: (1) the murders occurred during the course of a robbery, (2) the murders were committed by a person under sentence of imprisonment, (3) the murders were especially heinous, atrocious or cruel compared to other capital offenses, and (4) Mills intentionally caused the death of two or more persons. Mills offered as mitigating circumstances that he had no significant history of prior violent criminal activity, that at the time of the murders, he was under the influence of an extreme mental or emotional disturbance, and that

he has been rehabilitated in prison. Mills called his sister, Kim Mobley, and his father's girlfriend, Sherri Sanchez, to testify in further mitigation.

> **i.   Mills' claim that his trial counsel failed to investigate the evidence of the impact on Mills of his parents' lifelong methamphetamine addiction**

Mills alleges that his trial counsel failed to investigate readily available evidence that his parents used, abused, dealt, and were addicted to methamphetamines throughout his life. Some of the facts that Mills contends his trial counsel would have discovered, if they had conducted an adequate mitigation investigation, are as follows. Donnie Mills, Mills' father, used and sold methamphetamine throughout Mills' childhood and young adulthood. Donnie was arrested and convicted for methamphetamine possession in 1995 and again in 2004. During most of Mills' childhood, Donnie drove a truck for a living, and Mills accompanied him often. Donnie regularly used and sold methamphetamine to other truckers during this period of his career, including when Mills accompanied him on the road. Donnie lost his license because of his drug use and dealing. Donnie opened a diesel repair shop in Haleyville when Mills was about fifteen years old. Donnie sold methamphetamine out of the shop, and Donnie and his employees regularly used methamphetamine. Donnie encouraged Mills to use methamphetamine. Diane, Mills' mother, began using methamphetamine when

Mills was a young child and regularly used methamphetamine until October 2003, when she suffered a massive aneurysm that eventually ended her life. Diane was routinely high in front of Mills and her other children. In 1995, Donnie and Diane were arrested at Donnie's shop for possession of methamphetamine and drug paraphernalia. They were eventually convicted of the possession charges and sentenced to ten years in prison, later modified to five years of probation. Donnie was forced to close his shop, and Donnie and Diane began to sell methamphetamine from their home on a full-time basis. Donnie later opened a new diesel repair shop in 1998, from which he and Diane continued to deal and use methamphetamine. Mills worked for his father at the shop off-and-on from 2000 to early 2003.

According to Mills, had his counsel presented this mitigating evidence to the trial court at sentencing, he would have been sentenced to life imprisonment rather than death.

Mills raised this claim for the first time in his Rule 32 proceedings, and the ACCA rejected it on the merits in its review of the circuit court's denial of Mills' Rule 32 petition. (Vol. 21, Tab #R-64 at 70-73; *Mills v. State*, CR-13-0724, Mem. Op. at 70-73 (Ala. Crim. App. Dec. 11, 2015)). The court first noted that Mills' claim was insufficiently pleaded concerning the prejudice prong of *Strickland*. (*Id.*

at 70.) The court held that Mills' bare assertion that there was a reasonable likelihood of a different outcome was insufficient given the strong evidence of aggravation concerning Mills' crime, which the trial court noted was "cold, calculated, rehearsed, and unremorseful." (*Id.* at 71.) The court further found that Mills' allegations concerning his parents' drug use were not compelling, noting that evidence of a difficult childhood is characterized as a "double-edged sword." (*Id.* at 72, citing *McWhorter v. State*, 142 So. 3d 1195, 1248-49 (Ala. Crim. App. 2011)). Finally, the court noted that some evidence of Mills' family history of drug use was presented at trial. (*Id.* at 72-73.)

Mills has not demonstrated that the ACCA's decision holding that this claim was properly summarily dismissed was objectively unreasonable or contrary to clearly established Supreme Court precedent. First, the record establishes that trial counsel did present some evidence about Mills' family's drug use during the penalty phase of his trial. Sherri Sanchez, Donnie's girlfriend, testified that Mills' father went to prison after being convicted of possession of methamphetamine. (Vol. 10, Tab #R-28, R. 982, 984.) Even assuming that trial counsel had presented additional evidence that Mills' parents used drugs throughout his life, this evidence would not have added any significant mitigating evidence and would have been merely cumulative.

Moreover, the ACCA was correct that Mills' allegations concerning his parents' drug use were not compelling evidence, particularly in light of the heavy evidence of aggravating circumstances in his case. The majority of Mills' allegations concerning his parents' drug use consisted of general assertions that his parents simply used or sold methamphetamines, most of which occurred when Mills was already a teenager. Mills failed to plead any specific facts concerning his early childhood other than the generic allegation that his parents simply used drugs. Notably, the allegations concerning the alleged drug use by Mills' parents related mainly to his parents, not Mills himself.

Mills contends that his case is similar to *Johnson v. Secretary, Department of Corrections*, 643 F.3d 907, 930 (11th Cir. 2011), where the Eleventh Circuit granted habeas relief based on ineffective assistance of counsel where trial counsel failed to adequately investigate and uncover information about a defendant's family that would have contradicted the more positive image presented at the penalty phase of trial. In that case, trial counsel brought forward evidence that the petitioner's parents were "cold and uncaring, something in the nature of the 'American Gothic' couple." *Id.* at 936. The jury heard testimony from four witnesses that the defendant's father had been a "weekend drinker," that his mother would also drink, that the defendant spent several months in an orphanage, that he was an

alcoholic, and that his mother and brother died before his arrest for capital murder. *Id.* at 912-13. In fact, as revealed at the habeas evidentiary hearing, they were raging alcoholics; the petitioner was put into an orphanage when his father went on a three-month drinking binge in another state; the petitioner's mother attacked his father with a butcher's knife; and the petitioner was singled out for particularly severe beatings. *Id*. at 936-37. The jury never heard anything about the petitioner's mother's repeated suicide attempts—one of them discovered by the petitioner when he was a child. *Id*. It did not know anything about how the petitioner later found his mother, dead of an overdose, clutching a photograph of his dead brother, who also died of an overdose. *Id*. at 937. The jury also heard that the petitioner's grandparents "were caring and nurturing people," whereas later-introduced habeas evidence showed them to have inflicted horrifying physical, emotional, and psychological abuse on the petitioner. *Id*.

Here, the facts about his parents' drug use that Mills contends his counsel should have offered during the penalty phase simply do not compare with the horrifying acts that the petitioner in *Johnson* suffered during his childhood. Mills contends that, like the witnesses did in *Johnson*, his sister, Kim Mobley, painted a falsely positive picture of the Mills family during the penalty phase, describing Donnie and Dianne Mills as "very good parents" and testifying she and Mills grew

up in a "good home." (Vol. 10, Tab #R-28, R. 975.) She also testified that Donnie was "a good dad" and "a good provider." (*Id.* at 976.) But far from hiding something far more sinister, these characterizations actually echo the statements Mills makes in other parts of his habeas petition that he adored his mother, as evidenced by his driving one hour each way after work to spend the night with her when she was ill, and that he idolized his father, whom he also cared for emotionally and financially. It thus appears that while they certainly had their issues with drug abuse, Mills' family was close knit.

Mills also contends that his case is similar to *Cone v. Bell*, 556 U.S. 449 (2009), but *Cone* is also distinguishable on its facts. In *Cone*, the State's strategy had been "to present Mr. Cone as a calculating, intelligent criminal who was fully in control of his decision and actions at the time of the crimes. A key component of that strategy involved discrediting Cone's claims of drug use." *Id.* at 1174. To that end, the State presented expert and lay witnesses to establish that he was not addicted to drugs, including a former heroin addict with whom he had spent time a few months before the murders who testified that she no longer used drugs, stayed away from people who did, had never seen Cone use drugs and had never seen him show signs of paranoia. After his conviction for murder, Cone learned about evidence that the State possessed but had not disclosed, including statements by

witnesses that he appeared "drunk or high," "acted real weird," and "looked wild eyed" in the two days before the murders; statements of police officials that he was a serious drug user; and undisclosed notes of a police interview with the former heroin addict showing discrepancies between her initial statement and her trial testimony. *Id.* at 1783–84. The Supreme Court remanded for a hearing where evidence of Cone's drug addiction "may have persuaded the jury [at the sentencing phase of Cone's trial] that Cone had a far more serious drug problem than the prosecution was prepared to acknowledge, and that Cone's drug use played a mitigating, though not exculpating, role in the crimes he committed." *Id.*

In obvious contrast to *Cone*, the State put on testimony that Mills' abused drugs and even use it as an aggravating circumstance in closing argument, stating: "JoAnn Mills gave you a reason for this brutality in one word, methamphetamine, 'We were smoking meth.' . . . They were geeked out. That is why you have the brutality of this attack." (Vol. 10, Tab #R-23, R. 913).

In any event, evidence of his parents' drug use may have damaged Mills' mitigation efforts. As the Eleventh Circuit has "repeatedly recognized, evidence of drug and alcohol use is often a two-edged sword that provides an independent basis for moral judgment by the jury." *Brooks v. Commissioner, Ala. Dept. of Corrs.*, 719 F.3d 1292, 1304 (11th Cir. 2013). Given that his drug use near the time of the

murders was offered at trial, more evidence of his parents' drug use could have further emphasized Mills' culpability and suggested to the jury that he was perpetuating a history of illegal activity.

Even accepting Mills' allegations as true and considering all the additional mitigating evidence alleged along with the mitigating evidence presented at trial, Mills failed to plead a claim that could show that there was a reasonable probability that his sentence would have been different. Thus, Mills is due not relief.

> ### ii.   Mills' claim that his trial counsel failed to investigate Mills' own extended history of methamphetamine abuse and addiction

Mills also alleges that his trial counsel was ineffective for failing to adequately investigate and inform the jury of evidence that he abused methamphetamines for 13 years, spanning from his teenage years to the time of the crime. Mills contends that his counsel could have obtained this information from Donnie Mills, Kim Mobley, Johnny Mills, Danny Mills, Marlon Wakefield, and other friends, family members, and co-workers. Some facts that Mills contends his counsel would have discovered are as follows. Mills obtained a trucking license when he turned 21, and shortly thereafter his father supplied him directly with methamphetamine so that he could stay awake on the road. He used methamphetamine daily for almost two years to stay awake and deliver his loads on time. Donnie and Mills also used

methamphetamine together in order to work long hours on truck-repair projects. Donnie occasionally asked Mills to pick up drugs for Donnie in California while he was on the road, and Mills complied. Mills met and became involved with JoAnn Greene while he was on the road in 1997. JoAnn worked as his truck escort for "wide-load" trucks, and she and Mills continued their romantic relationship off-and-on until Mills' arrest in 2004. JoAnn had used methamphetamine before she met Mills. Mills asserts that had his trial counsel investigated and presented this evidence in mitigation, he would not have been sentenced to death.

Mills raised this claim for the first time in his Rule 32 proceedings, and the ACCA rejected it on the merits in its review of the circuit court's denial of Mills' Rule 32 petition. (Vol. 21, Tab #R-64 at 73; *Mills v. State*, CR-13-0724, Mem. Op. at 73 (Ala. Crim. App. Dec. 11, 2015)). Similar to Mills' claim concerning his parents' drug use, the ACCA held that Mills failed to plead a sufficiently specific claim of prejudice under *Strickland*, noting that his claim consisted of only a bare allegation. (*Id.*) The court also rejected Mills' underlying claim, noting that "there was evidence of Mills' extensive drug use—which Mills insistently denied throughout the proceedings—before the circuit court." (*Id.*)

Mills has failed to demonstrate how the state court's finding was objectively unreasonable. First, additional evidence of Mills' drug use would have been

cumulative to what was presented at trial. Both the trial court and the jury already heard testimony about Mills' drug use, as JoAnn testified that she and Mills had stayed up for over 24 hours using meth prior to murdering the Hills. (Vol. 9, Tab #R-19, R. 690-91.) Other evidence was also presented that Mills had used meth before on multiple occasions. (*Id*. at 885.) Based on this evidence, Mills' trial counsel argued during the penalty phase that the jury had "heard all kind of evidence about the use of methamphetamine" and further argued that this evidence showed that Mills was under the influence of methamphetamines at the time of the offense. (*Id*. at 991.) As a result, the trial court found the statutory mitigating circumstance contained in § 13A–5–51(2), Ala. Code 1975, to exist, i.e., that Mills committed the capital offenses while he was under the influence of extreme mental or emotional disturbance. *See Mills*, 62 So. 3d at 573. Thus, given the fact that evidence about Mills' drug use was already presented during the guilt phase and such evidence was found to be a mitigating factor at the penalty phase, even accepting Mills' additional allegations as true, he failed to plead a claim that could show a reasonable probability that his sentence would have been different.

Moreover, Mills failed to plead facts that could show how there was a reasonable probability that the aggravating circumstances would not have outweighed the mitigating circumstances given the strength of the aggravating

circumstances and the weak nature of the mitigating evidence. The extent of the additional evidence Mills claims his counsel should have presented was that he began using methamphetamines as a teenager and that he used drugs while he worked as a truck driver. None of this evidence would have been compelling, even when considered with all the mitigating evidence presented at trial, in the face of the strong evidence in aggravation.

Indeed, the cases upon which Mills relies involve a defendant's drug use as a child, among several other distinguishing facts. For example, in *Cooper v. Secretary, Department of Corrections*, 646 F.3d 1328, 1355 n.20 (11th Cir. 2011), the Eleventh Circuit granted habeas relief on a claim of ineffective assistance of counsel for failure to investigate, holding that evidence of the defendant's drug abuse at young age was mitigating because it served as a means of escaping his childhood. The evidence showed that the defendant's father and older brother severely abused him throughout his childhood and teenage years; he was abandoned by his mother for long periods of time; he began using drugs and alcohol at age eleven to escape his family and the abuse; this drug use included the use of inhalants, which, according to the psychological expert at the post-conviction evidentiary hearing, could have contributed to neurological deficits; and his IQ put him functioning at a borderline level of intelligence.

Additionally, as in the previous section, the additional evidence likely would have been damaging to Mills, as evidence of the defendant's drug use is often a double-edged sword. *See Brooks*, 719 F.3d at 1304. Notably, some of the evidence Mills contended his counsel should have presented, such as the fact that Mills picked up drugs for his father while in California, would not have painted Mills as a sympathetic figure, but likely would have caused the jury to view Mills simply as a typical drug dealer who routinely broke the law. Thus, given the danger of presenting more evidence of drug use to a jury, even accepting these allegations as true, the ACCA was correct in holding that Mills failed to plead a facially meritorious claim.

Because Mills failed to establish that this decision was objectively unreasonable, he is due no relief.

> **iii.   Mills' claim that his trial counsel failed to investigate evidence that Mills was a loving, generous, and well-liked brother, son, co-worker, and friend**

Mills alleges that his trial counsel failed to investigate and inform the jury that was well-liked by his friends and family and went out of his way to do kind things for people. He cites as examples that he would repair friends' vehicles for free or for a discount, that he often gave money to his father, and that he routinely drove an hour to spend each night with his mother after she became terminally ill in

2003. According to Mills, if his trial counsel had discovered and presented this evidence in mitigation, he would not have been sentenced to death.

Mills raised this claim for the first time in his Rule 32 proceedings, and the ACCA rejected it on the merits in its review of the circuit court's denial of Mills' Rule 32 petition. (Vol. 21, Tab #R-64 at 73-74; *Mills v. State*, CR-13-0724, Mem. Op. at 73-74 (Ala. Crim. App. Dec. 11, 2015)). The ACCA held that this claim was insufficiently pleaded, "particularly as to Mills' bare assertion that if counsel had done what Mills contends counsel should have, there is a likelihood that the result of the proceeding would have been different." (*Id.* at 73.) Further, the court held that Mills' claim was meritless because Mills' trial counsel *did* attempt to present evidence that he had two sons and was a positive influence in their lives, but that such evidence was undermined by the fact that Mills was in arrears on child-support payments. (*Id.* at 73-74.)

Mills has not shown that the ACCA's finding that this claim was insufficiently pleaded and subject to dismissal was objectively unreasonable. As an initial matter, "counsel has no absolute duty to present mitigating character evidence." *Mitchell v. Kemp*, 762 F.2d 886, 889 (11th Cir. 1985). In any event, as the trial court noted in its sentencing order, Mills' trial counsel presented evidence that Mills had two sons and that Mills could be a positive influence in their lives.

*See Mills*, 62 So. 3d at 573. Moreover, Mills' sister, Kim Mobley, testified before the jury during the sentencing phase that Mills was a good brother, that he saw her children and that he was a good uncle, and that he also visited his mother regularly after she entered a nursing home. (Vol. 10, Tab #R-28, R. 974-975, 979.) Thus, the additional general character evidence Mills claims should have been presented would have been cumulative and would not have led to a reasonable probability of a different sentence.

Moreover, additional evidence of Mills' kindness was not compelling or significant given the evidence presented that suggested that Mills was not a positive influence in his children's lives. The pre-sentence report indicated that Mills had been charged for nonsupport of his two children and was $10,318.67 in arrears on his child support payments. *Mills*, 62 So. 3d at 573. The trial court found that this fact undermined the strength of the mitigating circumstance concerning the positive impact Mills had on his children, *see id.*, and such evidence would likewise undermine the strength of any mitigating effect relating to additional evidence concerning his kindness. Further, this generally weak evidence would have been further undermined if presented in concert with other evidence Mills now alleges should have been presented—such as his history of drug abuse—which would have been odds with evidence of his supposed good character.

Finally, the evidence Mills contends should have been presented merely consists of generic acts of kindness such as the fact that he would work on a friend's truck for a discounted rate or that he gave money to his father. None of this evidence would have had a significant effect on the balance of aggravating and mitigating circumstances. Thus, he is due no relief.

> ### iv.     Mills' claim that his trial counsel failed to investigate evidence that Mills was a skilled worker with a strong work ethic

Mills alleges that his trial counsel failed to present evidence that he was hard working, had a strong work ethic, and worked diligently as a skilled mechanic and trucker for most of his life.

Mills raised this claim for the first time in his Rule 32 proceedings, and the ACCA rejected it on the merits in its review of the circuit court's denial of Mills' Rule 32 petition. (Vol. 21, Tab #R-64 at 74; *Mills v. State*, CR-13-0724, Mem. Op. at 74 (Ala. Crim. App. Dec. 11, 2015)). The ACCA held that Mills did not plead a sufficient allegation of prejudice under *Strickland*. (*Id*.) Further, the state court found that trial counsel did present evidence of Mills' work ethic, but that this evidence was undermined by other evidence presented at trial. (*Id*.)

Mills has failed to demonstrate how this decision was objectively unreasonable. Trial counsel did present such information and this evidence was

considered by the trial court as mitigating evidence in its sentencing order. Specifically, evidence was presented during trial that Mills worked as a truck driver and a mechanic starting in the eleventh grade and was described as "no trouble" and a "hard worker." *Mills*, 62 So. 3d at 574. In fact, this evidence was found to be a non-statutory mitigating circumstance. *Id.* Any additional evidence concerning his strong work ethic would have been cumulative of the evidence presented during trial.

Further, general evidence that Mills worked long hours and charged customers a fair price are simply examples of generic information that should be expected of any normal, good employee. Mills failed to plead how this non-specific, routine information, even accepted as true, would have led to a reasonable probability of a different sentence, particularly when, together with all other mitigating evidence, it is weighed with the heinous nature of Mills' crime and the strength of the aggravating circumstances in this case. For these reasons, Mills is due no relief.

> **v.** **Mills' claim that his trial counsel failed to investigate and present evidence that Mills was under the influence of multiple, extreme stressors, at the time of the offense**

Mills alleges that his trial counsel was ineffective for failing to adequately investigate and present mitigation evidence that he was under extreme stress as a

result of overlapping factors in the months leading up to the murders. He describes these "stressors" as the fact that his mother was ill, his father had poor health, he suffered from tendonitis and/or carpal tunnel syndrome in his right hand, which caused him to stop working and led to him having very little money, and he and JoAnn had marital difficulties.

Mills raised this claim for the first time in his Rule 32 proceedings, and the ACCA rejected it on the merits in its review of the circuit court's denial of Mills' Rule 32 petition. (Vol. 21, Tab #R-64 at 74-76; *Mills v. State*, CR-13-0724, Mem. Op. at 74-76 (Ala. Crim. App. Dec. 11, 2015)). Specifically, the state court held that Mills' claim was properly dismissed because he failed to plead a specific claim of prejudice under *Strickland*, and because his claim was refuted by the record. (*Id.* at 75.)

Mills has not demonstrated the ACCA's decision was unreasonable or contrary to Supreme Court precedent. Indeed, Mills' claim is both refuted by the record and without merit because his trial counsel presented this information during trial. Trial counsel argued during penalty phase closing arguments that the offense occurred when Mills was "under a heck of a lot of pressure," and that Mills acted when "he was under extreme, extreme emotional distress and pressure

because of the things that were stacking up against him in his life." (Vol. 10, Tab

#R-30, R. 990-91.) Specifically, his trial counsel argued that:

> [A]ll of a sudden things start crashing down around him. His mom is
> near death; his dad gets sick, has a heart attack and stroke and starts
> getting depressed. He's out of work. He can't work because of the
> hand. The place where he lives belongs to his employer, who he can't
> work for. He's going to have to find a new place to live. His ex-wife is
> on him, trying to put him in jail for back child support.

(*Id.* at 990.) Furthermore, the trial court considered the fact that Mills had to quit

work based on the tendonitis in his hand as mitigating evidence. *See Mills*, 62 So. 3d

at 574. Thus, because trial counsel *did* present the same type of information that

Mills now alleges his trial counsel was ineffective for failing to present, Mills failed

to plead facts that would show that there was a reasonable probability that the

balance of aggravating and mitigating circumstance did not warrant death. *See*

*Strickland*, 466 U.S. at 695.

Further, additional information on this subject matter would not have been

compelling or significant, and its mitigating effect would have been weak at best,

when weighed and considered with all the evidence presented during the penalty

phase. Indeed, the trial court stated in its sentencing order: "Giving the defendant

the benefit of any doubt the court does find that the defendant was faced with

emotional challenges due to the medical problems experienced by his parents, his

divorce, and loss of his job. But to experience these within a ten year period hardly

qualifies the defendant as being under the influence of an extreme mental or emotional disturbance." (Vol. 1, Tab #R-3, C. 134). Mills failed to plead how evidence that his parents were sick would have led to a reasonable probability of a different sentence when balanced against four strong aggravating circumstances stemming from a horrific, barbaric crime.

Therefore, he is due no relief.

> ### vi. Mills' claim that his trial counsel failed to investigate and present evidence that Mills functioned well during the three years he spent in pre-trial detention

Mills contends that his trial counsel should have presented evidence that he got along well in jail pending his trial and did not have any disciplinary problems.

Mills raised this claim for the first time in his Rule 32 proceedings, and the ACCA rejected it on the merits in its review of the circuit court's denial of Mills' Rule 32 petition. (Vol. 21, Tab #R-64 at 76; *Mills v. State*, CR-13-0724, Mem. Op. at 76 (Ala. Crim. App. Dec. 11, 2015)).

The state court properly held that this claim was insufficiently pleaded. (*Id.*) In particular, the court found that Mills failed to identify the name of any witness who could have testified in support of this claim and raised only a bare allegation of prejudice under *Strickland*. (*Id.*) Mills offers absolutely no basis to challenge the reasonableness of the state court's decision. He cites no Supreme Court case, nor

points to any findings that he contends were based on an unreasonable determination of the facts.

Even considering the aforementioned six areas of evidence together, *see Porter*, 558 U.S. at 41 (reviewing court must consider "the totality" of the available mitigating evidence) (quoting *Williams*, 529 U.S. at 397-98)), and weighing them against the aggravating factors, the Court is convinced that the ACCA's rejection of the claim was not unreasonable because the evidence would not have changed the outcome. Therefore, he is due no relief.

### 2.   Mills' claim that his trial counsel failed to procure the necessary expert assistance to effectively challenge the State's case during the penalty phase

Mills alleges that his trial counsel were ineffective for failing to obtain expert assistance to help prepare for the penalty phase, such as an independent psychologist, a social worker, or a mitigation expert.

Mills raised this claim for the first time in his Rule 32 proceedings, and the ACCA rejected it on the merits in its review of the circuit court's denial of Mills' Rule 32 petition. (Vol. 21, Tab #R-64 at 76-77; *Mills v. State*, CR-13-0724, Mem. Op. at 76-77 (Ala. Crim. App. Dec. 11, 2015)). The court determined that this claim was insufficiently pleaded under Rule 32.6(b) of the Alabama Rules of Criminal Procedure for two reasons. First, the court found that Mills failed to comply with

Rule 32.6(b)'s pleading requirements by failing to identify an expert by name and the expert's expected testimony. (*Id.*) Second, the court found that Mills made only a bare allegation of prejudice concerning this claim. (*Id.*)

Mills has failed to demonstrate how the ACCA's decision was objectively unreasonable. *See Borden*, 646 F.3d at 812. Mills' claim was nothing but a list of the type of the experts he contended should have been called. Under Alabama law, his claim failed because he "fail[ed] to identify an expert by name or plead the contents of that expert's expected testimony." *Lee*, 44 So. 3d at 1166-67. Mills failed to identify any holding from the Supreme Court that conflicts with the ACCA's proper application of this well-established line of Alabama caselaw concerning the requirement that a Rule 32 petitioner plead the name of an expert and that expert's testimony. Thus, Mills is due no relief.

### 3. Mills' claim that his trial counsel did not adequately prepare the two mitigation witnesses they did present at the penalty phase

Mills alleges that his trial counsel failed to adequately prepare defense and mitigation witnesses Kim Mobley and Sherri Sanchez to testify during the penalty phase of trial. Mills contends that if his counsel had properly prepared Mobley, Mills' sister, her testimony would have included information about her parents' lifelong methamphetamine addictions, Mills' devotion to his mother, Mills'

father's illness, Mills' right hand injury and struggles with methamphetamine addiction, the fact that Mills was a loving and caring brother, uncle, and son, and the fact that Mills had a strong work ethic.

Mills contends that had his trial counsel adequately interviewed Sanchez, Donnie's wife, prior to putting her on the stand, Sanchez would have told the jury how Mills provided emotional and financial support to his father during his illness and how Mills cared for his terminally ill mother.

Mills raised this claim for the first time in his Rule 32 proceedings, and the ACCA rejected it on the merits in its review of the circuit court's denial of Mills' Rule 32 petition. (Vol. 21, Tab #R-64 at 77; *Mills v. State*, CR-13-0724, Mem. Op. at 77 (Ala. Crim. App. Dec. 11, 2015)). Specifically, the court held that Mills' claim was insufficiently pleaded as he only raised a bare allegation of prejudice under *Strickland*. (*Id.*) Further, the court held that the additional evidence that Mills claimed should have been presented was cumulative to what was presented during trial. (*Id.*)

Consistent with the state court's finding, an examination of the claim that Mills presented to the state courts reveals that he failed to allege any new facts within this claim. Instead, Mills merely re-summarized the same allegations he asserted in his claim that trial counsel failed to conduct an adequate mitigation

investigation. For the same reasons as stated in Part IV.D.1.i-vi, *supra* at pages 155-76, Mills has failed to show how the ACCA's decision affirming the summary dismissal of this claim was objectively unreasonable. Thus, he is due no relief.

> **4.    Mills' claim that trial counsel did not investigate mitigating circumstances, prepare adequately, or offer available mitigation at the sentencing hearing before the judge**

Mills also contends that his trial counsel was also ineffective for failing to present additional witnesses and evidence during the sentencing hearing before the trial judge, after the jury had a returned a sentencing verdict recommending a sentence of death. In a capital proceeding, the defendant has the right to present mitigating evidence to the sentencing authority. *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); § 13A-5-45(g), Ala. Code (1975). At the judicial sentencing hearing, Mills' counsel offered no additional evidence and called no additional witnesses. Mills contends that had trial counsel called available witnesses to testify at the sentencing hearing, their testimony would have provided the trial judge with critical mitigating evidence and provided a substantial basis for sentencing Mills to life imprisonment without parole.

Mills raised this claim for the first time in his Rule 32 proceedings, and the ACCA rejected it on the merits in its review of the circuit court's denial of Mills' Rule 32 petition. (Vol. 21, Tab #R-64 at 79-80; *Mills v. State*, CR-13-0724, Mem.

Op. at 79-80 (Ala. Crim. App. Dec. 11, 2015)). The state court held that this claim was insufficiently pleaded, finding that this claim was nothing but a bare allegation. (*Id.* at 80.) In particular, the court found that Mills simply reasserted that his trial counsel should have presented the same evidence during the sentencing hearing before the judge that he contends should have been presented at the penalty phase before the jury. (*Id.*)

Mills presents nothing in his habeas petition to challenge the state court's determination of this claim, and he failed to establish that the decision was objectively unreasonable. Mills cites no relevant Supreme Court case concerning trial counsel's performance, nor does he identify any specific facts in the state-court record to show that the state court decision was unreasonable.

For the same reasons as stated in Part IV.D.1.i-vi, *supra* at pages 155-76, Mills has failed to show how the ACCA's decision affirming the summary dismissal of this claim was objectively unreasonable. Thus, he is due no relief.

### 5. Mills' claim that his trial counsel was ineffective for failing to object to the trial court's sentencing order

Mills contends that his trial counsel was ineffective for failing to object to various aspects of the trial court's sentencing order. First, Mills contends that the trial court improperly considered several "non-statutory aggravating circumstances": (1) the pain of the victims and their inability to "retaliate and

commit a criminal offense against Jamie Mills," (2) the need to "send . . . [a] message," (3) Mills' "lack of remorse," and (4) "the necessity for every person being morally responsible for his or her own actions." (Vol. 1, Tab #3, 134, 136.)

Second, Mills contends that the trial court should have assigned greater weight to the statutory mitigating circumstance that Mills committed the murders while under the influence of an extreme mental or emotional disturbance. Mills reads the trial court's order to have expressly disparaged this factor. (*See* Vol. 1, Tab #3, C. 133 (rejecting idea that "when an individual faces trials and tribulations in their life, that fact should in some way mitigate . . . [a violent crime]").)

Third, Mills contends that the trial court erroneously failed to consider the non-statutory mitigating circumstance that Mills had a possibility of moral and spiritual rehabilitation.

Mills raised this claim for the first time in his Rule 32 proceedings, and the ACCA rejected it on the merits in its review of the circuit court's denial of Mills' Rule 32 petition. (Vol. 21, Tab #R-64 at 80-81; *Mills v. State*, CR-13-0724, Mem. Op. at 80-81 (Ala. Crim. App. Dec. 11, 2015)). The ACCA held that Mills' claim was insufficiently pleaded, finding that he made only a bare allegation that, had his trial counsel objected, there was a reasonable probability of a different result. (*Id.* at 81.)

Mills has failed to establish that the ACCA's decision was unreasonable or contrary to Supreme Court precedent. Regarding Mills' first challenge to the trial court's order, his reading of it is not correct. The trial court did not consider the pain of the victims, their inability to retaliate against Mills, or Mills' lack of remorse as "non-statutory aggravating circumstances." Instead, these were merely passing comments in an extended section of the order in which the trial judge was discussing why he was giving little weight to the mitigating circumstance that Mills committed the murders while under the influence of an extreme mental or emotional disturbance. (Vol. 1, Tab #3, C. 132-34.) In proper context, the trial court's statement was not made in the process of considering non-statutory aggravating circumstances, and it was a relatively minor point in an otherwise lengthy discussion of a mitigating circumstance.

Mills cites *Espinosa v. Florida*, 505 U.S. 1079 (1992), for the assertion that "[t]his consideration of these non-statutory aggravating circumstances was reversible error." However, *Espinosa*'s holding is that consideration of an "invalid aggravating circumstance" violates the Eighth Amendment. *Id.* at 1081. The Supreme Court defined an aggravating circumstance as "invalid" if "its description is so vague as to leave the sentencer without sufficient guidance for determining the presence or absence of the factor." *Id.* The petitioner in *Espinosa*

argued that the Florida aggravating factor that "the murder . . . was especially wicked, evil, atrocious or cruel" was vague and therefore left the jury with insufficient guidance as to when to find its existence. *Id.* at 1080. Unlike in *Espinosa*, Mills nowhere argues that any of the aggravating factors in his case was vague.

Regarding Mills' second challenge, that the trial court failed to give sufficient weight to the circumstance that he committed the murders while under the influence of an extreme mental or emotional disturbance, Mills fails to point to any Supreme Court holding standing for the proposition that a trial court errs in assigning what weight it thinks is appropriate based on the evidence to a mitigating circumstance. Under Alabama law, "although consideration of all mitigating circumstances is required, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer." *Spencer v. State*, 58 So. 3d 215, 255 (Ala. Crim. App. 2008). Though Mills argues that the trial court's order suggested that it gave this circumstance no consideration at all, the trial court expressly stated, "The court does find this to be a mitigator in this case but assigns little weight to it in comparison to the aggravating circumstances of this offense." (Vol. 1, Tab #3, C. 134.)

Regarding Mills' third challenge, that the trial court failed to consider the possibility of his moral and spiritual rehabilitation, Mills fails to point to any evidence in the record that the trial court affirmatively refused to consider such evidence. Further, to the extent Mills' argument is premised on the fact that the trial court did not specifically list this proposed mitigating evidence in an itemized fashion in its sentencing order, that argument is meritless. *See Ex parte Lewis*, 24 So. 3d 540, 652-53 (Ala. 2009) ("Although the trial court did not list and make findings as to the existence or nonexistence of each nonstatutory mitigating circumstance offered by [the appellant], as noted above, such a listing is not required, and the trial court's not making such findings indicates only that the trial court found the offered evidence not to be mitigating, not that the trial court did not consider this evidence.").

Given the fact that Mills' substantive challenges to the trial court's sentencing order are meritless, Mills' counsel could not have been ineffective in failing to raise these challenges. Mills has failed to show that the ACCA's rejection of this claim was objectively unreasonable. Thus, he is due no relief.

     **6.**    **Mills' claim that his trial counsel failed to object to the trial court's alleged inaccurate instruction on the burden of proof during the penalty phase**

Mills alleges that the trial court was required to instruct the jurors that they did not have to agree unanimously on the existence of any mitigating circumstance before that circumstance or evidence could be considered. Mills also contends that the trial court compounded this alleged error by referring to the jury as a unit—by referring to the jury as "you" or "your" or "the jury"—during the instructions about aggravating and mitigating circumstances, which he says increased the likelihood that the jury interpreted the instructions to require unanimity on any mitigating circumstances. When the trial court did not instruct the jury that they need not be unanimous to find mitigation, Mills' counsel's failure to object, according to Mills, was constitutionally deficient.

Mills also alleges that, pursuant to *Ex parte McNabb*, 887 So. 2d 998, 1006 (Ala. 2004), the trial court was required to instruct the jurors that aggravating circumstances must be found unanimously, and that his counsel's failure to object when the trial court failed to do so also deprived him of constitutionally adequate representation.

 Finally, Mills points to the fact that the trial court instructed the jury that if it found that "the defendant has overcome with the mitigating circumstances, that they outweigh the aggravating circumstances" then its verdict would be life imprisonment without parole.  (R1. 1010.) Mills contends that this instruction led

the jury to believe that it must return a verdict of death if it found that the aggravating and mitigating circumstances were equally balanced, even though, under Alabama law, this scenario dictates a verdict of life imprisonment without parole, citing Ala. Code § 13A-5-46 (1975); *Ex parte Bryant*, 951 So. 2d 724, 730 (Ala. 2002). Mills contends that his trial counsel's failure to object to these alleged errors was deficient.

Mills raised this claim for the first time in his Rule 32 proceedings, and the ACCA rejected it on the merits in its review of the circuit court's denial of Mills' Rule 32 petition. (Vol. 21, Tab #R-64 at 77-79; *Mills v. State*, CR-13-0724, Mem. Op. at 77-79 (Ala. Crim. App. Dec. 11, 2015)). Regarding Mills' first claim premised on counsel's failure to object when the trial court did not instruct the jurors that they need not be unanimous in finding mitigation, the ACCA found that Mills' underlying claims were without merit, stating as follows:

Notably, Mills

> "does not assert that the jury was improperly instructed that it could not consider a mitigating factor unless the entire jury agreed upon its existence; rather, he argues that the circuit court led the jury to believe it had to be unanimous because the circuit court failed to instruct the jury otherwise."

*Wilson v. State*, 142 So. 3d 732, 797 (Ala. Crim. App. 2010). As noted in *Wilson*, a trial court is not "required to affirmatively instruct the jury that it need not be unanimous in finding mitigation." *Id*. at 798.

Rather, "as long as there is no reasonable likelihood or probability that the jurors believed that they were required to agree unanimously on the existence of any particular mitigating circumstances, there is no error in the trial court's instruction on mitigating circumstances."

Furthermore, this Court has rejected the argument that the trial court's use of "you" and "your" to refer to the jury was reasonably likely to require unanimous agreement regarding the existence of mitigating circumstances. *See, e.g., Hall v. State*, 979 So. 2d 125, 167 (Ala. Crim. App. 2007) ("'Use of the word "you," without more, in relationship to a jury charge on mitigating evidence does not imply that the finding of a mitigating circumstance must be unanimous.'") (quoting *Hall v. State*, 820 So. 2d 144, 146 (Ala. Crim. App. 1999)).

Summary dismissal of this claim was proper.

(*Id.* at 78.)

Contrary to Mills' assertion, the ACCA's decision on this point is not contrary to *Mills v. Maryland*, 486 U.S. 367, 384 (1987). In *Wilson*, cited by the ACCA above, the ACCA said: "The appellate courts of this state have consistently held, since the United States Supreme Court's decision in *Mills* [*v. Maryland*, 486 U.S. 367 (1988)], that as long as there is no 'reasonable likelihood or probability that the jurors believed that they were required to agree unanimously on the existence of any particular mitigating circumstances,' there is no error in the trial court's instruction on mitigating circumstances." 142 So. 3d at 797-98.

Further, Mills' claim that the trial court failed to properly instruct the jury that it must be unanimous in finding aggravating circumstances was meritless

because, as noted by the ACCA, the jury had already found the existence of two aggravating circumstances beyond a reasonable doubt by virtue of the guilty verdict and thus, Mills was already properly eligible for the death penalty.

Finally, Mills' claim that the trial court's instructions misled the jury on whether a death sentence was proper if the aggravating and mitigating circumstances were of equal weight is facially meritless. As noted by the ACCA, on direct appeal the Alabama Supreme Court rejected this precise substantive claim. The Alabama Supreme Court's analysis on direct appeal was as follows:

> Finally, Mills contends that the trial court committed plain error in instructing the jury as to aggravating circumstances and mitigating circumstances. Mills first cites the following instruction from the trial court:
>
>> "Now, ladies and gentlemen of the jury, if after a full and fair consideration of all the evidence in this case and all reasonable inferences therefrom you are convinced that the aggravating circumstances of capital murder during the course of robbery in the first degree and the capital murder of two or more people and any other of the aggravating circumstances which you determine the State of Alabama has proved to you beyond a reasonable doubt in today's proceeding, if those outweigh the mitigating circumstances which have been presented by the defense, your verdict would be, 'We, the jury, recommend the defendant Jamie Mills be sentenced to death.' . . . Or after a full and fair consideration of the evidence in this case and all reasonable inferences therefrom you are convinced that the defendant has overcome with the mitigating circumstances, that they outweigh the aggravating circumstances proven by the State beyond a

> reasonable doubt, then the form of your verdict would be, 'We, the jury, recommend the defendant Jamie Ray Mills be punished by life imprisonment without parole. The vote is as follows,' and there's a blank for life without parole and a blank for death, and it must be signed by the foreperson and dated today's date."

(Emphasis added.)

Mills, based on the language emphasized above, argues that this instruction constitutes plain error under *Ex parte Bryant*, 951 So. 2d 724 (Ala. 2002). The State, citing *Ex parte McNabb*, 887 So. 2d 998 (Ala. 2004), and *Ex parte Walker*, 972 So. 2d 737 (Ala. 2007), argues that *Bryant* is distinguishable and that no plain error occurred. We agree with the State.

In *Bryant*, the trial court's instructions to the jury suggested that the jury could recommend the death sentence if the mitigating circumstances did not outweigh the aggravating circumstances. In other words, the instructions suggested that the jury could recommend the death sentence if the aggravating circumstances and the mitigating circumstances were of equal weight. 951 So. 2d at 730. Even more significant to the plain-error analysis in *Bryant*, however, was that the trial court's instructions invited the jury to recommend a sentence of death without finding the existence of any aggravating circumstance. 951 So.2d at 730.

In *McNabb*, the sentencing instructions included the following:

> "Now, ladies and gentlemen, if, after a full and fair consideration of all of the evidence in the case, you are convinced beyond a reasonable doubt that at least one aggravating circumstance does exist and you are convinced that the aggravating circumstance outweighs the mitigating circumstances, then your verdict would be: 'We, the jury, recommend that the defendant be punished by death, and the vote is as follows. . . .' However, if after a full and fair consideration of all of the

evidence in the case, you determine that the mitigating circumstances outweigh any aggravating circumstance or circumstances that exist, or you are not convinced beyond a reasonable doubt that at least one aggravating circumstance does exist, your verdict should be to recommend the punishment of life imprisonment without parole. . . . "

887 So. 2d at 1001 (emphasis added in *McNabb*). This Court in *McNabb* concluded that these instructions did not constitute plain error because the trial court had not taken the additional step of inviting the jury to recommend a death sentence without finding the existence of any aggravating circumstance. Specifically, this Court stated in *McNabb*:

> "The charge in this case was not infected with the peculiar error present in [*Ex parte*] *Bryant*[, 951 So. 2d 724 (Ala. 2002) ], that is, the jury in this case was not invited to recommend a sentence of death without finding any aggravating circumstance. It was that invitation in *Bryant* that caused the error in that case to rise to the level of plain error, rather than error reversible only by a proper objection. Thus, in this case, although the court did not specifically instruct the jury what to do if it found the mitigating and aggravating circumstances equally balanced, we cannot conclude, considering the charge in its entirety, that the error 'seriously affect[ed] the fairness, integrity or public reputation of [these] judicial proceedings,' *Ex parte Davis*, 718 So. 2d [1166,] at 1173–74 [ (Ala. 1998) ], so as to require a reversal of the sentence."

887 So. 2d at 1004.

Similarly, in *Walker*, which involved instructions regarding the balancing of the aggravating circumstances and the mitigating circumstances that were identical to the instructions in *McNabb*, this Court held that no plain error occurred in the sentencing instructions

because "the trial court did not invite the jury in Walker's case to recommend a sentence of death without finding any aggravating circumstance." 972 So. 2d at 743.

In Mills's case, the trial court's instructions, taken as a whole, clearly informed the jury that the only way it could recommend a sentence of death was if the jury determined that aggravating circumstances existed and that those aggravating circumstances outweighed the mitigating circumstances. The trial court instructed the jury initially that "the law also provides that the punishment which should be imposed upon the defendant depends on whether any aggravating circumstances exist beyond a reasonable doubt, and if so, whether the aggravating circumstances outweigh any mitigating circumstances." (Emphasis added.) Even in the above-quoted portion of the instructions on which Mills relies for his argument, the trial court stated:

> "[I]f after a full and fair consideration of all the evidence in this case and all reasonable inferences therefrom you are convinced that the aggravating circumstances . . . which you determine the State of Alabama has proved to you beyond a reasonable doubt in today's proceeding, if those outweigh the mitigating circumstances which have been presented by the defense, your verdict would be, 'We, the jury, recommend the defendant Jamie Mills be sentenced to death.' "

(Emphasis added.) Accordingly, we hold that there was no plain error in the trial court's instructions regarding the weighing of the aggravating circumstances and the mitigating circumstances.

*Ex parte* Mills, 62 So. 3d at 599-601. The ACCA held that Mills has not pleaded

facts indicating that his case is "one of the rare instances in which the plain error

standard and the prejudice standard of *Strickland* would result in different

outcomes." Mills has failed to demonstrate how the ACCA's rejection of his claim was objectively unreasonable. Thus, he is due no relief.

### E.   Mills' claim that he was deprived of his right to a fair trial when jurors failed to answer questions accurately during voir dire

Mills alleges that three jurors failed to answer voir dire questions accurately which deprived him of the right to a fair trial. Specifically, Mills alleges that 1) L.H. failed to disclose that she had been the victim of a crime, namely a fraudulent use of a debit card, and that her son had been arrested for a crime, misdemeanor domestic violence against his wife, 2) V.N. failed to disclose that V.N. knew Guin Police Chief Bryan McCraw and Officer Larry Webb who were police officers and witnesses during trial, and 3) R.F. failed to disclose that he knew Mills' father and that R.F. had been the victim of a crime when an armed individual assaulted him on his property. Mills relies upon *Irvin*, 366 U.S. at 722 (the Sixth Amendment guarantees a criminal defendant a fair trial by a panel of impartial, indifferent jurors), and *McDonough Power Equipment v. Greenwood*, 464 U.S. 548, 556 (1984) (this right is violated and a new trial is required when a juror deliberately deceives the court about a matter which, if fully explored, would constitute a valid basis for a challenge for cause against that juror).       Mills raised this claim for the first time in his Rule 32 proceedings, and the circuit court rejected the claim in a detailed order after conducting an evidentiary hearing. (C. 422-29.) The ACCA

then affirmed the circuit court's decision on the merits. (Vol. 21, Tab #R-64 at 83-90; *Mills v. State*, CR-13-0724, Mem. Op. at 83-90 (Ala. Crim. App. Dec. 11, 2015)). The ACCA first noted the governing law, from *Ex parte Dobyne*, 805 So. 2d 763 (Ala. 2001), was that there are five factors that have been used to determine whether probable prejudice existed as a result of a juror's failure to disclose information: "(1) the temporal remoteness of the matter inquired about; (2) the ambiguity of the question propounded; (3) the prospective juror's inadvertence or willfulness in falsifying or failing to answer; (4) the failure of the juror to recollect; and (5) the materiality of the matter inquired about." (*Id.* at 84.) The ACCA then noted that Mills failed to offer any evidence that he would have struck the jurors in question had they responded in the manner he contends they should have. (*Id.* at 84.) The ACCA then determined that the record supported the denial of relief, and that the circuit court did not abuse its discretion in denying Mills' claims of juror misconduct concerning V.B., R.F., and V.N. (*Id.* at 84-90.)

The record supports the circuit court and the ACCA's findings.

### 1.    Juror L.H.

Regarding juror L.H., the record shows that L.H. failed to answer either affirmatively or negatively to a question on her questionnaire relating to whether a family member had ever been charged or convicted of a crime. (*Id.* at 427-28; Rule

32 Supp. C. 115.) The circuit court noted that many of the prospective jurors submitted incomplete questionnaires; in some instances failing to complete entire sections. (*Id.* at 428.) At the evidentiary hearing, L.H. testified that she did not even know whether her son had been convicted of the misdemeanor and only heard about the incident from her son. (Vol. 17, Tab #R-59, R. 50.) L.H. further testified that she simply "did not think about" the incident with her son at the time of Mills' trial. (*Id.* at 61.) Thus, the circuit court properly concluded that L.H.'s failure to answer the questionnaire was "nothing but oversight" and that L.H. attempted to answer all questions "truthfully and forthrightly." (Vol. 16, Tab #R-55, C. 428.)

The circuit court also found that the substance of the undisclosed matter was not material. (*Id.* at 428-29.) L.H. testified that her son was arrested in 2001 for a misdemeanor domestic violence charge. (*Id.* at 428.) But L.H. did not find out about the charge until her son told her a year later and L.H. did not know if he had even been convicted. (*Id.*)

The circuit court further found that Mills failed to prove he might have been prejudiced by L.H.'s failure to disclose in her questionnaire that she and her husband had been the victim of a debit card fraud after returning from a cruise in 2006 because the nondisclosure was not willful and involved matters that were not

material. (*Id.* at 429.) L.H. testified that "I did not even think about that at the time that I was filling out the questionnaire. It wasn't because I neglected to–I mean refused to. It was because I didn't even think about it." (*Id.*, quoting Vol. 17, Tab #R-59, R. 61.) L.H. also testified that the debit card fraud was not fresh on her mind when she filled out her questionnaire as this incident "was totally different" than the crime for which Mills was charged. (*Id.* at 53, 54.)

The circuit court's findings were not unreasonable because the matters inquired about were minor and not material to Mills' trial or voir dire. Notably, at least two other jurors disclosed that either themselves or their family members had been victims of crime (including juror J.M., whose half-sister was murdered) and were not struck. (Vol. 18, Tab #R-41, C. 42-46, 62-66.) Likewise, at least two other jurors were not struck who disclosed that they had family members who were charged with crimes. (*Id.* at 72-75; 52-55.) Thus, Mills simply cannot prove that L.H.'s failure to disclose these relatively minor facts had an obvious tendency of bias or would have prompted a challenge where similarly situated jurors were not struck.

### 2.    Juror V.N.

Regarding juror V.N., the circuit court properly denied Mills' claim that V.N. committed misconduct by failing to disclose in voir dire that he knew

McCraw and Webb, who testified during trial. The circuit court found that the specific question posed by the prosecutor during voir dire was whether any juror knew McCraw and Webb "better than just in passing." (Vol. 16, Tab #R-55, C. 426.) The circuit court then noted V.N.'s testimony that he was not close friends with McCraw and Webb, but knew them only in the professional context, limited to an occasional Friday night football game. (*Id.* at 427.) Specifically, the circuit court noted that V.N., who was the principal of the local high school, testified that McCraw would occasionally escort him to the bank at halftime to deposit the gate proceeds and that Webb may have provided the same service, but V.N. was not sure. Given this testimony, the circuit court found that "in no way" was Mills prejudiced and that the prosecutor's question was at best ambiguous and that V.N.'s silence "hardly constitutes anything but an honest response." (*Id.* at 427.)

The circuit court's findings were not unreasonable. The record of voir dire reveals that, although the prosecutor began the questioning of V.N.'s panel with a broad definition of whether jurors "knew" people associated with the case, because of the large response from the panel of jurors who knew McCraw and Webb, the prosecutor narrowed his question concerning these two officers. (Vol. 6, Tab #R-12, R. 281-87.) Specifically, after first asking jurors to raise their hands in response to the question "how many folks know Bryan," the prosecutor refined his question

and asked the following: How many folks of the ones—since he's chief, everybody knows who the chief is usually—would count him as a personal friend—or let me rephrase that. It's been a long day. How many folks would say they know Bryan better than just in passing? (*Id*. at 287.) The prosecutor repeated the same narrow questioning concerning Webb by asking "Again, the folks that know him, who would say they know him better than just in passing; you see him in a car and say, 'That's Larry Webb?'" (*Id*.) But as V.N. explained, he was not personal friends with either McCraw or Webb and knew them only in the professional context. (Vol. 17, Tab #R-59, R. 95.) In fact, Mills failed to prove that V.N.'s knowledge of McCraw and Webb was any different than the large number of jurors who indicated during voir dire that they generally knew these officers. Thus, the circuit court's finding that V.N. gave an honest response was correct. And given that the prosecutor initially asked broad-based questions concerning whether jurors knew certain people, but then narrowed his questioning as to whether they knew McCraw and Webb "better than just in passing" (Vol. 6, Tab #R-12, R. 287), the circuit court's finding that the prosecutor's questioning on this subject was "ambiguous" was equally correct. (Vol. 16, Tab #R-55, C. 427.)

In addition to the ambiguity of the question, Mills also failed to establish that the failure to respond by V.N. was willful or that the matter inquired about was

material. Indeed, the record does not indicate that defense counsel spent any significant time following up with the many jurors who indicated that they knew of McCraw or Webb. Defense counsel's actions, or lack thereof, demonstrated that knowing either McCraw or Webb was not material. Notably, defense counsel did not strike at least one juror, W.B. who indicated in voir dire that he knew both Webb and McCraw. (Vol. 6, Tab #R-12, R. 215.)

Finally, Mills failed to present either testimony from trial counsel that V.N. would have been struck had this additional information been known, or evidence that suggested the fact that V.N., like many other Marion County residents, knew police officers like McCraw and Webb, had any obvious tendency to bias V.N.

### 3.    Juror R.F.

Finally, regarding juror R.F., the circuit court properly denied Mills' claim that R.F. committed misconduct by failing to disclose in his questionnaire that he had been the victim of an assault. The circuit court found that in 1979 or 1980, R.F. got into a fight with a drunk individual. (Vol. 16, Tab #R-55, C. 425.) The circuit court noted R.F.'s testimony that the man initially slapped him, but that R.F. then "whipped him." (*Id.*) Based on this testimony, the circuit court found that R.F. did not consider himself to be a victim and that any failure to recall this incident was due to the fact that the incident had occurred over thirty years before trial. (*Id.* at

425-426.) Thus, the circuit court concluded that Mills failed to prove probable prejudice. (*Id.* at 429.)

The circuit court's findings are correct. Initially, Mills failed to establish that R.F. was untruthful in failing to respond affirmatively that he had been the victim of a crime. R.F. testified that he had never been a crime victim and "[n]ever called the police in my life." (Vol. 17, Tab #R-59, R. 76.) In the very least, R.F.'s expressed belief about the circumstances of this altercation, as well as his testimony that he tried to answer all questions during voir dire honestly (*id.* at 77), confirm the circuit court's conclusion that any failure to disclose this information was inadvertent. Moreover, Mills failed to establish that he might have been prejudiced. This temporally remote incident occurred in 1979 or 1980, nearly thirty years before Mills' trial. And as the circuit court noted, the remoteness of this event contributed to R.F's failure to recollect this event during voir dire.

Finally, this incident was not material to any issue in Mills' trial. As the circuit court found, R.F's incident involved an old-fashioned "fisticuffs" between two men. (Vol. 16, Tab #R-55, C. 425.) That incident bore no resemblance to the crime for which Mills was charged in which Mills brutally beat to death an elderly couple in their home with a machete, tire tool, and ball-peen hammer.

In sum, the Alabama state courts properly rejected this claim and Mills has failed to establish how those decisions were objectively unreasonable. Thus, he is due no relief.

**F.     Mills' claim that the State withheld evidence in violation of *Brady*, *Giglio*, and *Napue***

Mills asserts that JoAnn received an undisclosed plea deal in return for her testimony against him at trial and that the State did not provide this information to the defense, despite Mills' trial counsel's request for such information.

Mills also contends that JoAnn offered perjured testimony at his trial when she testified that she was merely a bystander during the murders, or, at most, participated in an after-the-fact coverup. Mills contends that this testimony was perjured because it is not sufficient to convict her as a principal to murder under Alabama law, *see* Ala. Code § 13A-6-2 (1975); *id.* § 13A-2-23 (complicity statute); *cf. id.* § 13A-10-43 (hindering prosecution in the first degree), yet after Mills' trial, on September 24, 2007, JoAnn pled guilty to one count of murder under Ala. Code § 13A-6-2 (1975) and was sentenced to life with the possibility of parole. Mills contends that during the plea colloquy, JoAnn admitted, under oath, that she committed the elements of murder, but that that statement was irreconcilable with her testimony at Mills' trial. He further contends that the State knew that she was offering perjured testimony yet failed to disclose this.

Mills contends that the State's suppression of this evidence violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution as espoused in *Brady*, 373 U.S. at 87 ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."); *Giglio*, 405 U.S. at 154 (evidence favorable to the defense includes evidence that would affect the jury's determination of the credibility of the witnesses); and *Napue*, 360 U.S. at 269 (holding that "conviction obtained through use of false evidence, known to be such by representatives of the State" violates Fourteenth Amendment).

This claim is procedurally defaulted from federal habeas review because it was procedurally defaulted in state court because of Mills' failure to comply with state procedural rules. Specifically, the ACCA held that the circuit court properly held that this claim was procedurally barred under Rule 32.2(a)(3) and (a)(5) because it could have been raised at trial or on appeal. (Vol. 21, Tab #R-64 at 90-92; *Mills v. State*, CR-13-0724, Mem. Op. at 90-92 (Ala. Crim. App. Dec. 11, 2015)).

The state court's finding was correct. Rule 32.2(a) of the Alabama Rules of Criminal Procedure provides that "[a] petitioner will not be given relief under this

rule based upon any ground" that "was raised or addressed at trial" (Rule 32.2(a)(2)), "could have been but was not raised at trial," (Rule 32.2(a)(3)), "was raised or addressed on appeal," (Rule 32.2(a)(4)), or "could have been but was not raised on appeal." (Rule 32.2(a)(5)).

Regarding Mills' contention that JoAnn received an undisclosed plea deal in exchange for her testimony, Mills' trial counsel did in fact raise this argument in his motion for a new trial, which was denied by the trial court. (Vol. 1, Tab #R-2, C. 120.) Yet Mills did not appeal the denial of this claim to the ACCA on direct appeal. Thus, the ACCA was correct in finding this claim defaulted because Mills could have raised this claim on appeal, but he did not.

Mills argues that he can establish cause for the default: his trial counsel's failure to provide any evidence in support of the motion for a new trial. Mills is correct that ineffective assistance of counsel can constitute cause. *See McCleskey*, 499 U.S. at 494. However, this Court rejected this specific ineffective assistance of counsel claim in Part IV.C.14, *supra*, at pages 152-55, because Mills still fails to allege what specific evidence or arguments his trial counsel could have presented during the motion for new trial to show that JoAnn lied on the stand and was in fact testifying against Mills in exchange for a lesser sentence. In other words, he offers no evidence, other than pure speculation, to suggest that an undisclosed *Brady*

violation actually occurred in this case. As such, this part of this claim is procedurally defaulted.

Regarding Mills' other contention that JoAnn offered perjured testimony at trial by stating that she was merely a bystander during the murders, the ACCA was also correct in noting that it could have been, but was not, raised at trial or on direct appeal, so it was barred by Ala. R. Crim. P. 32.2(a)(3) and (a)(5). As Mills acknowledges, JoAnn pled guilty to murder on September 24, 2007, before Mills even filed a motion for new trial (on October 2, 2007) or a direct appeal. (Rule 32 C. 93; C. 120-121.) Thus, on the face of the record, this claim certainly could have been raised at trial or on appeal. Alternatively, Mills has never pleaded any specific facts that, if true, would show that JoAnn's trial testimony actually constituted perjury. Accordingly, if Mills is arguing that his default on this claim is excused by his trial counsel's failure to raise this specific claim in his motion for new trial, that ineffective assistance of counsel claim would be subject to rejection for the same reason as noted above.

### G.    Mills' claim that his sentence is unconstitutional

Mills argues that his death sentence is unconstitutional because (1) the jury did not unanimously agree that the aggravating circumstances, if any, outweighed the mitigating circumstances, in violation of *Ring v. Arizona*, 536 U.S. 584 (2002);

(2) the jury was misinformed about the significance of its role in the sentencing process, in violation of *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985), and (3) double counting the aggravating circumstances failed to narrow the class of cases eligible for the death penalty, resulting in the arbitrary imposition of the death penalty, *see, e.g., Gregg v. Georgia*, 428 U.S. 153 (1976); *Zant v. Stephens*, 462 U.S. 862, 877 (1983), and subjected Mills to two punishments as a result of being convicted of a single criminal charge. *See North Carolina v. Pearce*, 395 U.S. 711, 717 (1969). (Vol. 15, Tab #R-53, C. 94-98, ¶¶ 183-90.)

This claim is procedurally defaulted from federal habeas review because it was procedurally defaulted in state court due to Mills' failure to comply with state procedural rules. Specifically, the ACCA held that the circuit court properly dismissed this claim as procedurally barred under Rule 32.2 because it could have been raised at trial or on appeal, but it was not. (Vol. 21, Tab #R-64 at 90-92; *Mills v. State*, CR-13-0724, Mem. Op. at 90-92 (Ala. Crim. App. Dec. 11, 2015).

Mills makes no argument to the contrary suggesting that he could not have raised this claim on appeal. Nor does he argue that there is any cause to excuse his default. Thus, because the last state court to review his claim held it was procedurally barred under state procedural rules, he is procedurally defaulted from habeas review.

Alternatively, Mills' claim is meritless. The Eleventh Circuit has rejected the argument that Alabama's capital murder statute violates *Ring*. *Lee*, 726 F.3d at 1197-98. Like Mills, the defendant in *Lee* was convicted of capital murder during the course of a robbery. *Id.* at 1197. The Eleventh Circuit held that "[t]he holding of *Ring* is narrow: the Sixth Amendment's guarantee of jury trials requires that the finding of an aggravating circumstance that is necessary to imposition of the death penalty must be found by a jury. That occurred in Lee's case by virtue of the jury's capital robbery-murder verdict." *Id.* at 1198. Thus, Mills' *Ring* claim is meritless.

Finally, the Alabama Supreme Court has recently reaffirmed that Alabama's capital sentencing system is constitutional and does not violate the Sixth Amendment in light of *Ring* and *Hurst v. Florida*. *Ex parte Bohannon*, 222 So. 3d 525, 532 (Ala. 2016) ("Our reading of *Apprendi*, *Ring*, and *Hurst* leads us to the conclusion that Alabama's capital-sentencing scheme is consistent with the Sixth Amendment.").

In his reply brief, Mills acknowledges that the United States Supreme Court has not yet found, in addressing Alabama's capital sentencing scheme, that his arguments are meritorious or retroactive. Accordingly, Mills is entitled to no relief on this claim.

## V.    CONCLUSION

For all of the reasons set forth herein, Mills' petition for writ of habeas corpus is due to be dismissed, or in the alternative denied.

Rule 11(a) of the Rules Governing Section 2254 Cases requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. This Court may issue a certificate of appealability "only if the applicant has a made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, a "petitioner must demonstrate that reasonable jurist would find the district court's assessment of the constitutional claims debatable and wrong," *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604 (2000), or that "the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336, 123 S. Ct. 1029, 1039 (2003) (internal quotations omitted). This Court finds Mills' claims do not satisfy either standard. Accordingly, a motion for a certificate of appealability is due to be denied.

A separate order in accordance with this opinion will be issued.

**DONE** and **ORDERED** on November 30, 2020.

L. Scott Coogler
United States District Judge

160704